UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL BATANJANY, CORY SOLOMON, PATRICK TRAVERS, and JORDAN BRODSKY | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : Case No._____ |
| | : |
| CLEAR STREET MANAGEMENT LLC, CLEAR STREET DERIVATIVES LLC, CLEAR HOLDINGS LLC, CLEAR STREET LLC, CLEAR STREET HOLDINGS LLC, CLEAR STREET GROUP INC., URIEL EPHRAIM COHEN, and KENNETH ARI SICKLICK, | : |
| | : |
| Defendants. | : |

## VERIFIED COMPLAINT

Plaintiffs Michael Batanjany ("Batanjany"), Patrick Travers ("Travers"), Cory Solomon ("Solomon"), and Jordan Brodsky ("Brodsky") (collectively, "Plaintiffs" or "Individuals"), for their Verified Complaint against Defendants Clear Street Management LLC ("CSM"), Clear Street Derivatives LLC ("CSD"), Clear Holdings LLC ("CH"), Clear Street LLC ("CS"), Clear Street Group Holdings LLC ("CSH"), Clear Street Group, Inc. ("CSG") (CSM, CSD, CH, CS, CSH, and CSG are, collectively, the "Clear Street Defendants" or "Clear Street"), Uriel Ephraim Cohen ("Cohen"), and Kenneth Ari Sicklick ("Sicklick") (all collectively, "Defendants"), allege and state as follows:

## PRELIMINARY STATEMENT

1.      Today is the day that well-respected Clear Street executives have been forced to overcome their fear of unlawful retribution from its tyrannical leader, Defendant Uriel Cohen (and the friends and family members he placed in positions of power throughout to give it the air of

legitimacy), to protect their rights under federal and state law and their hard-earned professional reputations.  These executives no longer have a choice in the face of Defendants' actual and threatened onslaught of retaliatory actions against them – all because they had the good sense to resign after their stated concerns about Cohen's and Clear Street's unlawful and unethical conduct, shared by so many others at Clear Street who are too afraid to speak.

2.      Plaintiffs are registered broker-dealers who recently resigned from their positions with Clear Street for countless good reasons, chief among them being:

    a.   toxic, bullying culture that Defendants Uriel Cohen and Kenneth Sicklick model and impose from the top down;

    c.   loose affiliation with the truth and ethical norms;

    d.   lack of legitimate corporate controls;

    e.   far-below-market compensation (even for executives who, like Plaintiffs, exhibited stellar performance);

    f.   consistent breaches of promises and contractual obligations to employees, clients, and vendors;

    e.   rampant, unchecked regulatory violations;

    f.   constant unlawful pressure on employees to disclose confidential client information to Defendant Cohen's family office, hedge fund, and other non-Clear Street affiliated business; and

    f.   Plaintiffs' and other executives' reported concerns falling on deaf ears, or worse, being met with threats of financial or reputational ruin, retaliatory adverse employment actions including baseless "for cause" terminations.

3.      Plaintiffs accepted offers of employment from a truly professional, reputable,

exciting new company.  With unblemished professional records, Plaintiffs thought they could simply resign, comply with their restrictive covenants, and move on to greener pastures.  But Defendant Cohen, Clear Street's Chairman, for no sane or lawful reason, decided instead to rain his special brand of terror down upon them and attempt to ruin their lives.

4.      In the three weeks since Plaintiffs resigned from Clear Street, Defendants have engaged in a litany of *admittedly* malicious, retaliatory actions against them, including using threats, duress, and coercion tactics to try to force them to relinquish their rights and dramatically expand their restrictive covenants.

5.      When that failed, Defendants claimed that Plaintiffs were purportedly terminated "for cause" (while admitting they had no legitimate basis to do so), forfeited all their vested interests through Clear Streets' Restricted Stock Unit and Stock Option Plans (yet also offered to buy them out at a fraction of their fair market value), and threatened to use all resources at their disposal, including private investigators and aggressive lawyers, to keep them embroiled in litigation and prevent them from working anywhere for years.

6.      Because Plaintiffs are registered broker-dealers, Clear Street is supposed to file Form U5s (Uniform Termination Notice For Securities Industry Registration) with FINRA by October 15, 2025, identifying the reason for their departure, and answering dozens of "yes" or "no" questions about any wrongful conduct by, investigations into, or complaints/proceedings against Plaintiffs.

7.      Form U5s are also used by the SEC, FINRA, states, future employers, and potential investors to identify individuals who could be violating industry, state, or federal rules, regulations, or laws.

8.      In light of Plaintiffs' complaints to supervisors about Defendants' unlawful

conduct, and Defendants' threats and retaliatory actions against Plaintiffs and other whistleblowers, Plaintiffs reasonably believed that **by October 15**, Defendants would file U5 forms with FINRA falsely claiming that Plaintiffs were "discharged" for misconduct, are the subject of investigations, complaints, or proceedings, or other intentionally malicious, knowingly baseless, and defamatory accusations. That belief has been proven more than correct – Defendants have elected to file the U5s days early, falsely claiming that Defendants breached the restrictive covenants in their Employment Agreements, apparently in response to Plaintiffs' good faith notice that they were seeking a TRO to enjoin that very filing. The execution pages of the now-filed U5s confirm that they were prepared and filed on the morning of October 10, 2025, and not at any earlier date. In addition, all Plaintiffs received a notification from FINRA at the same time (9:27 AM) and emails from Clear Street at nearly the same time confirming the filing of the forms, further evidencing Defendants' calculated and coordinated wrongdoing against Plaintiffs, and disregard for the process and for the Court's prospective review.

9.    Because Defendants' FINRA U5 filings would become part of Plaintiffs' permanent professional record, and are viewed by regulatory agencies, potential employers, and investors, they would cause immediate and irreparable harm to Plaintiffs' licenses, employment prospects, and professional reputations, leaving Plaintiffs without any adequate remedy at law.

10.    Plaintiffs therefore commenced this emergency action, seeking a temporary restraining order and preliminary injunction against Defendants to maintain the *status quo*, and asserting claims against Defendants for, among other things (1) violations of New York Labor Law §§ 740(2) and (8) (the "NY whistleblower statute"); (2) conversion; (3) defamation *per se*; and (4) tortious interference with business relationships.

11.    Plaintiffs have a substantial likelihood of success on each of these claims, especially

because – even though Defendants monitored and collected Plaintiffs' communications throughout their employment – Defendants have repeatedly admitted that they have *absolutely no* facts or evidence to support any of their actions or accusations, but rather have a personal vendetta and intend to punish and maximize the harm to Plaintiffs to deter anyone else Clear Street from challenging its illegal conduct or trying to leave.

12.    There is a strong federal and state public policy in favor of protecting people brave enough to report actual or suspected wrongdoing, and it is in the general public's interest to protect people like Plaintiffs from retaliatory actions taken by unscrupulous, powerful individuals and companies with enough resources to cause significant harm through their unlawful conduct if it is left unreported and unchecked.

13.    The public also has a clear interest in ensuring that companies comply with federal and state laws, rules, and regulations governing their industries designed to protect it, and ensuring that employers comply with laws protecting employees' rights to benefits, fair treatment, and their bargained-for contractual rights.

**JURISDICTION AND VENUE**

14.    This Court has exclusive subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because Plaintiffs assert claims under Sections 502 and 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132 and 1140; *see* Section 502(e) of ERISA, 29 U.S.C. § 1132(e) and under Section 1166 of the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1166.  This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(3), because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.  Supplemental jurisdiction is asserted over Plaintiffs' state law claims pursuant to

28 U.S.C. § 1367.

15.     Defendants are subject to general personal jurisdiction because they are doing business and/or reside in New York.  Defendants are also subject to personal jurisdiction in this court because they formed and breached relevant contracts with Plaintiffs and engaged in tortious conduct in and causing harm to Plaintiffs, in New York; and jurisdiction over Defendants is otherwise proper before this Court.

16.     Venue is proper in this Court because a substantial part of the events giving rise to the claims occurred in New York, and venue is otherwise proper under 28 U.S.C. § 1391.

## THE PARTIES

17.     Plaintiff Michael Batanjany is a citizen of New Jersey.

18.     Plaintiff Patrick Travers is a citizen of New Jersey.

19.     Plaintiff Cory Solomon is a citizen of Connecticut.

20.     Plaintiff Jordan Brodsky is a citizen of New Jersey.

21.     Defendant Clear Street Management LLC ("CSM") is a Delaware limited liability company, having its principal place of business at 55 Broadway, Suite 2102, New York, New York 10006.  On information and belief, CSM is controlled and majority owned by Defendant Cohen indirectly through Defendants CSH and CSG.  CSM is also the Plan Administrator and Sponsor of the group plan under which Plaintiffs and all CSM employees had their health insurance.

22.     Defendant Clear Street Derivatives LLC ("CSD") is a Delaware limited liability company, having its principal place of business at 4 World Trade Center, 150 Greenwich Street, Floor 45, New York, New York 10007.  On information and belief, CSD is controlled and majority owned by Defendant Cohen indirectly through Defendants CH and CSG.

23.     Defendant Clear Holdings LLC ("CH") is a Delaware limited liability company,

having its principal place of business at 4 World Trade Center, 150 Greenwich Street, Floor 45, New York, New York 10007.  On information and belief, Defendant CH is the sole member and owner of Defendant CSD, and is controlled and majority owned by Defendant Cohen indirectly through its parent company, Defendant CSG.

24.     Defendant Clear Street LLC ("CS") is a Delaware limited liability company, having its principal place of business at 4 World Trade Center, 150 Greenwich Street, Floor 45, New York, New York 10007.  On information and belief, CS is controlled and majority owned by Defendant Cohen indirectly through Defendants CSH and CSG.

25.     Defendant Clear Street Holdings LLC ("CSH") is a Delaware limited liability company, having its principal place of business at 4 World Trade Center, 150 Greenwich Street, Floor 45, New York, New York 10007. On information and belief, Defendant CSH is the sole member and owner of Defendants CSM, CSD, CS, and several other businesses that engage in related party transactions with these entities.  On information and belief, Defendant CSH is controlled and majority owned by Defendant Cohen indirectly through its parent company, Defendant CSG.

26.     Defendant Clear Street Group Inc. ("CSG) is a Delaware corporation, having its principal place of business at 4 World Trade Center, 150 Greenwich Street, Floor 45, New York, New York 10007. On information and belief, Defendant CSG is the indirect owner of Defendants CSM, CSD, CH, CS, CSH and several other companies that engage in related party transactions with those defendants. On information and belief, Defendant CSG is controlled and majority owned by Defendant Cohen.

27.     Defendants CSM, CSD, CH, CS, CSH, and CSG are, collectively, the "Clear Street Defendants" or "Clear Street." Defendant Cohen controls the Clear Street Defendants, and they

operate together as a conglomerate collectively doing business as "Clear Street."

28.    Defendant Uriel (Uri) Ephraim Cohen ("Cohen") is a citizen of New York and, on information and belief, the Chairman of the Board and Co-CEO of the Clear Street Defendants.

29.    Defendant Kenneth Ari Sicklick ("Sicklick") is a citizen of New York, and, on information and belief, a Member of the Board of Directors and Chief Legal Officer of the Clear Street Defendants.

## RELEVANT NON-PARTIES

30.    White Bay Group ("White Bay") is Defendant Cohen's private family office, headquartered and sharing offices with the Clear Street Defendants in New York, New York. White Bay invests in trading companies, broker dealers, and hedge funds.

31.    Alpine Global Management, LLC ("Alpine Global") (CIK: 1581655) is Defendant Cohen's proprietary investment firm headquartered in New York, New York.

32.    Edward Tilly is the former President and current Co-CEO of Clear Street.

33.    Andrew Volz is Clear Street's Chief Commercial Officer.

34.    Chris Pento is Co-Founder and a Member of the Board of Directors of Clear Street. He also used to be Clear Street's CEO, but he left that position to become an executive and partner at White Bay, Defendant Cohen's family office.

35.    Christy Moccia is Clear Street's Chief Compliance Officer and AML Compliance Officer.

36.    Prysm Capital, LLC ("Prysm") is a substantial investor and minority owner of the Clear Street Defendants. Prysm's Co-Founders, Jay Park and Matt Roberts, are both members of Clear Street's Board of Directors.

37.    William Frank is a former Staff Software Engineer at Clear Street.

8

## STATEMENT OF FACTS

38.     Defendant CS is a broker and dealer in securities registered with the Securities and Exchange Commission ("SEC") (SEC# 8-69972), the Municipal Securities Rulemaking Board ("MSRB") the Financial Industry Regulatory Authority, Inc. ("FINRA") (CRD# 288933), and the Securities Investor Protection Corporation.  It has clearing memberships with principal stock exchanges in the United States, including the New York Stock Exchange ("NYSE") and The Nasdaq Stock Market ("NASDAQ"), among others. CS is also a member of the Depository Trust and Clearing Company ("DTCC"), the National Securities Clearing Corporation ("NSCC"), the Fixed Income Clearing Company ("FICC"), the Government Securities Clearing Corporation ("GSCC") and the Options Clearing Corporation ("OCC"). CSM's primary designated self-regulatory organization related to its broker-dealer business is FINRA.

39.     Defendant CS has also entered into clearing arrangements with introducing brokers and executes and clears securities transactions directly for customers. Accordingly, Defendant CS is subject to SEC Rule 15c3-3 of the Securities Exchange Act of 1934, Computation for Determination of Reserve Requirements ("SEC Rule 15c3-3"), pertaining to the possession or control of customer assets and reserve requirements. Defendant CS is approved to engage in clearing and execution services, investment banking, prime brokerage, stock lending, and margin lending to customers of introducing firms as well as to direct customers and correspondents. As a registered FCM, Defendant CS is also subject to the customer segregation provisions under Regulation 1.20 sections 4d(a) and d4d(b), and Regulation 30.7 section 4(b) of the Commodity Exchange Act.

40.     Defendant CSD is registered with the SEC as a Security-Based Swap Dealer ("SBSD") (#549300DPEDN3YY2IMW76), pursuant to 17 CFR Part 240.

41.     On information and belief, Defendant CSM serves as the technical employer for individuals hired to perform services for CS, CSD, and other Clear Street Defendants and their affiliates.

42.     On information and belief, and as demonstrated herein, each of Defendants CSM, CSD, CH, CSH, and CSG is the mere alter ego of Defendant Cohen, including because:

    a.  they have overlapping directors, officers, and employees;

    b.  fail to adhere to corporate formalities;

    c.  are inadequately capitalized;

    d.  Defendant Cohen is in complete control of each company, with 10:1 voting rights on CSG's Board of Directors, with family members and friends who are proverbial "yes men" filling the majority of the other Board positions; and

    e.  Defendant Cohen uses their assets and data to benefit White Bay and Alpine Global (his personal family office and hedge fund).

43.     Plaintiffs Batanjany, Travers, Solomon, and Brodsky are registered broker-dealers with FINRA.

44.     Plaintiffs were all hired by CSM to work for CSD and/or CS.

**<u>Plaintiffs' Hiring at Clear Street, Vested RSUs, and Other Benefits</u>**

45.     CSM hired Patrick Travers to serve as Managing Director, Head of Distribution on February 6, 2022 with employment commencing June 6, 2022.  Per the terms of Plaintiff Travers' employment agreement with Clear Street (the "Employment Agreement") effective February 6, 2022, he was eligible to be awarded 350,000 restricted stock units in Clear Street Global Inc. ("RSUs") at the time of his hiring, subject to a specific vesting schedule contained in Clear Street

Global Inc.'s Restricted Stock Unit Issuance Agreement (the "Issuance Agreement").[1]

46.    At the time of his wrongful termination, Travers' title was CEO of Clear Street Derivatives (CSD), and he had 375,346 fully vested RSUs.

47.    CSM hired Jordan Brodsky to serve as a Middle Office Derivatives Specialist on July 12, 2022, with employment commencing July 25, 2022.  Per the terms of Plaintiff Brodsky's Employment Agreement effective July 12, 2022, she was eligible to be awarded 5,000 RSUs at the time of her hiring, subject to a specific vesting schedule contained in the Issuance Agreement.

48.    At the time of her wrongful termination, Plaintiff Brodsky's title was Director of Middle Office and Head of Operations, Clear Street Derivatives (CSD), and she had 3,958 fully vested RSUs.

49.    CSM hired Cory Solomon to serve as Managing Director, Derivatives on January 11, 2024, with employment commencing January 22, 2024. Per the terms of Plaintiff Solomon's Employment Agreement effective January 11, 2024, he was eligible to be awarded 60,000 RSUs at the time of his hiring, subject to a specific vesting schedule contained in the Issuance Agreement.

50.    At the time of his wrongful termination, Plaintiff Solomon had 40,714 fully vested RSUs.

51.    CSM hired Michael Batanjany to serve as Managing Director, Securities Lending on July 25, 2022, with employment commencing September 12, 2022.  Per the terms of Plaintiff Batanjany's Employment Agreement effective July 25, 2022, he was eligible to be awarded 50,000

---

[1] While Plaintiffs' Employment Agreements with CSM contain an arbitration provision, it is expressly limited to RSM which is defined as the "Company."  None of the other Clear Street Defendants are a party to those Employment Agreements or within the definition of "Company" used therein.  Plaintiffs therefore have no obligation to arbitrate their disputes with any of the other named Defendants.  Moreover, Plaintiffs plan to – but have not yet – initiated arbitrations against CSM pursuant to the arbitration provisions because of Defendants' bad-faith conduct detailed herein.  Plaintiffs determined Defendants' bad-faith conduct necessitated the filing of this Complaint and the contemporaneously filed Motion for a Temporary Restraining Order, Preliminary Injunction, and Sanctions.

RSUs at the time of his hiring, subject to a specific vesting schedule contained in the Issuance Agreement.

52.     At the time of his wrongful termination, Plaintiff Batanjany's title was Managing Director of Equity Finance Trading at Clear Street (CS) and had 36,458 fully vested RSUs.

53.     All RSUs issued to the Individuals at the time of their employment commencement were issued through CSG's 2021 Stock Incentive Plan and were subject to the executed Issuance Agreement between CSG and the Individuals.

54.     Pursuant to the Issuance Agreement, twenty five percent (25%) of the RSUs vested one year after the Individual's employment commencing (the "Vesting Commencement Date"), with the remaining balance of RSUs vesting in 36 equal month installments from Vesting Commencement Date.

55.     The Issuance Agreement also states that if the Individuals' employment was terminated, "any RSUs with respect to which the Time Requirement has been satisfied [*i.e.*, had vested] shall (if a Liquidity Event has not previously occurred) remain outstanding until the first to occur of a Liquidity Event or the Expiration Date."  If any RSUs had not yet vested by the time the Individual's employment was terminated, those RSUs would be forfeited.

56.     The Issuance Agreement also states that if the Individual was "terminated for misconduct, all RSUs shall be automatically forfeited."  "Misconduct" is defined in the Issuance Agreement as "cause" as that term is understood in any employment agreement entered into between CSG/CSM and the employee, or "in the absence of such a definition, shall mean the commission of any act of fraud, embezzlement or dishonesty by the [Employee], any authorized use or disclosure by the [Employee] of confidential information or trade secrets of the Corporation (or any Parent or Subsidiary), or any other intentional misconduct by the [Employee] adversely

affecting the business or affairs of the Corporation in a material manner." CSG could cause former employees to forfeit their RSUs only if their conduct constituted "misconduct" under the Issuance Agreement; all other terminations, regardless of reason, "shall not be deemed, for purposes of the Plan or this Agreement, to constitute grounds for termination for Misconduct." CSG placed sole discretion in the hands of the Plan Administrator to determine whether an employee's termination was for Misconduct, and the agreement offers no avenue by which a terminated employee could challenge the classification of their termination. Because CSG is controlled by Defendant Cohen, he effectively controls whether Plaintiffs were terminated for Misconduct within the meaning of the plan documents.

57.    Plaintiffs all had health insurance through CSM as part of their benefits. Pursuant to federal law, CSM was designated as the Sponsor and Plan Administrator for the health insurance plan offered to Plaintiffs and all other CSM employees. Under federal law, any employee becomes eligible for COBRA benefits, including, but not limited to, eligibility for COBRA health coverage. Federal law and regulations also allow an employer to deny a former employee eligibility for COBRA benefits if the employer classifies the former employee's termination as for "gross misconduct." Given Defendant Cohen's control of CSM, he also effectively controls whether an employee (like Plaintiffs) could be classified as having been terminated for gross misconduct and, by extension, ineligible for COBRA benefits.

**Plaintiffs' Dissatisfaction with Clear Street's Toxic Culture That Flaunted Applicable Regulations**

58.    Plaintiffs all continued to work, and perform their required services throughout the term of their employment without any interruptions.

59.    During their employment, each Plaintiff was an exemplary employee with no prior complaints regarding their respective job performances. Plaintiffs reasonably expected to be

compensated and even rewarded for their commitment and performance by Clear Street.

60.     Each Plaintiff grew dissatisfied with their employment for numerous reasons, and independently determined to seek employment elsewhere as a result.

61.     As their supervisors well knew from multiple prior complaints and discussions, Plaintiffs were unhappy with, among other things Clear Street's:

    a.  toxic, bullying culture that Defendants Uriel Cohen and Kenneth Sicklick model and impose from the top down;

    b.  loose affiliation with the truth and ethical norms;

    c.  lack of legitimate corporate controls;

    d.  far-below-market compensation (even for executives who, like Plaintiffs, exhibited stellar performance);

    e.  consistent breaches of promises and contractual obligations to employees, clients, and vendors;

    f.  rampant, unchecked legal and regulatory violations;

    g.  constant unlawful pressure on employees to disclose confidential client information to Defendant Cohen's family office, hedge fund, and other non-Clear Street affiliated business; and

    h.  ignoring Plaintiffs' and other executives' reported concerns and allowing them to fall on deaf ears, or worse, meeting them with threats of financial or reputational ruin, and retaliatory adverse employment actions including baseless "for cause" terminations.

62.     For example, Plaintiffs reasonably believed that the Defendants violated various rules, regulations, and state and federal laws when Plaintiffs observed wrongdoing and several

concerning practices at Clear Street involving senior management and affiliated entities, and which Plaintiffs refused to participate in, including the following:[2]

    a.   The Clear Street Defendants misled Kroll Bond Rating Agency ("KBRA") to believe that it did not have any term financing commitments when in fact both the stock repurchase group and the securities lending team, both under the same manager, had billions of dollars in commitments. Rather than disclose the misstatement to KBRA, Clear Street quietly closed down the commitments over the subsequent months. In the interim, the Clear Street Defendants used the fraudulently obtained bond rating to raise debt, despite its potential invalidity. Plaintiffs reasonably believed that this conduct might give rise to a common law claim for fraud, criminal wire fraud under 18 U.S.C. § 1343, or possibly a claim under 17 CFR § 240.10b-5.

    b.   Defendant Cohen also used employees of a separate company Defendant Cohen owns, White Bay, to collect Clear Street client data on information such as derivative swaps, and pressured Clear Street employees to provide the White Bay employee with that data. By way example, Plaintiff Brodsky was specifically asked to provide client data to White Bay employees. Plaintiff Brodsky explicitly flagged to supervisors that providing client data to a non-employee seemed likely to be illegal or violate rules and regulations and that she was not comfortable doing it. Plaintiffs reasonably believed this conduct might run afoul of data privacy regulations, such as the Graham Leach Bliley Act, 15 U.S.C. § 6801 which provides

---

[2] Plaintiffs have additional evidence and facts to support these allegations and additional violations not listed herein that can be alleged with specificity should the Court so require. To the extent the Court believes additional details or specifics would be helpful, Plaintiffs are willing to provide such for in-camera review, present during a preliminary injunction hearing, or amend their Complaint to provide these to the Court.

that "financial institution[s] may not, directly or through any affiliate, disclose to a nonaffiliated third party any nonpublic personal information," or the New York Stop Hacks and Improve Electronic Data Security Act, Gen. Bus. Law § 899-b (the "SHIELD Act"), which requires certain entities to put reasonable data security safeguards in place and notify regulatory authorities and victims in the event of a breach, or insider trading regulations given that retail investors obviously do not have the same access to Clear Street client data, as well as violated state and federal privacy laws.

c.  Defendants terminated an employee and Plaintiffs' colleague, who had raised a potential regulatory violation to Clear Street's executive team concerning the company's nonqualified custodian status under the 1940 Act.  Defendants terminated the employee in retaliation shortly thereafter, likely in violation of at least New York whistleblower laws.

d.  Plaintiffs witnessed members of the securities lending team engage in trading activity that raised serious compliance concerns under Regulation SHO and other securities laws. On or around May 30, 2025, Clear Street ended up holding a substantial long position due to being bought in from the street, following the brokers' recall of shares the firm had borrowed to cover existing short positions on a stock. Because there was no stock available in the market to return to those brokers, the buy-in caused Clear Street to hold the long position and the stock directly. The only way to sell this stock was then to either locate a new source to borrow from or for the clients to cover their own positions. Neither occurred. Clear Street subsequently sold the position on a day when the stock price had risen

significantly more than the price they received the buy-in on, resulting in approximately $1.6 million in profits. Upon information and belief, the individuals involved faced no internal consequences, and Plaintiffs reasonably believed the circumstances surrounding the buy-in, including the firm's risk exposure and profit motive, could implicate market manipulation or compliance violations under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5).

e.  Similarly, Plaintiffs also witnessed Clear Street personnel regularly make misleading materially false statements regarding the number of securities available for shorting in possible violation of Regulation SHO. This process included enhancing or exaggerating the number of securities actually available to purchasers by a factor of 6-8. As a result, when the need to make the delivery on those short positions came, Clear Street often could not make good on those deliveries. Plaintiffs reasonably believed this conduct may be in violation of federal securities laws, including, but not limited to Regulation SHO and/or Section 12(a)(2) of the Securities Act of 1933.

f.  It is unclear which, if any, of the above issues have been reported by Clear Street to regulators or if there are plans to disclose violations, where Clear Street is legally obligated to do so, creating concern about potential violations of these obligations, for example, under Section 11 of the Securities Act of 1933.

63.    Plaintiffs can provide detailed specific examples, along with the laws, rules, and regulations they reasonably believe were violated in subsequent filings.

64.    Plaintiffs raised concerns with their supervisors regarding the suspected or actual

misconduct, yet the company failed to take any responsive or remedial action.

65.     Plaintiffs also shared frustration with Clear Street with respect to compensation structure and bonuses beginning in fiscal year 2024. In particular, Plaintiffs felt that their 2024 fiscal year compensation did not accurately reflect the value of their work and the returns they created for Clear Street.  Furthermore, Plaintiffs' compensation discussions for fiscal year 2025 with Clear Street provided little clarity and hope that their compensation issues would be resolved.

### **Plaintiffs' New Employment Opportunities and Voluntary Resignations**

66.     For all of these reasons, each Plaintiff separately and independently decided to leave Clear Street to find new employment opportunities between 2024 and 2025.

67.     Between April and September 2025, each Individual was independently solicited by and recruited to work for another company which offered them a far better working environment and significantly better compensation – something that Clear Street does not offer. This company (the "New Employer") reached out directly to each of the Plaintiffs through LinkedIn to recruit them to join the company.

68.     After engaging in separate and independent discussions, interviews, and negotiations directly with the New Employer, each Individual received and accepted employment offers from the company (the "New Employer") between June and September 2025.

69.     For example, Plaintiff Solomon, dissatisfied with working at Clear Street, began seeking new opportunities for employment in late 2024.  An employee at Plaintiff Solomon's new employer reached out to Plaintiff Solomon via LinkedIn on June 18, 2025 regarding an open position at the employer, and they had a phone call to discuss the open position the following week.

70.    During their June 23, 2025 call, Plaintiff Solomon and the company employee discussed information about the new company, what his potential role would be, and what the company sought to build.

71.    On July 17, 2025, Plaintiff Solomon had a second phone call with additional representatives from the new employer.  He then met with a number of employees at his new employer for remote interviews in July 2025.

72.    On or around August 13, 2025, Plaintiff Solomon began employment negotiations with the new employer, and ultimately accepted the employers offer on or around September 8, 2025

73.    His new employer asked him to start as soon as possible so, on September 15, 2025, Plaintiff Solomon emailed his resignation to two employees at Clear Street, including his supervisor, and Tania Zivkovic, Clear Street's Chief People Officer.

74.    Plaintiff Brodsky was contacted by an employee of her new employer on or about July 3, 2025 via LinkedIn who provided their email address and asked to connect. She spoke with an employee at her new employer on or around July 29, 2025, and had subsequent discussions with the new employer in mid-August 2025.

75.    Plaintiff Brodsky received an offer letter from the new employer on August 15, 2025.  She negotiated the terms of her offer with the new employer until, and signed her offer letter on, September 10, 2025.

76.    Because she had weekly one-on-one meetings with her manager every Monday, she decided to use the regularly scheduled meeting on Monday, September 15, 2025 to verbally communicate her resignation to her manager.

77.    Following Plaintiff Brodsky's meeting with her manager, she emailed a formal

resignation to both her manager and Ms. Zivkovic.

78.    Plaintiff Batanjany was contacted by an employee of his new employer on or about July 28, 2025 via LinkedIn.  The two spoke on the phone a few days later about an open opportunity at the new employer and he expressed his interest.

79.    Plaintiff Batanjany received an email from representatives at his new employer on or around August 13, 2025 asking him for information regarding his non-competition and non-solicitation agreement and obligations with Clear Street before the new employer would send Plaintiff Batanjany an offer letter.

80.    After Plaintiff Batanjany provided the information, he negotiated the terms of the offer with the new employer until signing on September 9, 2025.

81.    His new employer asked him to start as soon as possible, so Plaintiff Batanjany resigned on September 15, 2025 by emailing Human Resources at Clear Street directly, copying his supervisor.

82.    Plaintiff Travers also met and interviewed with representatives and employees of the new company throughout the summer of 2025.  After several months of negotiations, he signed his offer letter on or around September 2, 2025.

83.    Plaintiff Travers sought to resign on or around September 5, 2025, but wanted to do so by meeting with Clear Street's CEO Edward Tilly, who was out of office at the time.  Plaintiff Travers initially intended to wait for Mr. Tilly to return so that he could speak to Mr. Tilly in person to tender his resignation, but after Mr. Tilly remained out of office for longer than expected, Plaintiff Travers resigned on a phone call on September 15, 2025.

84.    In their notices of resignation, each Plaintiff confirmed their knowledge of, and intention to comply with, the obligations in their Employment Agreements that survived

resignation, including, but not limited to, their applicable restrictive covenants to not compete and not solicit any employee of any Clear Street Defendant for a specified period of time.

85.     None of Plaintiffs' Employment Agreements contains a provision prohibiting solicitation of prior or current clients of RSM, or any other Clear Street Defendant.  Nevertheless, at no time during their employment or after their resignations on September 15, 2025, has any Plaintiff solicited any of their clients or even told them that they are changing firms.

86.     Some of the Individuals expressly offered to remain at Clear Street for a period of time to assist with transition of their responsibilities and with substantial upcoming matters.

87.     At no point prior to, or after, the Individuals' resignations have any of the Individuals violated any term of their Employment Agreements with CSM.

88.     Since the Individuals' resignations, none of the Individuals have violated any restrictive covenant contained in their Employment Agreements.

**Clear Street Directs Plaintiffs Solomon and Brodsky To Sign Egregious Employment Agreement Amendments, Without Legal Counsel, Immediately or Be Terminated "For Cause" In Retaliation**

89.     In response to Plaintiff Solomon's resignation, Clear Street requested the opportunity to present him with a "demand" that would ostensibly keep them employed at Clear Street rather than resigning  He agreed that Clear Street could present a "counteroffer," but that is far from what Clear Street ultimately presented.

90.     In response to Plaintiff Brodsky's resignation, a member of Clear Street's senior management team asked to meet to "figure something out."

91.     The next morning, at the express direction of Defendants Cohen and Sicklick, Clear Street executives called Plaintiff Solomon and Mr. Frank into separate individual meetings in which Clear Street presented them with the terms of their purported "counteroffer," which was

really a demand in the form of amendments to their existing employment agreements (the "Employment Agreement Amendment" or the "Amendment"). Clear Street demanded Plaintiff Solomon sign this Employment Agreement Amendment immediately and explicitly prohibited him from consulting with counsel regarding the terms of the Amendment.

92.    Clear Street also told Mr. Frank and Plaintiff Solomon it would terminate them for cause and initiate litigation against them if they refused to sign the Amendment but provided no basis for its threat.

93.    At the same time, Andy Volz, Clear Street's Chief Commercial Officer, confronted Plaintiff Brodsky and asked her to come to his office. Once there, he presented Plaintiff Brodsky with what he called a counteroffer. Volz also told her that she could not take the document from his office, that she needed to review it there, and that if she left his office without signing it, she would be terminated for cause. Volz also told Plaintiff Brodsky that Clear Street would sue anyone who resigned instead of signing the counteroffer, and that it planned to sue Plaintiff Travers whether the Terminated Individuals signed their counteroffers or not.

94.    The so-called "counteroffer" presented to Plaintiff Brodsky contained new and onerous obligations, including a new three-month notice period and an 18-month non-compete obligation. Her existing Employment Agreement had a one-month notice period and a three-month non-compete obligation. In response, Clear Street offered Plaintiff Brodsky no change to her compensation, only a one-time bonus and a number of new RSUs, but these purported grants were illusory because, as explained above, Defendant Cohen (through his control of all Clear Street Defendants) retained full discretion to determine whether an employee was terminated for "Misconduct" pursuant to the Issuance Agreement, which would cause the terminated employee to forfeit their shares regardless of whether they had actually engaged in Misconduct. Plaintiff

Brodsky told Volz that her decision to leave Clear Street was a direct result of the pressure he exerted on her to share sensitive client information with White Bay at his and Cohen's direction. In response, Volz took no responsibility for this violation, instead offering to tell the Company he ordered her to disclose the information which he claimed would make the issue "go away."

95.     Upon hearing Volz's response, Plaintiff Brodsky told him she would not sign the "counteroffer" which was really a disguised amendment to her Employment Agreement.

96.     Volz then told Plaintiff Brodsky that she was terminated "for cause," and ordered her to go back to her desk, remove any personal items in it, and leave the building. Plaintiff Brodsky did so.

97.     Per the terms of their Employment Agreements and the Issuance Agreement, termination "for cause" would force Plaintiffs Solomon and Brodsky to forfeit all benefits of their Employment Agreements, including all fully vested RSUs and stock options.

98.     Plaintiffs Solomon and Brodsky, and Mr. Frank, refused to sign the demands for an amendment to their Employment Agreements and were not permitted to keep copies of what had been handed to them.

99.     No such demand was made to Plaintiff Batanjany.

100.     After they refused to sign the Employment Agreement Amendments, Clear Street locked Plaintiffs Batanjany, Solomon, and Brodsky, and Mr. Frank (the "Terminated Individuals") out of all of the computer systems and escorted some of them from the premises, forcing them to leave all their private, personal, sensitive documents, information, and data in their offices and on company-owned equipment and systems.

101.     Such personal, private, and sensitive documents, information, and data includes, but is not limited to, the Individuals' medical records, personal identifying information, and login

information (*i.e.*, usernames and passwords) to the Individuals' personal devices, systems, applications, and accounts.

102.    At no time did the Clear Street Defendants provide notice to Plaintiffs that they intended or had the right to take these actions with respect to their personal, private, and highly sensitive documents, data, and information.  And at no time, before, during, or after the end of their employment did Plaintiffs ever give consent to Defendants to take these actions.

103.    Later that day, Plaintiffs Batanjany, Solomon, and Brodsky, and Mr. Frank received letters from Ms. Zivkovic terminating all four Individuals purportedly "for cause" effective as of September 16, 2025 (the "Termination Letters").

104.    Plaintiff Batanjany was dumbfounded, as Ms. Zivkovic had initially responded warmly to his resignation notice and wished him well.  He was never accused of any breach of his employment agreement, or any wrongdoing.  Rather, he later learned that he was terminated for cause *solely* because a number of other Clear Street employees had also resigned with the intention of joining the same New Employer.

105.    The Termination Letters contain no description of the "cause" for which each Individual was purportedly terminated, and none of Plaintiffs Batanjany, Solomon, and Brodsky, or Mr. Frank, has ever received any information (oral or written) concerning the "cause" for which they were purportedly terminated.

106.    The Termination Letters also state that, because the Individuals were terminated "for cause," they forfeit all their RSUs and options, including their time-vested RSUs and options.

107.    On or about September 16, 2025, Clear Street also "cancelled" the Terminated Individuals' time-vested RSUs and options as recorded in their Carta accounts, claiming they had been forfeited as a result of their "for cause" termination.

108.    Several days later, on information and belief after being advised by legal counsel that its actions were illegal, Clear Street reinstated the Terminated Individuals' time-vested RSUs and options on Carta.

109.    Defendants also sent, via email and physical mail, the Terminated Individuals Consolidated Omnibus Budget Reconciliation Act ("COBRA") election notices indicating that they *voluntarily* terminated their employment – despite claiming they were terminated for cause – and were thus entitled to pay for continued health insurance benefits through COBRA.

### Clear Street Retaliates Against Plaintiff Travers, Threatens to "Sue Him and His Entire Family Into the Ground" and Prevent Him From Working Potentially For Years, If He Does Not Agree to Extraordinary New Restrictive Covenants and Give Up His Contract Rights

110.    Plaintiff Travers was not called into a room and asked to sign a so-called counteroffer.  Rather, after Plaintiff Travers' voluntary resignation, Clear Street executives conveyed to Plaintiff Travers, upon information and belief at Defendants Cohen's and Sicklick's direction, that the Clear Street Defendants were threatening "to sue [Plaintiff Travers] *and his entire family* into the ground."

111.    Plaintiff Travers was later told by his direct supervisor that he could avoid "for cause" termination and litigation only by agreeing to a client-non-solicitation agreement (although his Employment Agreement contained no such provision) and potentially having his New Employer agree to it as well, or negotiating a new employment agreement with CSD.

112.    Defendant Cohen asked to meet with Plaintiff Travers in person on his return from Israel, but then failed to arrange such meeting.

113.    Instead, Plaintiff Travers had a phone conversation with Defendant Cohen on September 22, 2025, during which Travers was asked why he wanted to leave Clear Street, and to consider staying on under new terms.  Plaintiff Travers reiterated some of his previously stated

concerns and declined to remain at Clear Street, so he and Defendant Cohen discussed the terms on which he could negotiate an amicable exit.

114.    Defendant Cohen expressed to Plaintiff Travers his belief that a prominent asset management company in New York was actually responsible for recruiting all Plaintiffs from Clear Street. Plaintiff Travers disagreed with Defendant Cohen's belief and told him as such, given the company at issue played no role in his recruitment.

115.    Plaintiff Travers was told send Clear Street a proposed separation agreement (at his own cost and expense) in which he would:

    a.    state a fair market value for his vested RSUs and options at which he would propose that Clear Street buy him out (even though Defendant Cohen and others at Clear Street refused to put in writing or tell Plaintiff Travers what they understood to be the fair market value of his Clear Street interests;

    b.    agree to not solicit CSD's four or five largest clients for nine months (whom Clear Street failed to identify);

    c.    extend his three-month paid non-compete leave, during which his Employment Agreement originally provided for full payment of compensation, benefits, and continued vesting (the "Non-Compete Leave"), to nine months; and

    d.    receive in return, a release and non-disparagement (mutual) agreement.

116.    Plaintiff Travers was directed to negotiate these terms with Mr. Tilly. He promptly told Mr. Tilly that extending his three-month Non-Compete Leave was a non-starter, but he would, and did send him a draft term sheet on September 29, 2025 (incurring significant attorneys' fees and costs), with all other terms required by Defendant Cohen, including an equity buy back at $17.00 per share, which Travers calculated as greater than a 35% discount of the fair market value

for his interests.

117. In response, Mr. Tilly reported that Defendant Cohen:

a.  was extremely angry with Plaintiff Travers and felt strongly about suing him;

b. was telling people that Jay Park of Prysm and others were claiming that Travers was actively soliciting them to leave Clear Street and go to the New Employer;

c. wanted him to extend his non-compete term to six or nine months (which Travers again rejected); and

d.  even worse, demanded that, instead of a paid Non-Compete Leave, Plaintiff Travers had to agree to a six or nine month *unpaid* non-compete period because Defendant Cohen refused to pay Plaintiff Travers anything during the non-compete period because, in his mind, he had already paid Travers while he allegedly solicited other Clear Street employees to leave with him.

118. Plaintiff Travers once again reiterated that he never solicited anyone to go with him to the New Employer, never solicited any Clear Street clients—or even told them he was resigning from Clear Street—these accusations are entirely false are easily disproved, and he was already paid far below market compensation in the last several months during which he saved CSD by novating over $10 billion of swap positions from CSD to CS LLC.

119. Travers also reminded Mr. Tilly of all of the conversations they had had about Clear Street's unlawful conduct which was unacceptable to Plaintiff Travers and which should have been reported to regulatory authorities.

120. Mr. Tilly said he would speak with Defendant Cohen about accepting the three-month non-compete as long as Travers agrees to change his three-month Non-Compete Leave to an unpaid non-compete period to give Defendant Cohen what he wanted, and simply increase the

equity purchase price to make up for the lost income, vesting, and benefits. Mr. Tilly proposed, and Travers agreed to a purchase price of $17.50 per share.

121.    On September 30, 2025, Plaintiff Travers sent Mr. Tilly a revised proposed term sheet reflecting all these changes as requested.

122.    In response, on October 1, 2025, **Clear Street rejected its own proposal**, with Defendants Cohen and Sicklick reportedly now claiming that the nine-month main client non-solicitation provision "was worthless," the terms would "have to be far more robust" in favor of Clear Street (presumably in reference to the length of the unpaid non-compete), the $17.50 per share (which is roughly equivalent to a $4.3 billion market valuation for Clear Street) is far too high, and they would rather "roll the dice with litigation."

123.    Clear Street engaged in negotiations in bad faith from the outset. Instead of responding as part of the negotiations, Clear Street demanded instead that Travers provide an entirely new separation agreement that contained terms more generous to Clear Street.

**Clear Street Terminated Plaintiffs Without Any Evidence of Misconduct and Thus No Cause**

124.    At various times since September 15, 2025, at least Defendant Cohen, and likely Defendant Sicklick have stated to various Clear Street personnel and investors that:

   a.  Plaintiff Travers is the alleged "ringleader" who orchestrated the Individuals resignations and moves to the New Employer;

   b.  Plaintiffs violated their Employment Agreements;

   c.  Defendants have to "make an example of" the Individuals, especially Plaintiff Travers, by "suing him and his family into the ground," to deter other unhappy employees from leaving; and

   d.  Defendants will do everything in their power to prevent Plaintiffs from being able to work at the New Company, including by tying them up for months in court with

expensive, time-consuming, reputation-harming, and license-threatening litigation.

125.    Such accusations against Plaintiffs are knowingly and demonstrable false.

126.    Defendants have ***repeatedly admitted*** that they have absolutely no evidence to support their false and defamatory accusations, and, when confronted, claim that it simply has to be the case.

127.    In fact, every Plaintiff resigned voluntarily – for very good reasons – Clear Street had already violated their Employment Agreements, and none of them has violated ***any*** contractual obligation to Clear Street, either before or after their resignation.

128.    Mr. Frank's Employment Agreement with Clear Street defines termination for "Cause" in very narrow terms:

> "Cause" shall mean: (1) Employee's commission of fraud or reckless misstatement or omission materially affecting Company or its affiliates; (2) any act or omission by Employee that is reasonable to expect would materially injure the reputation, business or business relationships of Company or any of its affiliates; (3) Employee's indictment or conviction with respect to any felony or other crime or violation of law involving fraud or dishonesty, or Employee's entry of a plea of nolo contendere concerning any felony involving fraud or dishonest[y].

129.    While the other Individuals' Employment Agreements with Clear Street do not define "Cause," Mr. Frank's Employment Agreement shows Clear Street's intent to define "cause" in the narrowest of terms.

130.    Defendants have never claimed that any facts support firing Plaintiffs Batanjany, Solomon, and Brodsky, or Mr. Frank for "Cause" as defined therein.  And no such facts exist.

131.    Defendants have never claimed that any facts exist to support firing any of the Plaintiffs for "Cause" even under its commonly understood meaning in the industry.  And no such facts exist.

132.    Plaintiffs voluntarily resigned from Clear Street and, unlike Clear Street who was already in breach of their Employment Agreements, at no point prior to or after September 15, 2025 did any Plaintiff violate any term of their Employment Agreements or any related agreement governing any aspect of their employment.

133.    On the other hand, ironically, the Clear Street Defendants routinely:

a.    solicit entire groups of employees from their competitors;

b.    direct their employees to get around express non-solicitation agreements by simply having another employee solicit the desired personnel, clients, or vendors;

c.    breach their agreements with, and promises to, their employees; and

d.    engage in illegal conduct without consequence.

**Clear Street Retaliates Further Once Discussions Between Plaintiff Travers and Clear Street Fail to Reach an Amicable Resolution.**

134.    On information and belief, Defendants have gone so far as to force one of their wholly owned subsidiaries to cancel a contract it has with the New Employer (which was in place long before the subsidiary was acquired by a Defendant Cohen owned company) that provides critical exchange clearance services to the New Employer in an attempt to disrupt its ability to conduct business.  Defendants did so in clear retaliation for the New Employer hiring Plaintiffs.

135.    With Defendants' aggressive, retaliatory conduct and rhetoric increasing, Plaintiffs gave up hope of reaching an amicable settlement.

136.    On October 3, 2025, Plaintiffs' counsel sent Clear Street a demand letter (the "Demand Letter"), describing Clear Street's unlawful and tortious conduct against their whistleblower and Employment Agreement-compliant clients (as set forth above in more detail), demanding that Clear Street cease and desist from taking any further retaliatory, adverse actions against, or making any defamatory statements about, them, and directing Clear Street to

immediately preserve and cease any document destruction policies with respect to all relevant evidence in anticipation of potential litigation.

137.    Immediately thereafter, Clear Street once again cancelled **all** time-vested RSUs and options that Plaintiffs had earned through September 16, 2025 *and already paid taxes on*, reflecting forfeiture for misconduct on Carta, in clear retaliation for counsel's Demand Letter.

138.    This pattern of conduct has caused all Plaintiffs to reasonably fear that Defendants may soon attempt to falsely claim that Plaintiffs were terminated for "gross misconduct" which would render Plaintiffs ineligible for COBRA benefits.

139.    While claiming a former employee was terminated for "gross misconduct" is typically an extraordinary step that most companies are loathe to take unless employees are proven to have engaged in serious malfeasance, Plaintiffs are concerned that Defendants, particularly Defendant Cohen, have engaged in erratic, egregious, and vindictive behavior such that Defendants may attempt to punish or strong-arm Plaintiffs further by attacking their health insurance benefits under COBRA by claiming Plaintiffs were terminated for "gross misconduct."

140.    Plaintiffs may desperately need health insurance under COBRA while they are unemployable during the non-compete period and thus ineligible for an employer sponsored health care plan.

141.    Plaintiffs need clarity and assurance that they – and their families that are or were beneficiaries on their plans – have and will continue to have COBRA health insurance coverage until they are eligible for coverage under another employer's plan.

142.    The COBRA notices that Plaintiffs have received to date only add further confusion and opaqueness as to whether Plaintiffs and their beneficiaries are and will continue to be eligible for COBRA.

143.    For example, even though Clear Street has not yet officially terminated Plaintiff Travers – and still lists him on their website as CEO of CSD, thereby holding him out to the public as a representative of an entity he claims has engaged in significant wrongdoing – Clear Street Defendants appear to have caused a COBRA election notice to be emailed to Plaintiff Travers' personal email address on Thursday, October 2, at 12:16 PM.

144.    Plaintiff Travers has not received a physically mailed COBRA notice, although the remaining Plaintiffs each received a COBRA notice in the mail.

145.    Plaintiff Travers' COBRA election notice listed the reason for receiving the notice as "End of Employment (Involuntary)," despite Plaintiff Travers' uncertain employment status with Clear Street.

146.    In contrast, Plaintiffs Batanjany, Solomon, and Brodsky all received COBRA election notices via email *and via first class mail* in which their reason for receiving notice was listed as "End of Employment (Voluntary)," despite Defendants telling Plaintiffs Batanjany, Solomon, and Brodsky that they had been terminated for cause.

147.    The COBRA notices issued by Defendants thus completely mismatch what Defendants have told Plaintiffs about their respective leaves from Clear Street and have sewn confusion and fear in Plaintiffs regarding the future of their health care coverage.

148.    Indeed, Defendants have also not sent Plaintiff Travers an official termination notice of any kind, which might provide clarity to Plaintiff Travers as to whether Defendants are claiming he was terminated for "gross misconduct" (which would strip Plaintiff Travers of his COBRA coverage), "for cause," or merely that he had resigned.

149.    This confusion has also harmed Plaintiffs through their dependents and beneficiaries.

150.    Plaintiff Travers' COBRA election notice email was sent to Plaintiff Travers only, and no other qualified beneficiaries under his health insurance plan with Clear Street, including his wife and his two children, both of whom are in college and do not live at home ("Travers' Family").

151.    Travers' Family does not have access to his personal email address.

152.    But for Plaintiff Travers' living and communicating with his spouse, if any member of Travers' Family were to have previously lost or in the future lose contact with Plaintiff Travers, they would have had no notice of the change or no way to receive future updates.

153.    Despite Travers' Family's right to their own notices, separate from that sent to the covered employee, regarding their rights to elect to continue coverage under COBRA, Travers' Family has received no notice of their health insurance rights under COBRA.

154.    Plaintiff Travers and Travers' Family are in imminent danger of suffering substantial harm by the lack of notice and lack of clarity as to their rights to COBRA coverage and the Clear Street Defendants' apparent intention to seek to deprive them of any benefits via fraudulently claiming Plaintiff Travers was fired for wrongful conduct.

155.    Plaintiffs have expended significant time, energy, fees, and costs to attempt resolve these disputes through Plaintiff Travers' negotiations with Defendants, and on the filing of this lawsuit and request for injunctive relief, in part, to ensure that they and their family-member beneficiaries are not stripped of their health care coverage under COBRA.

156.    Plaintiffs have experienced still more retaliation at the hands of Defendants after Plaintiffs demanded that Defendants cease and desist their increasingly egregious conduct.

157.    On October 3, 2025, at 1:31 PM, counsel for Plaintiffs sent a letter to Defendant Cohen, Defendant Sicklick, Mr. Tilly, Mr. Park, Ms. Zivkovic , and Clear Street's General Counsel

(the "10/3 Letter"), demanding that Defendants "immediately cease and desist all such illegal conduct, take immediate curative action, and preserve all relevant documents for use in anticipated litigation."

158.    Notwithstanding Plaintiffs' entreaties through legal counsel, Defendants took additional actions to retaliate against Plaintiffs and to impede their ability to investigate and report Defendants' actual and suspected unlawful activities to regulators as set forth below.

### FIRST CAUSE OF ACTION

**(Violations of N.Y. Labor Law §§ 740(2) and (8))**
**(Against All Defendants)**

159.    Plaintiffs hereby reallege each allegation of the foregoing paragraphs as if fully set forth herein.

160.    At all relevant times, until September 15, 2025, Plaintiffs were employees of Defendant CSM.  Since that date, Plaintiffs have been former employees of Defendant CSM.

161.    CSM hired Plaintiffs to provide services to CSD and/or CS as described herein.

162.    From at least 2024 through to the present, Plaintiffs reasonably believed that the Clear Street Defendants violated or may have violated various rules, regulations, and state and federal laws, including:

   a.  state and potentially federal whistleblower protection laws when they terminated an employee who raised a potential regulatory violation to the executive team concerning nonqualified custodian status under the 1940 Act;

   b.  securities fraud when they made untrue statements of material fact to a bond agency regarding their lack of financing commitments;

   c.  various data privacy and data breach laws and regulations, insider trading laws, and/or securities fraud when they collected data from Clear Street's clients and

provided it to employees of White Bay, and potentially also to Alpine Global and

other third-parties owned, controlled by, or affiliated with Defendant Cohen; and

d.  various laws, rules, and regulations when they sold stock short without coverage in

place and exaggerated the number of securities available for the purposes of short

selling.

163.    Plaintiffs learned about and/or personally observed or experienced these known and

suspected legal violations, and refused to participate in any such activity.

164.    Plaintiffs also complained about this suspected or actual unlawful activity to

numerous supervisors, including their immediate supervisors, and/or threatened to disclose it to

additional supervisors and/or relevant public bodies if appropriate corrective measures were not

taken.

165.    Plaintiffs regularly discussed the Clear Street Defendants' apparent ambivalence to

legal and regulatory compliance with their supervisors and coworkers and emphasized the need to

take corrective action to prevent regulatory intervention.  Plaintiffs' concerns typically fell on deaf

ears, and no corrective actions were taken by Defendants.

166.    On information and belief, neither Defendants nor any Clear Street supervisor who

was already aware of Defendants' conduct took any corrective action, or would take any corrective

action due to loyalty to and/or fear of retaliation from Defendant Cohen.

167.    Because Plaintiffs engaged in these protected actions, Defendants took their first of

many adverse actions against them in from 2024 to date.  Among other things, Defendants:

a.  failed to give them raises commensurate with their job performance or industry

standards, and failed to pay Plaintiffs bonuses that Defendants had expressly

assured them they would receive;

b.  took clients and/or business that Plaintiffs had generated away from them to give it to other employees with less experience, worse performance, and who had not raised concerns about Defendants' illegal conduct;

c.  used threats, duress, and coercion to try to force them to agree to punitive amendments to their Employment Agreements (*e.g.*, greatly extending existing and adding new restrictive covenants, and requiring Plaintiffs to abrogate other rights they had under their Employment Agreements);

d.  terminated them allegedly "for cause" without notice, stated reason, and without any basis to do so, and even admitted that they had no facts or evidence to support their accusations;

e.  directed them not to return to their offices and to immediately return all company property in their possession;

f.  seized possession of their private, personal, and highly sensitive documents, information, and data, including, but is not limited to, the Individuals' medical records, personal identifying information, and login information (*i.e.*, usernames and passwords) to the Individuals' personal devices, systems, applications, and accounts without notice or consent;

g.  made defamatory statements about Plaintiffs, especially Plaintiff Travers, to Clear Street colleagues, vendors, clients, investors, and other third parties.

168.  Plaintiffs reasonably believed, and informed Defendants and their in-house and counsel, through numerous direct conversations with Clear Street executives, that Defendants' conduct violated various laws, rules, and regulations (including, *e.g.*, pertaining to securities and whistleblower protections), and/or threatened to disclose such actions to their supervisors and/or

public bodies if they did not take corrective action. Plaintiffs, through their counsel, also informed Defendants and their in-house counsel via their 10/3 Letter, that Defendants' adverse employment-related and retaliatory actions were illegal, and directed them to immediately cease and desist their illegal conduct, and preserve all relevant evidence.

169.    In particular, Plaintiffs reasonably believed that Defendants' retaliatory actions violate SEC Rule 21F-17, 17 C.F.R. § 240.21f-17, N.Y. Labor Law §§ 201-i and 740, federal and state data privacy laws, and other applicable laws, rules, and regulations.

170.    Because of Plaintiffs' original protected activity and now their additional complaints about Defendants' actual and suspected legal and regulatory violations, immediately upon their receipt of Plaintiffs' counsel's 10/3 letter, Defendants took ***additional retaliatory adverse actions*** against Plaintiffs.  Among other things, Defendants:

a.  destroyed relevant evidence the existence, total number, vesting status, and value of Plaintiffs' vested RSUs and stock options which, just moments before counsel sent its 10/3 letter, was accurately recorded and available to Plaintiffs on CARTA (the software system Clear Street uses to manage employee's equity interests) but was then gone, with search results saying only "canceled" or "terminated" and an indication of "misconduct";

b.  unlawfully cancelled, terminated, caused Plaintiffs to forfeit, and converted to their own use and benefit, all of Plaintiffs' fully vested RSUs and stock options, falsely stating, without explanation, that this was done due to "misconduct";

c.  caused a COBRA election notice to be exclusively emailed to Plaintiff Travers' personal email address noting that he had been terminated "Involuntarily" which, coupled with the lack of any termination notice having been issued to Travers, the

fact that all other Plaintiffs' COBRA notices had previously said "Voluntary", the "misconduct" entries made on the CARTA system, and Defendants' escalating threats and retaliatory conduct suggest that Defendant intends to challenge;  and

d.  made and recorded malicious and fraudulent determinations that Plaintiffs were terminated for "misconduct" and/or "gross misconduct" to effectuate the forfeiture of Plaintiffs' RSUs and stock options, and, on information and belief, to deprive Plaintiffs and their families or, at a minimum, Plaintiff Travers and his family, of their COBRA health insurance benefits;

171.    At this point, Plaintiffs reasonably believed that Defendants' conduct violated ERISA, SEC Rule 21F-17, 17 C.F.R. § 240.21f-17, N.Y. Labor Law §§ 201-i and 740, and other applicable laws, rules, and regulations, and informed Defendants and their in-house counsel, via Plaintiffs' counsel's 10/4 letter, that Defendants' conduct, if not an accidental technical error, constitutes knowing and intentional "retaliatory action against employees who reported or threatened to report actual or suspected wrongdoing by Clear Street," and threatened to seek emergency judicial and regulatory relief if Defendants did not take corrective action within twenty-four hours.

172.    Defendants took no corrective action within twenty-four hours, or to this date. Instead, they proved that their recent retaliatory actions were, in fact, intentional, and took further steps to impede Plaintiffs' investigation and reporting of Defendants' actual and suspected wrongdoing to regulators in violation of SEC Rule 21F-17, 17 C.F.R. § 240.21f-17.

173.    In particular, on October 5, 2025, Defendants, via email from Defendant Sicklick:

a.  directed Plaintiffs and their counsel not to "communicate with anyone at or related to Clear Street without [the] explicit consent" of Defendant Sicklick, Clear Street's General Counsel, and Clear Street's outside counsel; and

    b.   on information and belief, directed all Clear Street personnel not to communicate with Plaintiffs or their counsel and, if contacted, to immediately report it to Defendant Sicklick.

174.    From October 6 through 8, 2025, Defendants mislead Plaintiffs into believing that Clear Street's outside counsel would rein in Defendant's retaliatory behavior in another bad-faith effort to prevent Plaintiffs from seeking this emergency relief sooner.

175.    But Defendants ignored Plaintiffs' demands for immediate corrective action and, on October 8, 2025, proving beyond any doubt that Defendant Cohen intends to continue to inflict maximum harm on at least Plaintiff Travers, Clear Street, through counsel,[3] demanded that he agree to amend his Employment Agreement to:

    a.   ***triple*** the length of his Non-Compete Term (from three-months to nine-months);

    b.   relinquish his right to receive full pay and benefits during the Non-Compete Term;

    c.   adding a new twenty-four month ***all clients*** non-solicitation agreement; and

    d.   sell his vested RSUs to Clear Street at a price that's 65.2% less than Clear Street's recent valuation.

176.    Defendants violated, and continue to violate, New York Labor Law § 740(2) (prohibiting employer retaliation) and § 740(8) (requiring employers to post a notice informing employees of their rights and obligations under the whistleblower protection law), as well as SEC Rule 21F-17, 17 C.F.R. § 240.21f-17.

177.    Defendants' retaliatory actions were and are willful, malicious, or wanton.

178.    Defendants' retaliatory actions harm the public, in general, which has a strong

---

[3] Defendants' choice of outside counsel, Rick Ostrove of Leeds Brown, reputed to be Nassau County's most brutally aggressive litigator against employees, speaks volumes about Defendants' intentions vis-a-vis Plaintiffs. When asked exactly what individuals and entities his firm represents, he responded only "Clear Street" so, at this point Plaintiffs do not know the answer.

interest under state and federal law, in encouraging whistleblowers to take action to curb unlawful behavior such as Defendants' which is harmful to its employees, clients, investors, and vendors.

179.    As a result of Defendants' unlawful retaliatory conduct, Plaintiffs have suffered, and continue to suffer, harm, including, but not limited to, lost wages, benefits, and equity compensation, restricted current and future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and non-economic damages.

180.    Plaintiffs are also in imminent danger of Defendants filing fraudulent and defamatory Form U5s with FINRA, depriving them of their COBRA health care benefits, which would cause irreparable harm.

181.    Pursuant to N.Y. Labor Law § 740(4), Plaintiffs are entitled to:

a.    a temporary restraining order and preliminary injunction to restrain Defendants' continued violations;

b.    reinstatement of full fringe benefits and seniority rights;

c.    compensation for lost wages, benefits, and other renumeration;

d.    payment of their reasonable costs, disbursements, and attorneys' fees;

e.    a civil penalty of an amount not to exceed ten thousand dollars; and

f.    punitive damages.

## SECOND CAUSE OF ACTION

**(Declaratory Judgment Pursuant to 28 U.S.C. §2201)**
**(Against All Defendants)**

182.    Plaintiffs hereby incorporate and re-allege all prior allegations as if fully set forth herein.

183.    There is a definite and concrete, real and substantial, justiciable, and continuing case or controversy existing between Plaintiffs and Defendants regarding the parties rights and obligations under Plaintiffs' Employment Agreements and related documents.  This case or controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

184.    Plaintiffs contend that, as of September 16, 2025, Defendants had no right to terminate Plaintiffs "for cause" under their Employment Agreements, or take any subsequent related actions to direct forfeiture of their vested interests, deprive them of COBRA health care benefits, or file false and damaging Form U5s with FINRA, because

a.  CSM was already in material breach of the Employment Agreements, Plaintiffs were not in breach, and thus CSM precluded from taking such enforcement actions;

b.  CSM was already in material breach of the Employment Agreements, and Plaintiffs were relieved of their obligations to perform with respect to the provision Defendants sought to enforce;

c.  CSM repudiated its contractual obligations to Plaintiffs, so cannot now seek to enforce them; or

d.  CSM repudiated its contractual obligations to Plaintiffs, so Plaintiffs have been excused from their performance obligations; and

e.  No Defendant, other than CSM, is a party to Plaintiffs' Employment Agreements so regardless of which, if any, of the above is correct, none of them had any right to terminate any Plaintiff "for cause" or any reason, or to take any of the subsequent enforcement actions.

Accordingly, any such actions by Defendants are invalid, should be set aside, declared null and void, and Defendants should be enjoined from taking any such actions (or similar or related actions) going forward, and be directed to take corrective action to immediately reinstate the status quo.

185.    Defendants contend that as of September 16, 2025, or the date on which they terminated any particular Plaintiff "for cause":

      a.  CSM was not in material breach of the Employment Agreements;

      b.  CSM had not repudiated its obligations under the Employment Agreements;

      c.  Plaintiffs had materially breached their Employment Agreements;

      d.  Plaintiffs have not been relieved of their performance obligations; and/or

      e.  Defendants other than CSM have the right to take enforcement actions against the Plaintiffs under their Employment Agreements and/or other controlling agreements to be identified by them.

Defendants contend that any such actions by Defendants should are valid,  should not be set aside, declared null and void, and Defendants should not be enjoined from taking any such actions (or similar or related actions) to direct forfeiture of their vested interests, deprive them of COBRA health care benefits, or file false and damaging Form U5s with FINRA or to take immediate corrective action to reinstate the status quo.

186.    Defendants contend the opposite.

187.    Plaintiffs further contend that, even if Plaintiffs are incorrect with regard to their above assertions, and Defendants are correct about their assertions above, then:

      a. Plaintiffs did not commit any acts that could constitute "Cause" under the Employment Agreements;

    b. Defendants still had no right to direct forfeiture of their vested interests, because Plaintiffs did not engage in "misconduct" within the meaning of the applicable documents;

    c. Defendants still had/have no right to deprive them of COBRA health care benefits, because Plaintiffs did not engage in "gross misconduct" for purposes of the exclusion to COBRA coverage; and

    d. If Defendants seek to enforce Plaintiffs Employment Agreements, they:

        i. cannot demand that Plaintiffs agree to amend them, either by waiving their rights, adding new obligations, or increasing their obligations, under pain of litigation or otherwise;

        ii. cannot refuse to comply with and/or repudiate their own obligations under the Employment Agreements (e.g., refuse to pay Plaintiffs during their Non-Compete Leave);

        iii. breach their obligations by making false determinations of "Cause", "Misconduct", "Gross Misconduct", or misrepresentations on Form U5s.

188.    Defendants contend that they have not breached the Employment Agreements, but rather have merely 'extended counteroffers' or 'negotiated' with Plaintiffs as to modifying the terms of the already existing and enforceable Employment Agreements, and that in fact Plaintiffs have breached by engaging in 'misconduct' of some kind which they have not detailed.

189.    Plaintiffs seek a declaration of the parties' respective rights and obligations as set forth above.

**THIRD CAUSE OF ACTION**
**(ALTERNATIVE TO DECLARATORY JUDGMENT ACTION)**

**(Breach of Express Contract)**
**(Against Clear Street Management LLC)**

190.    Plaintiffs hereby reallege each allegation of the foregoing paragraphs with the exception of those in the Second Cause of Action as if fully set forth herein.

191.    Plaintiffs entered into valid and enforceable Employment Agreements with CSM.

192.    Plaintiffs fully performed, or substantially performed, all their duties and obligations under the Employment Agreements, or they were excused from performing them.

193.    CSM materially breached and/or unequivocally repudiated Plaintiffs' Employment Agreements, including, without limitation, their post-termination compensation and vesting provisions in various ways by, among other things: (1) demanding that Plaintiffs provide confidential information to third parties not entitled to the information and thereby violate the "Conduct During Employment" provisions, Section 3 of the Employment Agreement which require compliance with "all applicable laws, rules, and regulations"; (2) retaliating against Plaintiffs for expressing their concerns about Defendants' potential legal and regulatory violations, including by withholding promised compensation and, after they already resigned, purporting to terminate them "for cause" for admittedly malicious, vindictive reasons and without any lawful basis; (3) after certain Plaintiffs resigned in accordance with the terms of their Employment Agreements, using threats, intimidation, duress, and coercion to force them to sign punitive amendments to their Employment Agreements (*e.g.*, greatly extending existing and adding new restrictive covenants, and requiring Plaintiffs to abrogate other rights they had under their Employment Agreements) immediately, with no access to legal counsel, or face "for cause" termination and litigation; (4) after Plaintiff Travers resigned in accordance with the terms of his

Employment Agreement, demanding that he agree to triple his Non-Compete Period, add a lengthy client non-solicitation provision (where his original contract contained none), and give up his right to the Non-Compete Leave payments required by his existing agreement because Defendant Cohen unequivocally refuses to pay it; (5) threatening them by claiming Defendants would take all possible measures, including litigation to prevent them from resigning (despite Plaintiffs' express contractual right to do so) or commencing work for their New Employer long after their contractual non-competes expire; and (6) cancelling, terminating, and/or converting for their own use or benefit Plaintiffs' vested RSUs and stock options by falsely claiming Plaintiffs were terminated for cause thereby unilaterally reducing their compensation and benefits in contravention of the terms of the Employment Agreements.

194.    As a direct and proximate result of CSM's breaches, Plaintiffs have suffered direct and consequential damages, including loss of compensation, diminution of equity interests, reputational harm, and other consequential losses, and are entitled to recover compensatory damages, attorneys' fees, and other relief in an amount to be proved at trial, but in no event less than $11,644,944.

## FOURTH CAUSE OF ACTION
## (ALTERNATIVE TO DECLARATORY JUDGMENT AND EXPRESS BREACH OF CONTRACT CAUSES OF ACTION)

**(Breach of Implied Covenant of Good Faith and Fair Dealing)**
**(Against Clear Street Management LLC)**

195.    Plaintiffs hereby repeat and reallege the foregoing allegations with the exception of those in the Second and Third Causes of Action as if fully set forth herein.

196.    Plaintiffs entered into valid and enforceable Employment Agreements with CSM.

197.    Plaintiffs fully performed, or substantially performed, all their duties and obligations under the Employment Agreements, or they were excused from performing them.

198.    Implied in each of Plaintiffs' Employment Agreements is a covenant of good faith and fair dealing, prohibiting CSM from taking actions that would injure Plaintiffs' right to receive the benefits of those agreements.

199.    CSM was bound to perform its obligations in good faith and to refrain from conduct that would deprive Plaintiffs of the fruits of their bargains.

200.    Plaintiffs reasonably understood, and had a right to expect, that CSM would act in good faith towards them under the Employment Agreement.

201.    CSM breached these implied covenants by, among other things: (1) demanding that Plaintiffs provide confidential information to third parties not entitled to the information and thereby violate their legal and professional duties; (2) retaliating against Plaintiffs for expressing their concerns about Defendants' potential legal and regulatory violations, including by withholding promised compensation and, after they already resigned, purporting to terminate them "for cause" for admittedly malicious, vindictive reasons and without any lawful basis; (3) after certain Plaintiffs resigned in accordance with the terms of their Employment Agreements, using threats, intimidation, duress, and coercion to force them to sign punitive amendments to their Employment Agreements (*e.g.*, greatly extending existing and adding new restrictive covenants, and requiring Plaintiffs to abrogate other rights they had under their Employment Agreements) immediately, with no access to legal counsel, or face "for cause" termination and litigation; (4) after Plaintiff Travers resigned in accordance with the terms of his Employment Agreement, demanding that he agree to triple his restrictive covenants, accept a lengthy client non-solicitation provision (where his original contract contained none), and give up his right to the Non-Compete

Leave required by his existing agreement because Defendant Cohen absolutely and unequivocally refuses to pay it; (5) threatening them by claiming Defendants would take all possible measures, including litigation to prevent them from resigning (despite Plaintiffs' express contractual right to do so) or commencing work for their New Employer long after their contractual non-competes expire; and (6) terminating, cancelling, and/or converting for their own benefit and use Plaintiffs' vested RSUs by falsely claiming Plaintiffs were terminated for cause thereby unilaterally reducing their compensation and benefits in contravention of the terms of the Employment Agreements.

202.    To the extent CSM's conduct did not violate the express provisions of Plaintiffs' Employment Agreements, they nonetheless breached their implied covenant of good faith and fair dealing by attempting to forcefully coerce Plaintiffs into amending the Employment Agreements.

203.    CSM's breaches were willful and undertaken in bad faith, evidencing misconduct and a deliberate disregard of Plaintiffs' rights.

204.    As a direct and proximate result of CSM's breaches, Plaintiffs have suffered direct and consequential damages, including loss of compensation, loss of equity interests, reputational harm, and other consequential losses, and are entitled to recover compensatory damages and other relief in an amount to be proved at trial, but in no event less than $11,644,944.

<u>**FIFTH CAUSE OF ACTION**</u>

**(Unjust Enrichment)**
**(Against All Defendants Except CSM)**
**(Against CSM in the Alternative to Second, Third, and Fourth Causes of Action)**

205.    Plaintiffs hereby reallege each allegation of the foregoing paragraphs as if fully set forth herein.

206.    Defendants were unjustly enriched and benefited by retaining and/or converting to their own use and benefit, Plaintiffs' compensation, equity interests, and other benefits to which Plaintiffs were entitled under their Employment Agreements.

207.    Defendants' retained and/or converted these benefits to their own benefit and use at Plaintiffs' expense.

208.    Defendants' enrichment was obtained through wrongful conduct, and/or or under circumstances where equity demands restitution.

209.    It is against equity and good conscience to permit Defendants to retain benefits of Plaintiffs' labor, contributions, and entitlements under the circumstances.

210.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs have suffered damages in an amount to be proved at trial, but in no event less than $11,644,944, together with pre- and post-judgment interest, attorneys' fees, and costs.

## SIXTH CAUSE OF ACTION

### (Defamation Per Se)
### (Against All Defendants)

211.    Plaintiffs hereby reallege each allegation of the foregoing paragraphs as if fully set forth herein.

212.    On and after September 15, 2025, Defendants published false statements of fact about, of, and concerning Plaintiffs to the Clear Street Defendants' officers, directors, executives, employees, and, upon information, to the Clear Street Defendants' independent contractors, clients, investors, vendors, and affiliated companies and personnel.

213.    Through both their words and actions, Defendants defamed Plaintiffs by stating:

    a.    in public Form U5s filed with FINRA on the morning of October 10, 2025 – after receiving notice of Plaintiffs' intention to seek emergeny injunctive relief this

morning – that Plaintiffs were "discharged" due to "Breach of Contract – Restrictive Covenants"'

b.  in Clear Street documentation and the CARTA system – which is accessed on a regular basis by all Clear Street employees – that Plaintiffs were terminated "for cause" and engaged in "misconduct" sufficient to cause them to forfeit their vested RSUs and stock options;

c.  in Clear Street documentation and the health insurance administration system that Plaintiff Travers was terminated "Involuntarily" and, upon information and belief, for "gross misconduct" sufficient to cause him and his family member beneficiaries to be excluded from COBRA health benefits;

d.  on information and belief, in Clear Street documentation and the COBRA administration system that all other Plaintiffs engaged in "gross misconduct" sufficient to cause them and their family member beneficiaries to be excluded from COBRA health benefits;

e.  orally to Clear Street Defendants' officers, directors, executives, and employees that Plaintiff Travers is the "ringleader" who orchestrated the Plaintiffs' resignations and moves to the New Employer;

f.  orally to various Clear Street personnel and investors that Plaintiffs violated their Employment Agreements;

g.  orally to various Clear Street personnel and investors that Plaintiffs solicited Clear Street employees to join the New Employer;

h.  that Plaintiffs were terminated "for cause" when Plaintiffs had already resigned, and CSM had already breached their Employment Agreements thus relieving Plaintiffs of any further performance obligations, and/or no such cause existed;

214.    Defendants' statements and actions were reasonably understood to be statements of fact about Plaintiffs, and were understood by people who saw, heard, and/or read them to be statements of fact about Plaintiffs.

215.    Each of the statements made regarding Plaintiffs were false, set forth untruthful reasons for their termination from CSM, and forfeiture of their vested interests, and impugned their integrity and professional conduct by implying Plaintiffs had performed their jobs poorly or engaged in unethical or unlawful conduct.

216.    Each of the Defendants acted with at a minimum negligence, in making false statements because, among other things, prior to and at the time the statements were made

217.    In fact, even though Plaintiffs as non-public figures need not plead or prove it, Defendants own admissions, and conduct, prove that Defendant Cohen, and all other Defendants who are controlled and mere alter egos of Defendant Cohen, made these false statements with reckless disregard for their falsity, or malicious intent to defame and har Plaintiff as evidenced by representatives authorized to speak on their behalf, including Defendants Cohen and Sicklick, Mr. Tilly, Mr. Volz, and Defendants' outside counsel, Mr. Ostrove, each admitting that neither they personally nor Defendants had any evidence, and were aware of no facts, that supported the truthfulness of their statements but Defendants wanted to defame Plaintiffs – whom they knew were whistleblowers preparing to report Defendants' illegal conduct to government bodies and seek relief against them – out of spite and ill will, and announced that they:

a.  have to "make an example of" the Plaintiffs, especially Plaintiff Travers;

    b.  intend to "sue Pat Travers **and his family into the ground**" regardless of whether Defendants have no evidence, factual basis or even if all other Plaintiffs give Defendants everything they demanded.

218.  The substantial danger of injury to Plaintiffs' reputation from Defendants' false statements is readily apparent. Such false statements about their termination from CSM would tend to harm the reputation of Plaintiffs as to lower them in the estimation and esteem of their colleagues, clients, investors, vendors, the community, and/or to deter third parties from associating, dealing, or working with them.

219.  As a direct and proximate result of Defendants' false statements, Plaintiffs suffered damages, including, *inter alia*, injury to their reputation, harm to their ability to carry on their profession, embarrassment, humiliation, and emotional distress.

220.  Defendants had no applicable privilege or legal authorization to make these false and defamatory statements about Plaintiffs, or if they did, they abused it.

221.  Accordingly, Plaintiffs are entitled to judgment awarding them damages, punitive damages, preliminary and permanent injunctive relief, and all other relief the Court deems just.

## <u>SEVENTH  CAUSE OF ACTION</u>

**(Wrongful Termination - ERISA § 510 (29 U.S.C. § 1140); Failure to Comply with Notice Requirements and Injunctive Relief –**
**ERISA §§ 502(a)(1)(B) and (a)(3) (29 U.S.C. §§ 1132(a)(1)(B) and (a)(3)); and COBRA § 1166(a) (29 U.S.C. § 1166(a))**
**(Against All Defendants)**

222.  Plaintiffs hereby reallege each allegation of the foregoing paragraphs as if fully set forth herein.

223.    ERISA § 510 provides that it is unlawful to discharge "a participant or beneficiary … for the purpose of interfering with the attainment of any right to which such participant may become entitled to under [an employee benefit plan]." 29 U.S.C. § 1140.

224.    As a participant and/or beneficiary of the Issuance Agreement, Plaintiffs belonged to a group protected by ERISA § 510.

225.    Although Plaintiffs were qualified for their positions, they were discharged purportedly for cause shortly after submitting their resignations, and as a result, Plaintiffs were forced to forfeit all benefits of their Employment Agreements, including all vested RSUs and stock options and, upon information and belief, Defendants intend to deprive Plaintiffs of their COBRA health insurance benefits.

226.    As evidenced by the temporal proximity between the date of Plaintiffs' attempted resignations and the date Defendants purported to terminate them for cause, Defendants terminated Plaintiffs with the specific intent of depriving Plaintiffs of benefits to which they were entitled under the Issuance Agreement and Employment Agreement.

227.    As a direct and proximate result of CSM's wrongful termination carried out in order to prevent Plaintiffs' attainment of a right under the Employment Agreement, Plaintiffs have been damaged.

## EIGHTH CAUSE OF ACTION

**(Failure to Comply with Notice Requirements and Injunctive Relief
ERISA §§ 502(a)(1)(B) and (a)(3) (29 U.S.C. §§ 1132(a)(1)(B) and (a)(3)) and COBRA §
1166(a) (29 U.S.C. § 1166(a))
(Against All Defendants)**

228.    Plaintiffs hereby reallege each allegation of the foregoing paragraphs as if fully set forth herein.

229.    Under federal law, any employee becomes eligible for COBRA benefits, including, but not limited to, eligibility for COBRA health coverage.  Federal law and regulations also allow an employer to deny a former employee eligibility for COBRA benefits if the employer classifies the former employee's termination as for "gross misconduct."

230.    CSM is controlled by Defendant Cohen indirectly through Defendants CSH and CSG.  CSM is also the Plan Administrator and Sponsor of the group plan under which Plaintiffs and all CSM employees had their health insurance.

231.    CSM, the Plan Administrator, and therefore CSG and Defendant Cohen, have sole discretion to determine whether an employee's termination was for Misconduct.  These Defendants control whether Plaintiffs were terminated for Misconduct within the meaning of the plan documents.

232.    Given Defendant Cohen's control of CSM, he also effectively controls whether an employee (like Plaintiffs) could be classified as having been terminated for gross misconduct and, by extension, ineligible for COBRA benefits.

233.    While most companies are reluctant to claim a former employee was terminated for "gross misconduct" absent proof the employee engaged in serious malfeasance, Plaintiffs are concerned that Defendants, particularly Defendant Cohen, have engaged in erratic, egregious, and vindictive behavior such that Defendants may attempt to punish or strong-arm Plaintiffs further by attacking their health insurance benefits under COBRA by claiming Plaintiffs were terminated for "gross misconduct."

234.    Further, the COBRA notices that Plaintiffs have received to date only obfuscate whether Plaintiffs and their beneficiaries are and will continue to be eligible for COBRA.

235.    For example, the COBRA notices issued by Defendants completely mismatch what Defendants have told Plaintiffs about their respective leaves from Clear Street and have sewn confusion and fear in Plaintiffs regarding the future of their health care coverage.

236.    Plaintiff Travers' COBRA election notice listed the reason for receiving the notice as "End of Employment (Involuntary)," despite Plaintiff Travers' uncertain employment status with Clear Street.

237.    In contrast, the COBRA election notices for Plaintiffs Batanjany, Solomon, and Brodsky all listed their reason for receiving notice as "End of Employment (Voluntary)," despite Defendants telling them that they had been terminated for cause.

238.    Defendants failure to comply with the notification requirements as set forth by 29 U.S.C. § 1166(a) renders them liable for statutory damages pursuant to 29 U.S.C. § 1132(c)(1)(A)

239.    Plaintiffs are entitled to emergency injunctive relief and permanent injunctive enjoining Defendants from making false determinations and otherwise seeking to deprive Plaintiffs of their COBRA health insurance benefits, to preserve the status quo and prevent imminent irreparable harm.

## NINTH CAUSE OF ACTION

**(Conversion)**
**(Against All Defendants)**

240.    Plaintiffs hereby reallege each allegation of the foregoing paragraphs as if fully set forth herein.

241.    Plaintiffs had a property right in their respective RSUs which had vested when they submitted their resignations on September 15, 2025.

242. Plaintiff would have taken full ownership and control over the vested RSUs after resigning, but for Defendants wrongful termination of Plaintiffs purportedly for cause when no such cause existed.

243. By claiming that Plaintiffs were terminated for cause, Defendants exercised an unauthorized dominion and control over the vested RSUs and revoked them from Plaintiffs.

244. During attempted negotiations with Defendants regarding Plaintiffs' separation from Clear Street, Plaintiffs asked that Defendants reinstate the vested RSUs. Defendants ignored or refused those requests.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests that this Court:

A. Grant judgment on the Nine Causes of Action in favor of Plaintiffs against Defendants in an amount to be determined at trial, together with pre- and post-judgment interest thereon;

B. Issue a temporary restraining order and preliminary injunction pending resolution of Plaintiffs' claims in this action as requested in Plaintiffs' contemporaneously filed Motion For a Temporary Restraining Order, Preliminary Injunction, and Sanctions;

C. For the Seventh and Eighth Causes of Action, enter judgment as follows: (a) compensatory damages; (b) attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g); (c) prejudgment interest; and (d) such other relief as the Court may deem just and appropriate under the circumstances.

D. Award Plaintiffs their attorneys' fees and costs;

E. Award sanctions against Defendants and their attorneys for filing defamatory U5s

with FINRA after Plaintiffs notified Defendants of their intention to seek emergency injunctive relief this morning and before this Court had the opportunity to rule; and

F.  Grant Plaintiffs such other and further relief as the Court deems just.

## JURY DEMAND

Plaintiffs demand trial by jury on all claims and issues so triable.

Dated: New York, New York
October 10, 2025

Respectfully Submitted,

By: /s/ *Courtney R. Rockett*
Courtney R. Rockett
Alyssa M. Pronley
Patrick E. McDonough
Jarrett M. Field
**Sterlington PLLC**
228 Park Avenue South, No. 97956
New York, New York 10003
(212) 433-2831
courtney.rockett@sterlingtonlaw.com
alyssa.pronley@sterlingtonlaw.com
patrick.mcdonough@sterlingtonlaw.com
jarrett.field@sterlingtonlaw.com
*Attorneys for Plaintiffs Michael Batanjany, Patrick Travers, Cory Solomon, and Jordan Brodsky*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL BATANJANY, CORY SOLOMON, PATRICK TRAVERS and JORDAN BRODSKY,<br><br>Plaintiffs,<br><br>v.<br><br>CLEAR STREET MANAGEMENT LLC, CLEAR STREET DERIVATIVES LLC, CLEAR HOLDINGS LLC, CLEAR STREET LLC, CLEAR STREET HOLDINGS LLC, CLEAR STREET GROUP INC., URIEL EPHRAIM COHEN, and KENNETH ARI SICKLICK,<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:   Case No._____<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## VERIFICATION OF MICHAEL BATANJANY

I, Michael Batanjany, declare under penalty of perjury under the laws of the United States of America that I have read the foregoing Verified Complaint, and that the facts alleged therein are true and correct to the best of my personal knowledge.

Executed on October 10, 2025

Michael Batanjany

1