UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
MICHAEL BATANJANY, CORY SOLOMON,            1:25-cv-08420-AT
PATRICK TRAVERS, and JORDAN BRODSKY,

                           Plaintiffs,
                                                                        **DECLARATION OF**
              -*against*-                                 **ANDREW VOLZ**

CLEAR STREET MANAGEMENT LLC,
CLEAR STREET DERIVATIVES LLC,
CLEAR HOLDINGS LLC, CLEAR STREET LLC,
CLEAR STREET HOLDINGS LLC,
CLEAR STREET GROUP INC.,
URIEL EPHRAIM COHEN, and
KENNETH ARI SICKLICK,
                           Defendants.
------------------------------------------------------------------X

      Andrew Volz, pursuant to 28 U.S.C. §1746, hereby declares as follows under penalty of perjury:

      I submit this Declaration in support of Defendants' motion to compel arbitration and in opposition to Plaintiffs' memorandum of law in support of motion for a temporary restraining order and preliminary injunction and for sanctions.

1. I am the Chief Executive Officer of Clear Street LLC and the Chief Commercial Officer of Clear Street Group Inc. Clear Street Holdings LLC is a wholly owned subsidiary of Clear Street Group Inc. Clear Street Management LLC, Clear Street Derivatives LLC, and Clear Street LLC are wholly owned, or nearly wholly owned, subsidiaries of Clear Street Holdings LLC. These entities operate collectively under the Clear Street brand and are hereinafter referred to collectively as "Clear Street." Upon reviewing the Complaint, I note that Plaintiffs also name "Clear Holdings LLC" as a defendant. To my knowledge,

1

that entity has no connection whatsoever to Clear Street or any of its affiliates. Public records indicate that "Clear Holdings LLC" is a separate Delaware entity associated with aircraft ownership and operations. https://registry.faa.gov/AircraftInquiry/Search/NNumberResult?nNumberTxt=425X&utm_source=chatgpt.com. According to the FAA, the Delaware address associated with Clear Holdings LLC has no connection to Clear Street.

2. I am part of Clear Street's Executive Management Team. I am familiar with Clear Street's business operations, its competitive positioning, its sensitive proprietary systems, and the intellectual property employed by the Firm, as well as the circumstances surrounding the termination of the Plaintiffs.

## OVERVIEW

3. The allegations in the Plaintiffs' Complaint present a false and inflammatory narrative. Clear Street denies engaging in wrongful or unlawful conduct, and none of the Plaintiffs ever reported or complained to me -- or to my knowledge, to anyone else at Clear Street -- about any illegal activities before their resignations.

4. As Chief Executive Officer of Clear Street's securities-based swap dealer (the "Derivatives Team"), Travers had ultimate responsibility for overseeing that division's operations, compliance, and performance.

5. Plaintiffs were among the highest-paid employees at Clear Street, collectively earning over $13 Million annually. When they signed their lucrative employment agreements, they committed not to compete, not to prepare to compete, and to arbitrate any

employment disputes. They breached all these agreements as evidenced by the circumstances surrounding their coordinated resignations.

6. On September 15, 2025, seven employees, including all four Plaintiffs, gave notice of their intent to leave. Clear Street quickly learned that they were all bound for the same competitor. The timing and coordination of these resignations left no doubt that the effort had been jointly planned, likely over an extended period of time.

7. Their coordinated effort would have removed nearly the entire senior leadership of one of Clear Street's most profitable business units to start a competing division at a rival firm.

8. This conduct violated the restrictive covenants in the Plaintiffs' employment agreements, which prohibited them from engaging in or preparing to engage in any competitive business activity, or from soliciting, inducing, or otherwise interfering with another employee's employment.

9. Clear Street had paid these employees tens of millions of dollars for precisely these commitments.

10. As high-level employees, Plaintiffs had access to confidential, proprietary, and strategic information, and Clear Street was deeply concerned that the employees would undermine the company by departing for a competitor.

11. Upon discovering this coordinated plan, Clear Street acted squarely within its contractual and legal rights by terminating the Plaintiffs during their notice period when they all arrived at the office to work the next day. This resulted in the forfeiture of the Plaintiffs' equity and the accurate completion of all required regulatory filings, including Form U5 submissions.

## DERIVATIVES TEAM

12. Clear Street's Derivatives Team helps clients invest in different assets without actually owning them. Clear Street holds the assets, and clients make agreements that let them gain or lose money based on how those assets perform. This kind of financing lets clients borrow money to support the launch of their products, usually exchange-traded funds ("ETFs") that move up or down with the market. It is a way for clients to get the funding they need to bring their investment products to market quickly.

13. The Derivatives Team consists of approximately ten employees.

14. Among the members of the Derivatives Team were Plaintiffs Travers, Cory Solomon ("Solomon"), and Jordan Brodsky ("Brodsky"). Plaintiff Michael Batanjany ("Batanjany") was not a member of the Derivatives Team, but he worked with the Derivates Team on a daily basis.

15. Travers was the senior executive in charge of the Derivatives Team. He had ultimate responsibility for its commercial, operational, and regulatory strategy and was privy to confidential information concerning capital allocation, product design, client relationships, and future business initiatives. Travers' position gave him insight into nearly every aspect of Clear Street's institutional client base and long-term competitive planning.

16. Solomon was the Managing Director of the Derivatives Team and was instrumental in developing and executing Clear Street's derivatives strategies. He also played a key role in trading an options book related to the funding of the overall business.

4

17. Brodsky was the Associate Director of the Derivatives Middle Office and was responsible for post-trade processing, position reconciliation, trade confirmation, and regulatory reporting for Clear Street's derivatives business. She had day-to-day access to transaction data, client account information, and proprietary processes used to manage operational risk and ensure compliance with regulatory requirements. Her role placed her in direct contact with sensitive internal systems and client records that are essential to the smooth functioning of the derivatives platform.

18. Batanjany was the Head of Securities Lending Demand. He constantly interfaced with the Derivatives Team and was responsible for oversight of Clear Street's largest securities finance accounts. He regularly handled information concerning client pricing structures and trading positions. He worked closely with the trading and funding desks to execute transactions. That role necessarily exposed him to sensitive, non-public information about Clear Street's funding model, client demand patterns, and internal profit margins.

19. Additional members of the Derivates Team included William Frank ("Frank"), Adam Glazer ("Glazer"), and Curtis Allemang ("Allemang"). These employees were also high-level executives with access to trade secrets and sensitive information.

20. Collectively, the Derivatives Team oversaw trading, client relationships, and operational functions, and their roles involved extensive access to confidential information, proprietary systems, and strategic plans.

21. The business line managed by the Derivatives Team was one of the most profitable and strategically important divisions within Clear Street. It generates substantial revenue, supported many of the firm's largest institutional clients, and was integral to Clear Street's reputation and market position in prime brokerage and clearing services.

22. The Plaintiffs were collectively paid more than $13 million per year, which was well above industry standard compensation for their respective roles.

## EMPLOYMENT AND RSU AGREEMENTS

### At-Will Employment

23. Travers, Solomon, Brodsky, and Batanjany all signed employment agreements with Clear Street as at-will employees. (Exhibits 1-4 – "Employment Agreements").

24. In the introductory recital clauses of each Employment Agreement it states: "The Company desires to employ the Employee on a full-time basis, at-will …"

25. The at-will nature of the Plaintiff's employment is further established in Section 12.1 of each Employment Agreement, which is entitled "Employment At-Will" and specifies that either party could terminate the relationship at any time, with or without cause, with or without notice.

26. Employees were not required to provide advance notice of resignation but were requested to do so under Section 12.3. None of the Employment Agreements require Clear Street to provide any justification or reasoning for an employee's termination.

27. Although Plaintiff Frank is an at-will employee, his employment agreement provided him with a $100,000 bonus which could be clawed back if he was terminated for "Cause." "Cause" was defined to include "any act or omission by Employee that is reasonable to expect would materially injury the reputation, business or business relationships of Company or any of its affiliates." (Complaint ¶ 128.)

### Non-Compete Clause

28. Each of these agreements contains a non-competition clause. Each non-competition clause states:

6

> Employee shall not, directly or indirectly, participate in, *engage in or prepare to engage in* any Competitive Business Activity.

(emphasis added). Travers and Brodsky are subject to a three-month post-employment non-compete period, while Batanjany and Solomon are subject to a nine-month post-employment non-compete period. The non-compete restrictions also applied while employed by Clear Street. (Exhibits 1-4, Attachment A § 3.).

29. Each of the Employment Agreements extends full payment to the employees of base pay during their non-competition period. In other words, they would be on "garden leave" and not working for Clear Street during this time.

**<u>Non-Solicitation Clause</u>**

30. Each agreement also contains a "Non-Solicitation and No Hire" clause, which states that, while employed by the Firm and for a period of 24 months thereafter, the employee shall not, either individually or on behalf of any other person or entity, directly or indirectly:

> employ, solicit, induce, hire, offer to hire, *or otherwise interfere with the employment* ... of any current or former ... employee of the Company or its affiliates.

(Emphasis added).

**<u>Arbitration Clause</u>**

31. Each of the Employment Agreements at issue also contains an arbitration clause. This clause states:

> Any dispute between Employee and Company which cannot be amicably settled and is a dispute that arises out of Company's securities business activities shall be submitted for binding arbitration per the rules of FINRA. All other disputes that do not arise from Company's securities business activities shall be submitted for binding arbitration administered by the American Arbitration Association (AAA), unless the dispute is required to be submitted to FINRA. Arbitration shall be the exclusive dispute resolution process...

7

32. Travers' Employment Agreement designates JAMS as the arbitration agency, while the other agreements designate AAA.

**Restricted Stock Unit ("RSU") Agreements**

33. In addition to the Employment Agreement, each of the Plaintiffs also had an RSU Agreement. (Exhibits 5-8.) These "RSU Agreements" governed the allocation and valuation of restricted stock units to the employees. Each RSU Agreement states:

> In the event the Participant's Service is terminated for misconduct, all RSUs shall automatically be forfeited and the Participant shall have no further rights with respect to such forfeited RSUs, regardless of whether and the extent to which the Time Requirement has been satisfied as of such termination. The Plan Administrator shall have sole discretion to determine whether termination of Service has occurred, the effective date of such termination, and whether such termination was for Misconduct.

34. "Misconduct" is defined in the RSU Agreements as:

> the commission of any act of fraud, embezzlement or dishonesty by the Participant, any unauthorized use or disclosure by the Participant of confidential information or trade secrets of the Corporation (or any Parent or Subsidiary), or any other intentional misconduct by the Participant adversely affecting the business or affairs of the Corporation (or any Parent or Subsidiary) in a material manner.

### HIRING OF JOHN LEVENE

35. In May 2025, Clear Street hired John Levene ("Levene") as Head of Institutional. In this role, Levene oversaw the Firm's prime brokerage business and managed the sales, capital introduction, and client service teams.

36. Prior to joining Clear Street, Levene had been spent over 25 years at Goldman Sachs, including 14 years as a partner, during which time he served as a leader and held prominent positions.

37. Travers complained to me about Levene's hire on multiple occasions. He told me, and others, that he believed that he was being usurped, as Levene had been assigned some roles previously filled by Travers. On one occasion, Travers said to me, "There's no fucking way I'm working for this guy."

38. After Levene started working at the Firm, Travers' negative attitude got worse. Travers frequently made sarcastic comments about Levene and even threatened to resign due to Levene's hire.

39. During a company town hall, Levene made a presentation at which he announced that approximately 10 employees were being reassigned from Travers to Levene. I witnessed Travers react by becoming visibly upset.

40. Because Clear Street valued Levene's extensive experience, he was included in meetings of the Firm's Executive Management Team. Travers was upset that he was not included in these meetings, and I believe that this only reinforced his belief that he was being supplanted.

41. In summary, I noticed a marked change in Travers' attitude and outlook once Levene was hired, and I believe that this directly led to the events that followed.

## EVENTS OF SEPTEMBER 15, 2025

42. Early in the morning on September 15, 2025, Travers approached me. He told me that he was resigning from the Firm as he had received a better offer to work at another company. I asked him what company had made the offer, but he refused to tell me. He told me it was a "crypto firm" and that they offered to double his compensation. I also asked him if he was the only one who was leaving. He told me that the only employees leaving were him and Allemang.

43. Within a half hour, I was approached by Allemang. He informed me that he was resigning as he had received an offer from another firm. He said that he had to take the offer because it was "phenomenal."

44. After my conversation with Allemang, I reported the situation to Atul Pawar ("Pawar"), Clear Street's Chief Risk Officer. I also told Pawar my suspicion that they were leaving to go work at Hidden Road. I suspected this because I believe that Hidden Road is the only firm that has enough capital and the appropriate registration to operate a viable swap dealer entity, but it was not functioning as one in the same business line that Clear Street was operating. It therefore made sense that it would offer dramatically above-market compensation to lure away our team, build that business, and compete with us. It also can be characterized as a "crypto firm," and was recently acquired by Ripple Labs Inc. in a deal that has been reported to be worth $1.25 billion.

45. When I relayed my suspicions to Pawar, he told me that this was his suspicion as well.

46. After that, I had another conversation with Travers. I told him that I suspected he was going to Hidden Road, and he admitted to me that was the case. I told Travers that Hidden Road was one of our competitors and that his going to work there would violate his non-compete agreement. During the conversation, I asked Travers if it was really just him and Allemang who were leaving. He responded by telling me that it was them and "a few others" thereby revealing that he either lied or misled me in our first conversation, and that he knew others were going to resign.

47. Within a few hours of this conversation, I learned that Brodsky, Batanjany, Frank, Solomon, and Glazer had also resigned.

48. Later that day, I ran into Batanjany. We briefly discussed the fact that he was leaving. He told me, in sum and substance, that he had been trying to get more money from Clear Street for a while, and that he was leaving to go with Travers because Hidden Road was offering him a lot more pay.

## CLEAR STREET RESPONSE

49. Throughout the rest of the day, I had numerous discussions with other Clear Street senior executives. We were all concerned that more than 50% of the Derivatives Team was leaving *en masse*, and that this could significantly impact our business.

50. We were also concerned that the employees were all leaving for a competitor, and that they had obviously planned this together. The fact that they all resigned on the same day, within a short time of one another, and were bound for the same competitor, left no doubt that their departures were coordinated and that they had jointly planned to compete with Clear Street. It is impossible to believe that seven senior professionals independently decided to leave their lucrative positions simultaneously for the same destination without prior discussion or mutual encouragement. Also, Travers lied or misled me in our initial conversation as to who was leaving and revealed that he knew of the other resignations. Further, Travers had connections throughout the industry, and he could have directed Hidden Road to employees of other firms, but instead they tried to decimate our firm. Accordingly, other executives and I reasonably concluded that they must have communicated extensively while still employed, shared information about prospective employment, and coordinated the timing and circumstances of their departures. In doing so, they interfered with one another's employment relationships and prepared to compete in violation of their contractual and fiduciary duties to Clear Street.

11

51. Also, we knew that Hidden Road had a small derivatives business and was trying to jump start that line of business at their firm. The easiest way to do this was to "poach" our Derivatives Team.

52. In my view and the view of the Executive Management Team, this behavior represented a violation of the individuals' restrictive covenants and constituted intentional misconduct especially since the plans were made while they still worked at Clear Street, while being paid over $13 Million annually not to engage in this behavior.

53. We believed that, as leader of the Derivates Team, Travers was the driving force behind the departures, and that his anger over the hiring of Levene led him to help Hidden Road target the exact employees that would be needed to inflict maximum damage on the Firm and ensure the success of our competitor.

54. The loss of all these particular employees *all at the same* time was deeply concerning.

55. Given their roles, each Plaintiff (and the other departing employees) had access to or knowledge of proprietary models, software, trading strategies, counterparty risk metrics, and internal processes that are not publicly disclosed. Their prior positions placed them in the "inner sanctum" of the firm's highest-level operational, product, and technological workstreams.

56. Ultimately, the Firm's senior leadership determined that, to minimize the impact to our business, we would have to make counteroffers to some of the departing employees. We believed that this would allow us to continue to operate our Derivatives Team at the same level it had operated at in the past. We identified the employees we wanted to keep as Solomon, Brodsky, Frank, Glazer, and Allemang.

57. Given the substantial risk to Clear Street, we decided that we had to act quickly to retain some of these employees. Accordingly, within the bounds of the law, we did exert pressure, both time pressure and significant financial incentives, to encourage them to stay.

58. On September 16, 2025, I had a phone call with Allemang. I told him that we wanted to keep him at Clear Street and extended a substantial counter to Hidden Road's offer of increased compensation. Allemang accepted my offer and agreed to stay at Clear Street.

59. I had a similar discussion with Brodsky and made her a counteroffer. She rejected it.

60. Another Clear Street executive, John DiBacco, extended similar offers to Solomon and Glazer. Glazer accepted his offer and stayed at Clear Street, and Solomon rejected his.

61. Frank was presented a counteroffer by Jon Daplyn, Clear Street's Chief Operating Officer. Frank rejected it.

62. When the offers were extended to each of the employees, they were each informed that their behavior had violated the provisions of their Employment Agreements, and that they would be terminated for cause if they did not agree to stay at the Firm. They were each given a short time frame to accept or reject the offer.

63. This same message (i.e., that they had violated their Employment Agreement), was delivered to Travers and Batanjany. However, we did not extend counteroffers to them.

64. Travers did not receive a counteroffer because senior management believed he led the effort to have over 50% of our Derivatives Team leave the firm at once, that he had enticed other employees to leave, and that he had assisted Hidden Road in selecting the critical employees to target. We also felt that we could sustain operations without him, especially if we were able to retain others.

65. Similarly, Batanjany didn't receive a counteroffer because of his disloyalty, he was not technically a member of the Derivatives Team, and we believed that we could continue the Team's functions without him.

66. Ultimately, the retention of Allemang and Glazer allowed Clear Street's Derivatives Team to continue functioning as it had in the past.

67. However, the retention packages extended to these employees in the wake of the coordinated resignations cost the Firm millions of dollars and significant time and effort.

## CONVERSATION WITH ALLEMANG

68. I have had several conversations with Allemang regarding his now-abandoned effort to leave Clear Street for Hidden Road.

69. Allemang confirmed our suspicions. He told me that the employes who were planning to leave (i.e., the Plaintiffs plus himself, Frank, and Glazer) had extensively discussed the offers they received from Hidden Road with each other, and the fact that they would all notify Clear Street of their planned departures on the same day. Indeed, he specially said, among other things, "No shit we coordinated it. How else do you explain us all quitting the same morning."

70. He said that the employees were going to Hidden Road to perform substantially the same functions they performed at Clear Street.

71. He also told me that, in all of his conversations with his fellow departing employees, the only reason that any of them cited for leaving was that Hidden Road would pay them substantially more money.

72. He told me that none of the other departing employees had cited impropriety at Clear Street as the reason that they were leaving. In fact, he told me that in all his conversations

with the other employees none of them had ever even mentioned Clear Street's alleged unlawful actions.

## LAWSUIT

73. On October 3, 2025, the Firm received a letter from counsel representing Travers, Solomon, Batanjany, Frank, and Brodsky. (Exhibit 9.) This letter accused Clear Street of "defamation per se, breach of employment agreements, and use of threats, duress, and coercion to try to force them to give up their rights and/or agree to broader restrictive covenants and other extra-contractual obligations, under pain of fraudulent 'for cause' termination, forfeiture of vested interests, and pursuit of frivolous litigation against them."

74. Notably, this letter did not allege any violations of FINRA or SEC rules and did not allege any of the misconduct that was later alleged in the Verified Complaint.

75. The very next day, on October 4, 2025, the Firm received another letter from Plaintiffs' counsel. (Exhibit 10.) I viewed this letter as an amplification of the one from the previous day.

76. Despite Plaintiffs and their counsel being fully aware of the arbitration clauses, the Plaintiff's filed the instant action in this Court on October 10, 2025, in violation of their Employment Agreements.

77. Given that settlement negotiations were ongoing since their terminations and that they have been contentious, I believe that the decision to proceed publicly was a calculated attempt to gain leverage in settlement discussions by publicizing false and malicious accusations.

78. The filing was unnecessary, improper, and in direct contravention of the Plaintiffs' arbitration agreements. As noted in the memorandum submitted herewith, Clear Street is moving to compel arbitration, which is where all these claims should be litigated.

## **CONCLUSION**

79. While the Plaintiffs' filings here attempt to portray themselves as victims, Clear Street paid them tens of millions of dollars, and Plaintiffs are demanding that Clear Street pay them millions more despite their disloyalty, intentional misconduct, and breaches of their Employment Agreements.

80. Because these employees were not low-level or back-office staff but senior professionals with high compensation and deep access to sensitive information, the risk posed by their departures was materially greater than would be the case for lesser employees. The level of access and responsibility they held, as well as their executive compensation packages, justified heightened confidentiality and non-competition expectations.

81. In light of the foregoing, Clear Street's decision to classify their departures as "for cause," and to treat the terminations as falling within the "Misconduct" standard under the RSU Agreements was contractually supportable, consistent with corporate practice, and necessary to protect Clear Street's intellectual property, client relationships, and system integrity.

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 20, 2025.*

                                                                         *Andy Volz*
                                                                      Andy Volz (Oct 20, 2025 15:54:05 EDT)
                                                                      Andrew Volz