UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL BATANJANY, CORY SOLOMON, PATRICK TRAVERS and JORDAN BRODSKY, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : Case No. 1:25-cv-08420 (AT) |
| | : |
| CLEAR STREET MANAGEMENT LLC, CLEAR STREET DERIVATIVES LLC, CLEAR HOLDINGS LLC, CLEAR STREET LLC, CLEAR STREET HOLDINGS LLC, CLEAR STREET GROUP INC., URIEL EPHRAIM COHEN, and KENNETH ARI SICKLICK, | : : : : : : |
| | : |
| Defendants. | : |

## PLAINTIFFS' POST-HEARING BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Courtney R. Rockett
Alyssa M. Pronley
Patrick E. McDonough
Jarrett M. Field
**Sterlington PLLC**
228 Park Avenue South, No. 97956
New York, New York 10003
(212) 433-2831
courtney.rockett@sterlingtonlaw.com
alyssa.pronley@sterlingtonlaw.com
patrick.mcdonough@sterlingtonlaw.com
jarrett.field@sterlingtonlaw.com

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARD .................................................................................................... 2

ARGUMENT .................................................................................................................. 2

    I. Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction .............................. 2

    II. Plaintiffs Demonstrated a Likelihood of Success on the Merits ............................................ 5

        A. Plaintiffs Were "Employees" and Defendants Were Their "Employer" .......................... 5

        B. Plaintiffs Engaged in Protected Activity and Defendants Retaliated in Response .......... 6

        C. Defendants' Causation Challenge Is Not Just Without Merit, It Is Sanctionable ........... 17

    III. The Balancing of the Hardships Weighs Heavily in Favor of Plaintiffs ........................... 24

    IV. Public Policy Weighs in Favor of Granting the Preliminary Injunction ........................... 28

    V. The Court Should Waive or Require Only a Nominal Bond ................................................ 29

CONCLUSION ............................................................................................................... 29

## TABLE OF AUTHORITIES

**Cases**

*A&J Produce Corp. et al. v. JD Produce Maspeth LLC et al.*,
   No. 25-cv-1759-AT, ECF No. 41 (S.D.N.Y. Apr. 28, 2025) .................................................... 29

*Barclays Cap. Inc. v. Shen*,
   20 Misc. 3d 319 (Sup. Ct. 2008) ......................................................................................... 3

*Bd. of Regents of Univ. of State of N. Y. v. Tomanio*,
   446 U.S. 478 (1980) ........................................................................................................... 27

*Bill Johnson's Restaurants, Inc. v. N.L.R.B.*,
   461 U.S. 731 (1983) ........................................................................................................... 27

*Counterman v. Colorado*,
   600 U.S. 66 (2023) ............................................................................................................. 27

*Heath v. Warner Commc'ns, Inc.*,
   737 F.2d 1254 (2d Cir.1984) ............................................................................................... 27

*In re Document Technologies Litigation*,
   275 F. Supp. 3d 454 (S.D.N.Y. 2017) ................................................................................. 23

*Jordan v. Metro. Life Ins. Co.*,
   280 F. Supp. 2d 104 (S.D.N.Y. 2003) ................................................................................... 3

*LaForest v. Former Clean Air Holding Co.*,
   376 F.3d 48 (2d Cir. 2004) ................................................................................................... 4

*Lau v. Meddaugh*,
   229 F.3d 121 (2d Cir. 2000) .....................................................................................................

*Lesnik v. Lincoln Fin. Advisors Corp.*,
   No. 18-CV-3656 (LJL), 2020 WL 3057456 (S.D.N.Y. June 9, 2020) ...................................... 3

*O.M. v. N.Y. City Dep't of Ed. et al.*,
   No. 23-cv-04446-JAV-GWG, ECF No. 46 (S.D.N.Y. Oct. 3, 2023) ........................................ 29

*Rosenberg v. MetLife, Inc.*,
  8 N.Y.3d 359 (2007) ............................................................................................... 3

*See Regal Knitwear Co. v. N.L.R.B.*,
  324 U.S. 9 (1945) .................................................................................................... 6

*Stork H&E Turbo Blading, Inc. v. Berry*,
  32 Misc.3d 1208(A), 2011 WL 2611642 (Sup. Ct. June 30, 2011) ........................ 23

**Statutes**

15 USC § 6801 *et seq* ............................................................................................... 9
15 USC § 6802 ........................................................................................................... 9
17 C.F.R. § 248.10 ..................................................................................................... 9
N.Y. Gen. Bus. §§ 899-aa, 899-bb ............................................................................ 9
N.Y. C.P.L.R. § 204(a) ............................................................................................ 27
N.Y. Labor Law § 740(1)(a) .................................................................................... 15
N.Y. Labor Law § 740(1)(d) .................................................................................... 15
N.Y. Labor Law § 740(1)(e) .................................................................................... 15
N.Y. Labor Law § 740(2)(a) ................................................................................ 5, 15

**Rules**

FINRA Rule 812 ....................................................................................................... 26
Fed. R. Civ. P. 65(d)(2) ............................................................................................. 5
SEC Rule 10b-5 ....................................................................................................... 11

**INTRODUCTION**

Even without discovery, Plaintiffs proved that Clear Street is akin to a mafia-esque criminal enterprise with Uriel Cohen, his close friends, and family at the helm. Taking "operating in the gray" to a whole new level, Clear Street's success comes from skirting the laws its competitors in the highly regulated financial services industry obey.  Cohen demands unconditional "loyalty" from his employees and secures it with bribes, threats, intimidation, and punishment.  If an employee dares to raise concerns about illegal conduct, as long as they are revenue generators, help sweep it under the rug, and do not report it, their punishment is limited to demotion, a reduction in responsibility, threats, and/or intimidation.  But if their actions harm Clear Street's bottom line – if their silence cannot be bought, or they threaten to report, and/or leave Clear Street, – then, in Defendants' own words, the "consequences of their disloyalty" are dire, including termination "for cause," and threatened or actual financial and reputational ruin.

Plaintiffs are well-respected broker-dealers with over 65 years of combined experience in the industry.  They resigned from Clear Street after refusing to participate in, and raising concerns about, Clear Street's rampant illegal business practices, to no avail.  Both before *and after* Plaintiffs commenced this action, Defendants engaged in a barrage of retaliatory actions that, by Defendants' own admission, are meant to "punish" them for their "disloyalty," and inflict maximum harm on Plaintiffs *and their families* to deter others from following in their footsteps.  With their hubris and conviction to being "above-the-law" on full display in this action, Defendants are now subject to no less than two motions for sanctions, and one for contempt of court, yet they remain undeterred.

For the reasons set forth in herein and in Plaintiffs' Motion for Preliminary Injunction (ECF Nos. 7, 45, 50, 75, and 83) ("Motion"), and proved by the evidence marshaled below and in the

attached Appendix ("App'x"),[1] this Court should grant Plaintiffs' Motion and enter the attached [Proposed] Order reinstating the *status quo ante* Defendants destroyed after receiving notice of this Motion, and, pending a resolution of the parties' disputes, enjoining Defendants from taking any further adverse actions against Plaintiffs.

**LEGAL STANDARD**

The parties raised no new legal arguments at the hearings with respect to the legal standard to be applied to Plaintiffs' Motion for a Preliminary Injunction. Plaintiffs therefore rest on their recitation of the relevant law in **ECF No. 7**: Pl. Mem. ISO Mot. for TRO/PI at 21-23 & 30-31; **ECF No. 45**: Pl. Ltr. Mot. Re: Issues to Prove at 2; and **ECF No. 50**: Pl. Reply Mem. ISO Mot. for TRO/PI at 2-5.

**ARGUMENT**

**I.    Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction.**

The parties raised no new legal arguments during the hearings with respect to irreparable harm. Plaintiffs therefore rest on their recitation of the relevant law in **ECF No. 7**: Pl. Mem. ISO Mot. for TRO/PI at 24-25, and **ECF No. 50**: Pl. Reply Mem. ISO Mot. for TRO/PI at 9-10, except as supplemented below.

It is undisputed that: (1) each Plaintiff is a FINRA registered broker-dealer (App'x at 1); (2) Plaintiffs voluntarily resigned from Clear Street on September 15, 2025 (*id.* at 2); yet (3) Defendants purported to terminate them "for cause" the next day (*id.* at 3); and (4) on October 10, 2025, Defendants filed Form U5s with FINRA claiming Plaintiffs were "Discharged" for "Breach

---

[1] Plaintiffs utilize an appendix to collect citations from a variety of documents supporting various general points made throughout. Any reference to an appendix number refers to the row of content collecting citations for that topic.

of Contract – Restrictive Covenants" (the "U5s") (*id.* at 4).  But Defendants' purported "for cause" termination and stated grounds are invalid, and the U5s are false.  *See* Section II.B. below.

Plaintiffs' testimony proved broker-dealers' reputations are dependent on their U5s, which can be seen by, at least, the SEC, FINRA, future employers, clients, investors, banks, and the public.  App'x at 5.  As a result, false U5s claiming Plaintiffs were fired "for cause" will substantially impact their professional licenses, employability, client and business prospects, and cause significant irreparable personal and professional reputational harm.  *Id*.

"There is no adequate remedy at law … if [an employer] file[s] a false Form U–5." *Jordan v. Metro. Life Ins. Co.*, 280 F. Supp. 2d 104, 109 (S.D.N.Y. 2003).  While, as a general matter, damage to a discharged employee's reputation and decreased employment opportunities were not previously considered irreparable harm because plaintiffs had an adequate remedy at law, namely, a claim for money damages, the "New York Court of Appeals has held statements made by an employer on Form U5 are absolutely privileged against defamation claims" and, as a result, Plaintiffs have no adequate remedy at law.  *Lesnik v. Lincoln Fin. Advisors Corp.*, No. 18-CV-3656 (LJL), 2020 WL 3057456, at *2 (S.D.N.Y. June 9, 2020), citing *Rosenberg v. MetLife, Inc.*, 8 N.Y.3d 359 (2007); *Barclays Cap. Inc. v. Shen*, 20 Misc. 3d 319, 326 (Sup. Ct. 2008) (finding *Rosenberg* "**unequivocally rules out monetary damages, of any kind**, for a claimed defamation in a required U5 filing") (emphasis added).

Defendants argue that Plaintiffs have not been irreparably harmed because Hidden Road hired them and is aware of the U5s.  But Plaintiffs received their job offers weeks *before* Defendants filed the false U5s, with future employment to commence months later.[2]  App'x at 6.

---

[2] Defendants have also repeatedly threatened to sue Hidden Road and Plaintiffs to get an injunction preventing Plaintiffs from working there, even after the term of their (illegal) restrictive covenants expire.  App'x at 7.  Accordingly, Defendants should be equitably estopped from making this argument.

3

Clients viewing the U5s could pressure Hidden Road not to let Plaintiffs commence employment. Even if they commence work, the false U5s' negative effect on future employers, clients, customers, banks, regulatory agencies, and the public generally (*id.* at 5) could still result in termination, demotion, and serious reputational and economic harm from the inability to get new clients or work for old ones, and prevent Plaintiffs from getting hired by subsequent employers. Defendants provided **no** testimony or other evidence to the contrary.

In addition, on October 4, 2025, Defendants sent a defective COBRA election notice to Patrick Travers ("Travers") only (not his family) falsely claiming he was terminated involuntarily and *after Plaintiffs filed this whistleblower action*, Defendants changed the qualifying event in at least Michael Batanjany's ("Batanjany's") COBRA notice to "involuntary" termination,[3] forecasting Defendants' intention to challenge Plaintiffs' *and their families'* right to receive health coverage, which could easily lead to substantial irreparable harm to, not just Plaintiffs and their families, but to public health (*e.g.*, untreated communicable diseases). *Id.* at 8; *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 55–56 (2d Cir. 2004) (collecting Second Circuit cases holding that termination of medical coverage causes irreparable harm).

Defendants' sole argument is that COBRA notices asserting "involuntary" termination, as opposed to "willful misconduct," still permit Plaintiffs to obtain coverage, and they have done so. App'x at 9. But if the change has no effect, and Defendants have no intention of challenging Plaintiffs' right to coverage, then there was no reason to do it in the first place. The only logical inference to be drawn is that Defendants are threatening to challenge Plaintiffs' and their families' right to health insurance coverage in the future.

---

[3] Unlike Mr. Batanjany, Plaintiffs Cory Solomon ("Solomon") and Jordan Brodsky ("Brodsky") had already signed up for COBRA when Defendants changed Mr. Batanjany's status so they no longer have access to paperwork indicating their qualifying event, but if Defendants actively changed Mr. Batanjany's event, they almost certainly changed Solomon's and Brodsky's as well. Only Defendants know what they did and can access the proof necessary.

## II.    Plaintiffs Demonstrated a Likelihood of Success on the Merits.

The parties raised no new legal arguments during the hearings with respect to the law governing Plaintiffs' likelihood of success.  Plaintiffs therefore rest on their recitation of the relevant law in **ECF No. 7**: Pl. Mem. ISO Mot. for TRO/PI at 25-29; **ECF No. 50**: Pl. Reply Mem. ISO Mot. for TRO/PI at 6-8 & 10-11; and **ECF No. 75**: Pl. Supp. Mem. ISO Mot. for TRO/PI at 1-4 (focused on the parties' causation arguments), except as supplemented below.

Plaintiffs proved they are likely to succeed on the merits (or at the very least that there are serious questions going to the merits making them fair grounds for litigation) on their claim for violation of N.Y. Labor Law § 740(2)(a).[4]

### A.    Plaintiffs Were "Employees" and Defendants Were Their "Employer."

It is undisputed that Clear Street Management LLC ("CSM"), a personnel management company, technically employed Plaintiffs to perform services for Clear Street Derivatives, LLC ("CSD") and/or Clear Street, LLC ("CS").  App'x at 10.  All corporate defendants are directly or indirectly majority-owned and controlled by, and alter egos of, Defendant Uriel Cohen ("Cohen"). *Id.* at 11.  For purposes of this motion only, Plaintiffs are willing to stipulate that CSM is Plaintiffs' "employer" within the meaning of N.Y. Labor Law § 740 because any factual disputes in this regard are immaterial since any resulting preliminary injunction would properly enjoin all Defendants. Fed. R. Civ. P. 65(d)(2).[5]

---

[4] To preserve the record, Plaintiffs reiterate their objection to the Court's ruling during the October 29, 2025 motion conference that their motion for a preliminary injunction was limited to Plaintiffs' whistleblower claim under N.Y. Labor Law.  As stated during that conference, Plaintiffs' Verified Complaint plainly stated that Plaintiffs were seeking injunctive relief in connection with, and had a substantial likelihood of success on, each of Plaintiffs' claims.  In addition, the elements of, and factual allegations supporting, Plaintiffs' ERISA (defective and false COBRA election notices), conversion (RSU forfeiture), defamation per se (U5s and related statements), declaratory judgment, and breach of contract (pressure to participate in illegal acts, attempted forced amendment under duress, improper termination "for cause" after resignation, lack of cause, improper forfeiture of RSUs, denial of COBRA coverage) are all included in or subsumed by the elements of, and facts supporting, Plaintiffs' N.Y. Labor Law whistleblower claim.

[5] Moreover, because Plaintiffs proved Defendants often try to evade laws, and use Cohen-affiliated entities and their personnel to violate laws, rules, or regulations, or to conceal their misconduct, Plaintiffs' proposed order also extends

**B. Plaintiffs Engaged in Protected Activity and Defendants Retaliated in Response.**

Extensive evidence proves that, during and after Plaintiffs' employment: (1) Plaintiffs objected to, refused to participate in, and/or threatened to, or did, disclose to supervisors, regulatory agencies, and this Court, a litany of Clear Street activities, policies, and practices that Plaintiffs reasonably believed violated laws, rules, or regulations; and (2) consistent with their established pattern and practice, Defendants systematically threatened to take and/or took adverse actions against Plaintiffs in response. Due to word-count limitations, Plaintiffs discuss instances from only the last year, and only some of many that occurred in that time frame.

**1940 Act Violations / Kurek Whistleblower Retaliation**. At a November 2024 management meeting, Joshua Kurek ("Kurek") said CS was likely violating the Investment Company Act of 1940 by holding securities for a qualified fund client as custodian even though CS was not a qualified custodian. App'x at 12. Travers discussed this potential violation at length with Andrew Volz, Chief Commercial Officer ("Volz"), Christy Moccia, Chief Compliance Officer ("Moccia"), Edward Tilly, CEO ("Tilly"), and Christopher Pento, Director ("Pento"), and suggested reporting the violation. *Id.* Defendants claimed to agree but, to Plaintiffs' knowledge, never did. *See* November 13 and 20, 2025 Hearing Transcripts ("Tr."), Exs. 5 and 6, 186:9-12. Instead, Clear Street just offboarded the client, labelled Kurek a "revenue inhibitor," and abruptly fired him. App'x at 12.[6] This and the evidence below establishes Defendants' pattern and practice

---

to the Cohen-affiliated non-parties named in Plaintiffs' Verified Complaint, those discussed herein, and any other Cohen-affiliated entity and its personnel. *See Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14 (1945) ("[D]efendants may not nullify a[n injunction] by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.").

[6] Whether Kurek was terminated "for cause" or resigned/signed a separation agreement (as Defendants claim) after being threatened with "for cause" termination, is irrelevant. Plaintiffs reasonably believed Defendants violated the law when they took adverse action against a whistleblower.

of retaliating against whistleblowers, especially when they "hinder[ed] the creation of money that came from doing the illegal conduct." Tr. 246:4-11; 186:13–187:6.

Solomon and Travers discussed their concerns about this whistleblower retaliation with supervisors, including Tilly, Volz, John DiBacco, Head of Markets Trading ("DiBacco"), Tom Klein, Managing Director ("Klein"), Moccia, and Pento, and were told, in essence, "keep your mouth shut, keep your head down" or you could be terminated and/or sued too. App'x at 12.

**Intraday Margin Call Issues**. In December 2024, Travers and DiBacco expressed concern that CSD could not meet its required intraday margin call and risked a significant exhaustion of the firm's existing capital if a customer liquidated a large number of securities. App'x at 13. In response, Pento proposed that CSD transact with Alpine Global Management, LLC ("Alpine"), Cohen's hedge fund, to move liability from CSD to Alpine. *Id.* When Travers suggested this might violate regulations, Pento told Travers he "can resign immediately" as CEO of CSD. *Id.* Pento only backed off this position when Travers told him such a resignation would be reported to the SEC. *Id.*

**Collateral / Capitalization / Novation**. Around the same time, CS was not requiring CSD to post adequate collateral for its positions in violation of CSD's regulatory obligations because CSD is not just an affiliate of CS, it was a client and thus had its own margin requirements. *Id.* at 14. Travers and Solomon discussed their concerns about this and the serious risk of enforcement actions with their supervisors and senior management, including DiBacco, Klein, Volz, Pento, Tilly, and Scott Gutmanstein, General Counsel ("Gutmanstein"). *Id.* Now forced to address this, Defendants could have just brought both entities into compliance, but instead undertook a novation process to transfer ███████ of trades on CSD's books to CS. *Id.* In doing so, Defendants punished Travers and Solomon by transferring approximately 95% of the book they had built up

7

at CSD to CS to be managed by Volz.  *Id*.  Because the novation did not resolve the underlying regulatory violation (it only fixed it on a going-forward basis), FINRA commenced an investigation into this conduct that is believed to be still ongoing.  *Id*.

**Misleading Kroll Bond Rating Agency ("KBRA")**.  In early 2025, Defendants met with KBRA to obtain a bond rating in an effort to raise debt from investors.  *Id.* at 15.  Defendants misled KBRA by failing to disclose ███████████████ of term commitments it had on their books to artificially enhance Clear Street's bond rating (and thus raise more debt on better terms). *Id*.  Misleading KBRA or any bond agency to get a higher credit rating ultimately misleads investors who believe the debt in which they're investing carries less risk.  *Id*.  Solomon discussed his legal concerns, including the significant legal risk from raising significant debt based on an inflated rating, with Klein, DiBacco, Travers, and others, but Defendants never told KBRA about their omissions.  *Id*.  Instead, Defendants just disposed of the term commitments on a go-forward basis.  *Id*.  Shortly thereafter, Solomon learned that Cohen planned to transfer Solomon's *most profitable* work to another employee, thereby reducing his level of responsibility and compensation even though he had done nothing wrong and had stellar job performance.  *Id*.

**Client Data Sharing**.  In late 2024, Solomon was directed to have a call with Alpine, Cohen's hedge fund, to discuss moving positions from CSD's swap portfolio to Alpine.  *Id.* at 16. Solomon was not comfortable with Alpine having first-hand knowledge of CSD's positions, and Cohen's search for ways to move profits from CSD to his outside affiliate, so he voiced his concerns to DiBacco and others on the call about the legality of this conduct, to no avail.  *Id*. Solomon was still required to have the call with Alpine (and discovered that Alpine already had CSD's proprietary and confidential information, despite his objection), and the only reason he was not forced to move CSD's positions to Alpine was that Alpine lacked the necessary capital.  *Id*.

In 2025, Defendants continued to direct employees to share their confidential client and proprietary data with non-authorized persons and non-Clear Street personnel.

For example, beginning around April 2025, Volz pressured Brodsky to share such data with Elad Hillman, a White Bay employee. *Id.* at 17. Brodsky resisted and spoke with DiBacco because she believed this would violate client data privacy laws.[7] *Id.* When DiBacco reported this to Cohen, he responded by asking why DiBacco and Brodsky were "being difficult" about it, which they knew from experience was Cohen's way of threatening to fire them if they did not comply. *Id.* As discussed in more depth below, when Brodsky reiterated her legal concerns to Volz during her post-resignation exit interview, his sole response was that he would send her an email saying this was being done at his direction, confirming Defendants' intent to continue with, and require her to participate in, this misconduct. *Id.*

Around the same time, Elli Ausubel, Alpine's COO/White Bay Director, ("Ausubel") repeatedly pressured Travers and others to share their clients' confidential data with him. *Id.* at 18. When Travers expressed his concerns to Cohen, all Cohen said was that Ausubel is on Clear Street's Board, which Travers rejected as legally insufficient. *Id.* Cohen pretended he was not annoyed with Travers for raising the issue and told Travers to just give him the data instead (which

---

[7] The Gramm-Leach-Bliley Act ("GLB Act"), codified at 15 USC § 6801 *et seq*., imposes an "affirmative and continuing obligation [on broker-dealers and other financial institutions] to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." *See* 15 U.S.C. § 6801. Section 502 of the GLB Act prohibits, with narrow exceptions, the disclosure of nonpublic information about customers to nonaffiliated third parties (*i.e.*, people who are not "Associated Persons" of the broker-dealer). *See* 15 U.S.C. § 6802. Disclosure is permissible **only** where the broker-dealer shares with the customer a privacy notice describing the information sharing, that the customer is given reasonable opportunity to opt out of the disclosure, and the customer chooses not to opt out. *See id.* Furthermore, SEC Regulation S-P, which implements Section 502 of the GLB Act, contains an express prohibition on sharing confidential client data with nonaffiliated third parties (i.e., non-Associated Persons). *See* 17 C.F.R. § 248.10 ("Except as otherwise authorized in this subpart, you may not, directly or through any affiliate, disclose any nonpublic personal information about a consumer to a nonaffiliated third party unless" the firm provides an initial privacy notice, an opt-out notice, a reasonable opportunity to opt out, and the consumer does not opt out). New York's SHIELD Act similarly imposes obligations on companies like Clear Street to develop, implement, and maintain reasonable safeguards that protect the security and confidentiality of customer information and data. *See* N.Y. Gen. Bus. §§ 899-aa, 899-bb.

also did not address the illegality). *Id.* But shortly thereafter, Cohen told others that he was considering firing Travers and DiBacco because they were "disruptors" and transferred several of Travers' roles and employees to John Levene. *Id.*[8]

Defendants' new argument, raised for the first time at the November hearings – namely, that this was all legal because White Bay and other Cohen-owned-and-controlled companies had contracts with Clear Street variously described as "services agreements," "confidentiality agreements," and "work-share agreements" – is both frivolous and irrelevant.[9] *Id.* at 19. No one ever mentioned any such agreements to Plaintiffs (*id.*), and all that matters is Plaintiffs' reasonable belief that the conduct was unlawful.

**Regulation SHO Violations**. In late-Spring/early-Summer 2025, Batanjany witnessed CS personnel engage in numerous Regulation SHO violations,[10] including improperly selling a long position without adequate cover in place and regularly making materially misleading statements regarding the number of securities CS had available for shorting. *Id.* at 20. Compliance personnel had expressly admitted to him, and demonstrated, that they were completely powerless to investigate, prevent, or penalize this conduct. *Id.* Batanjany discussed the legal violations and the

---

[8] Defendants' argument, that Travers' frustration with this was about money and a bruised ego, was amply discredited by Travers (Tr. 183:2-13; 199:14-200:3), and entirely misses the point. The temporal proximity of this classic retaliatory adverse employment action to Travers' raising multiple illegality concerns to management is damning and the only relevant fact – not Travers' emotional upset at the career and economic harm resulting from the retaliatory actions.

[9] At the Hearing, Defendants testified that any information shared with White Bay, Alpine, and other Cohen-controlled entities was done pursuant to specific agreements. The Court ordered Defendants to produce those agreements, which they did on December 1, 2025 via email to Plaintiffs. After review, these agreements in no way support Defendants' testimony at the Hearing. These agreements are master services agreements governing the parties' relationships, but contain **no** provisions that require or even authorize the sharing of confidential CSD client information with any entity or individual that is not an Associated Person of CSD, which is the basis of the unlawful conduct for which Plaintiffs complained. Travers Decl., Ex. 1 ¶ 28; Ex. A.

[10] The SEC issued Regulation SHO to implement the Securities Exchange Act of 1934, in particular, to regulate short sale practices. See 17 C.F.R. Part 242. The "SHO" in the name "Regulation SHO" stands for "Short Sales" because the rules in this regulation (Rules 201-204), were implemented to address concerns regarding naked short selling and promote market integrity and transparency.

compliance department's inability to act on numerous occasions with compliance personnel and Solomon, who, in turn, conveyed them to DiBacco on Batanjany's behalf, and also mentioned them to Jennifer Leonardo, the CEO's assistant ("Leonardo"). *Id.* After being the most vocal and persistent critic of Clear Street's trading desk and lack of compliance, Defendants chose to not even offer Batanjany a "counteroffer" after he resigned, but to instead just terminate him "for cause" without explanation. *Id.*

In late-Summer/early-Fall 2025, Defendants hatched a plan to



Travers immediately expressed his concerns about this illegal conduct to senior management, and Defendants retaliated against him as outlined below. *Id*.

Given Clear Street's repeated unlawful conduct and retaliation against anyone who dared to raise concerns about potential violations, Plaintiffs resigned on September 15, 2025. App'x at 2. In their September 16, 2025 post-resignation exit interviews, Brodsky and Solomon reiterated their complaints about Defendants' illegal conduct, as did Travers in calls with Tilly. *Id.* at 21.

Defendants demanded that Brodsky and Solomon sign amendments to their employment agreements which would, *inter alia*, significantly increase their restrictive covenants in notice, term, and substance, or be terminated "for cause" and face litigation. *Id.* at 22.[12] Each refused. *Id.* Because of Plaintiffs' consistent complaints about Defendants' illegal conduct, and Defendants' newfound certainty that Plaintiffs could not be bribed or threatened into not reporting it to public bodies (based on Plaintiffs' exit interviews and refusal to sign the "counteroffers"), Defendants terminated Plaintiffs "for cause" on September 16, 2025. *Id.* at 3.

On September 17, 2025, Defendants marked all of Plaintiffs' vested-RSUs and stock options cancelled/forfeited for "misconduct," in essence stealing ███████ of Plaintiffs' vested-RSUs, which was a significant part of their hard-earned compensation for services they already provided to Clear Street. *Id.* at 23. Without explanation, but on information and belief as the result of Curtis Allemang's attorney challenging the legality of Defendants' conduct, Defendants ***briefly*** reinstated Plaintiffs' RSUs and stock options (*id.*), and sent Brodsky, Solomon, and Batanjany COBRA election notices identifying their qualifying event as "End of employment (Voluntary)." *Id.* at 24.

Nevertheless, during the week of September 22, 2025, Defendants directed Travers to draft, at his sole cost and expense, a proposed separation agreement requiring him to: (1) ██████████ ████████████████████████████████████████████████████████████████████ ██████████████████████; and (2) dramatically increase his existing restrictive covenants, or else Defendants would sue him and his family into the ground. *Id.* at 25.

---

[12] Although Brodsky and Solomon were offered one-time payments to sign the amendments, they were illusory and subject to repayment at Cohen's sole discretion. November 13 and 20, 2025 Hearing Joint Exhibit ("JE") 33. Travers was offered no compensation for his concessions; indeed, he was told his greatly increased non-compete period had to be unpaid. App'x. at 22.

Travers did so, and kept sending revised drafts to reflect terms Tilly said Cohen demanded. *Id.* But after Travers asked Defendants to offer separation agreements to the other Plaintiffs as well, and reiterated his complaints about Defendants' illegal conduct to Cohen and Tilly, Cohen rejected his own proposed terms and reverted to his previous threats to sue Travers and his family into the ground.[13] *Id.*

Indeed, at Cohen's direction, senior Clear Street personnel told Plaintiffs that Defendants intended to use all resources at their disposal, including private investigators and aggressive lawyers, to tie Plaintiffs up in litigation and prevent them from working anywhere for years. *Id.* And on October 2, 2025, Defendants sent Travers a defective COBRA notice (only emailed to his personal email, not addressed to his family members, and never mailed to anyone), identifying his qualifying event as "End of employment (Involuntary)." *Id.* at 24.

Plaintiffs, through counsel, sent Defendants an October 3, 2025 letter, demanding that they immediately cease and desist all retaliatory actions against Plaintiffs and preserve all documents for anticipated litigation. *Id.* at 26. Immediately upon receipt, Defendants once again cancelled/forfeited Plaintiffs' RSUs and stock options for alleged "misconduct." *Id.*

In response, Plaintiffs sent another letter on October 4, 2025, suggesting that any forfeiture in retaliation for threatening to report Defendants' illegal conduct would violate securities and state whistleblower laws, and demanding Plaintiffs' vested-RSUs and Stock Options be reinstated. *Id.* Plaintiffs' counsel also demanded, on October 6, 2025, that Defendants correct Travers' COBRA status. *Id.* at 24.

---

[13] During subsequent settlement discussions, Defendants insisted that Plaintiffs agree to prohibitions on Plaintiffs' right to act as whistleblowers under federal and state law for any potential violations witnessed, including the SEC whistleblower program, which is an illegal request.

In light of Defendants' ever-escalating retaliation, Plaintiffs reasonably believed that, by October 15, Defendants would file U5s falsely claiming Plaintiffs were "discharged" for misconduct or other intentionally malicious, baseless, and defamatory assertions.  Plaintiffs' counsel therefore drafted and, on October 9, 2025, gave defense counsel express notice of their intent to file the next morning this action asserting, *inter alia*, N.Y. Labor Law whistleblower and ERISA claims, and a Motion for Temporary Restraining Order and Preliminary Injunction.  *Id.* at 27.  Defense counsel promptly relayed this information to Defendants prompting their discussion of Plaintiffs' filing that same night, October 9, 2025.  *Id.*

Defendant Sicklick, Clear Street's Chief Legal Officer's testimony that "there was never any indication to [him] of any whistleblowing or regulatory violations that were going to be filed" (*id.* at 443:19-21), and Defendants' counsel's sworn statement to the Court that he did not know that the Plaintiffs' TRO sought to prevent the filing of false U5s, are entirely incredible.  Definitive evidence—including Plaintiffs' counsel's October 3 and 4 letters,[14] and contemporaneous notes of the October 9, 2025 call[15]—proves beyond doubt that Defendants (including Sicklick) were on notice that Plaintiffs' suit alleged whistleblower retaliation, and the TRO was being filed the morning of October 10th to prevent Defendants from making false and defamatory statements in the U5s that were due by October 15, 2025.

Despite having this knowledge, Defendants prepared and filed U5s with FINRA at 9:27 A.M. the next morning, October 10, falsely claiming Plaintiffs were "Discharged" due to "Breach

---

[14] The October 4, 2025 letter, (JE 10), notes specifically that "[i]t is difficult to imagine that a company … would knowingly and intentionally take retaliatory action against employees who reported or threatened to report actual or suspected wrongdoing by Clear Street[.]"

[15] The Court marked Plaintiffs' counsel's notes as Court Exhibit 1 (Tr. at 172:3-4) and read a relevant portion of them into the record noting that Plaintiffs' counsel plainly told Defendants' counsel that the pending suit was "[n]ot an employment dispute.  It was retaliatory, and your clients know it.  Hopefully, they will fill you -- they know very well what the issues are and what laws they've been breaking and how many employees/execs there feel about it."  *Id.* at 169:4-10.

of Contract – Restrictive Covenants."[16] App'x at 27. Although Defendants' counsel interrupted Sicklick's testimony mid-sentence to try to prevent him from giving a direct admission (Tr. 442:21–443:21), Defendants were forced to concede that they filed the U5s in response to Plaintiffs' notice of intent to file the instant whistleblower action (App'x at 27), in clear violation of N.Y. Labor Law §§ 740(1)(e)(ii) and (2)(a).[17]

Though Defendants clearly sought to deprive this Court of the ability to grant, and Plaintiffs of their ability to obtain, emergency relief, Plaintiffs filed their Verified Complaint and Motion For a TRO/Preliminary Injunction, updated to address Defendants' early morning retaliatory U5 filings, on October 10, 2025, and added a Motion for Sanctions.[18]

Undeterred, after Plaintiffs commenced this action and while their motion for emergency injunctive relief was pending, Defendants changed the qualifying event in at least Batanjany's COBRA notice to "End of employment (Involuntary)" (*id.* at 24), forecasting Defendants' clear intention to challenge Plaintiffs' *and their families'* right to receive health coverage. They also attempted to put Plaintiffs' future employer out of business by terminating, without a cause, a contract critical to its operations that it had with one of Defendants' newly acquired subsidiaries. Comp. ¶ 134.

---

[16] Procedurally, the U5s are also inaccurate because each Plaintiff had already resigned on September 15, 2025, before being purportedly "terminated for cause" on September 16, 2025. *See, e.g.,* Tr. at 266:25–267:8 (testimony of Andrew Volz conceding each plaintiff resigned on September 15, 2025). However, although Andrew Volz and others suggested that Plaintiffs' same-day resignations reflected "coordinated action" and therefore a "breach" of the restrictive covenants (*see, e.g.,* Volz Decl. at ¶ 5), Plaintiffs' resignations were all effective before Defendants attempted to terminate them. Defendants' after-the-fact "for cause" designations on the U5s are therefore also procedurally inaccurate, as Plaintiffs could not have been terminated after already resigning.

[17] § 740(1)(e)(2) prohibits "actions or threats to take such actions that would adversely impact a former employee's current or future employment" and (2)(a) prohibits employers from retaliating in response to an employee "threaten[ing] to disclose to a … public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law." Further, § 740(1)(d)(ii) includes federal courts in its definition of "public body," and § 740(1)(a) includes former employees in its definition of "employees."

[18] Defendants' conduct in this regard, and their counsel's false representations to this Court about the contents of Plaintiffs' October 9 call, among other things, will now be the subject of Plaintiffs' separate motion for sanctions.

Most recently, in response to Plaintiffs' lawsuit and truthful testimony, Cohen threatened to sue Plaintiffs ██████████████████████████████████████████████ ███████████████████.

Finally, countless times since September 15, 2025, Defendants have defamed Plaintiffs by falsely telling:

- colleagues, clients, vendors, FINRA, the SEC, and the public that Plaintiffs were terminated "for cause" because they violated their non-solicitation and non-compete agreements (*id.* at 28);

- colleagues, clients, and vendors that Travers is the "ringleader" who solicited multiple Clear Street employees to prepare to compete with Clear Street (*id.*);

- Hedge Fund Alert reporter, James Prado Roberts, who is Volz's go-to press contact, that Plaintiffs committed perjury in their court submissions and November 13, 2025 hearing testimony (*id.*); and

- colleagues and clients that Plaintiffs are ████████████████████████████████ ████████████████████████████████████████████.

## C. Defendants' Causation Challenge Is Not Just Without Merit, It Is Sanctionable.

As a threshold matter, with respect to Plaintiffs' pre-September 15, 2025 protected activity, Defendants' witnesses just made incredible blanket denials that no Plaintiff ever engaged in any protected activity, and applied the wrong legal standard arguing that Plaintiffs failed to prove Clear Street's conduct was actually illegal, even if it was, Clear Street remedied it, and Plaintiffs never reported it to Cohen, Sicklick, or Volz.  Defendants made no attempt to disprove Plaintiffs' evidence that they engaged in protected activity during their employment as defined by N.Y. Labor Law (*see* Section II.A above), or that Defendants engaged in the pre-September 15, 2025

retaliatory actions outlined above. Therefore, as a matter of law, Plaintiffs proved that their pre-September 15, 2025 protected activity resulted in the pre-September 15, 2025 retaliatory actions outlined above, and was necessarily one reason for Defendants' retaliatory actions on and after September 15, 2025.

With respect to their post-September 15, 2025 retaliatory actions, Defendants argued only they: (1) terminated Plaintiffs "for cause," and filed accurate COBRA notifications and Form U5s, because they reasonably believed that Plaintiffs violated their non-solicitation and non-compete agreements; and (2) cancelled Plaintiffs' vested RSUs/options because they engaged in "misconduct" that materially harmed Clear Street. Even though Plaintiff does not have to disprove Defendants' stated bases (*see* ECF No. 75), the evidence overwhelmingly proves that they are pure pretext.

The following facts are undisputed: (1) Plaintiffs had no negative performance reviews and were exemplary employees (*id.* at 29); (2) Plaintiffs formally resigned from Clear Street on September 15, 2025, pursuant to Section 12.1 of their employment agreements (*id.* at 2); (3) Defendants made the decision that same night to terminate Plaintiffs "for cause" and to mark Plaintiffs' vested-RSUs canceled (*id.* at 30); (4) all Defendants knew at that time (indeed, until November 7, 2025) were facts (1) and (2) above, and they "believed" Plaintiffs were ultimately going to the same future employer (*id.* at 31);[19] and (5) the September 16, 2025 Termination Letters do not identify the "cause" for which Plaintiffs were purportedly terminated. JE 22-24.

In fact, in conversations between Plaintiffs and Defendants (and their counsel) leading up to Plaintiffs' filing of this action, Defendants made contradictory accusations, and repeatedly

---

[19] *See, e.g.*, Volz Decl. at ¶ 5 ("They breached all these agreements as evidenced by the circumstances…"); Tr. at 277:15–278:6.

admitted as late as October 9, 2025, that Defendants had absolutely no evidence to support their breach-of-restrictive-covenant allegation, and that Defendants' actions were a personal vendetta/intent to punish and maximize the harm to Plaintiffs (especially Travers) to deter anyone else with knowledge of Clear Street's conduct from following in Plaintiffs' footsteps.  App'x at 32.

On October 20, 2025, for the very first time in their Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 36), Defendants claimed that their suspicion of Plaintiffs' breach of their restrictive covenants was bolstered by comments Allemang made to Volz at some point on or after September 16, 2025. Without committing to a date that this conversation allegedly took place, Defendants' brief does not suggest that Allemang told Volz anything about Plaintiffs during their September 16 call.  ECF No. 36 at 19 ("Clear Street's good faith conclusion was reinforced by Allemang's ***later*** admission that the departures were indeed coordinated") (emphasis added). While equally vague, Volz's supporting declaration also seemed to confirm that whatever conversation Volz may have had with Allemang regarding Plaintiffs' resignations did not take place during their initial call on September 16, 2025 when Volz attempted to threaten or bribe Allemang to buy his silence and cooperation. *See* Volz Decl. ¶¶ 58, 68-69.

Defendants called Volz to testify on November 13, 2025, and seemed determined to try to get him to allege that his "No sh!%" conversation with Allemang took place during his "counteroffer" call on the morning of September 16, 2025.  But Volz's testimony is so inconsistent that it is simply not credible.  App'x at 33.  For instance, Volz testified initially that his conversation with Allemang was "following Curtis agreeing to stay," but then moments later, suggested the conversation was actually "Tuesday, [September 16], midday" (after the terminations).  Tr. 271:7-24.

Further, despite Volz's testimony that he spoke to Allemang "over the course of 40 minutes" (Tr. 279:8-16) on September 16, allowing sufficient time for Volz to ask Allemang about Plaintiffs, Allemang—Defendants' own witness—made it clear their conversation "was only a few minutes." Tr. 405:3-12; 408:19-25.  Travers corroborated Allemang's account and noted that Allemang was "pretty hysterically crying and hyperventilating, saying that he was just threatened and was told that him and his family would be bled dry if he didn't sign this contract," (Tr. 203:3-8), which Allemang largely admitted.  Tr. 407:25–408:10; 409:13–410:9.  It is implausible that Volz's testimony about this call is reliable because Allemang's and Travers' accounts align regarding the length of their call and Allemang's emotional state.  The most logical inferences to be drawn from this are that either Volz was mistakenly referencing a *later* call with Allemang, or he was not telling the truth about the conversation at all.  Either way, Volz's testimony about the timing of the alleged conversation is not reliable.

Indeed, based on the fact that Defendants never even asserted in this litigation that this alleged conversation took place until **October 20, 2025**, it is unlikely that Allemang said anything along these lines until that time (if ever).  *See* ECF No. 36 at 19.  Regardless, Volz admits that any comments Allemang allegedly made to Volz about his own (and potentially others') plans to leave Clear Street were made *after* Volz threatened him and bribed him to stay, *after* Defendants made the decision to terminate Batanjany and Travers "for cause," *after* Defendants made the decision to terminate Brodsky and Solomon "for cause" if Defendants were unable to secure their silence with a bribe and amended employment contract, and *after* Defendants decided to cancel Plaintiffs' vested-RSUs and Stock Options.  App'x at 31.

Defendants also failed to introduce any new relevant or persuasive at the November 13 and 20, 2025 hearings.  Quite the contrary.

19

The narrative Defendants tried to advance to justify their terminating Plaintiffs' "for cause," marking their vested-RSUs canceled for "misconduct," COBRA notices, and U5s, was that Travers solicited Plaintiffs (and others) to leave Clear Street as a group, pitched them to Hidden Road as such, negotiated all of their contracts, and orchestrated the September 15, 2025 *en masse* resignations. But despite having threatened and bribed Allemang into staying at Clear Street, he should have had evidence to support Defendants' narrative in his possession, yet after working with Allemang and others for over two months to develop their defense in this action, Defendants adduced absolutely no proof of any of this.

Defendants introduced only five exhibits (JE 42-45) and related information from Allemang (which defense counsel misguidedly described to Plaintiffs' counsel as alleged "smoking gun" evidence). As a threshold matter, on cross-examination, notwithstanding defense counsel's improper attempt to intervene, Allemang admitted that he only gave these documents and related evidence to ***Defendants' outside litigation counsel***—not Defendants—and did not do so until ***November 7, 2025***. Tr. 411:18–413:13. Therefore, none of it could have formed the basis for Defendants' purported "reasonable belief" that Plaintiffs breached their restrictive covenants at the time Defendants threatened to take or took any of their pre-November 7, 2025 adverse actions against Plaintiffs, including filing the false U5s.

In any event, Allemang's evidence does not support, much less prove, Defendants' solicitation theory.[20] Rather, it is entirely consistent with what all other credible evidence proves – namely, that each Plaintiff independently decided to leave Clear Street at different times and looked into numerous different opportunities; Hidden Road (not a recruiter) directly solicited each

---

[20] Moreover, any negative testimony Allemang gave on November 20 was the result of malicious witness tampering by Defendants' counsel who, despite the Court's sequestration order, sought to bias Allemang against Travers. Tr. 416:14–417:6. This conduct is the subject of Plaintiffs' separate Motion to Hold Defendants and Their Counsel in Contempt of Court.

individual Plaintiff at different times,[21] and offered Plaintiffs jobs at different times; each Plaintiff dealt directly with Hidden Road (not Travers) regarding their employment agreements;[22] and their same-day resignations were primarily the result of Plaintiffs' supervisors' schedules and the end of a quarterly payment period.  App'x at 34.

Nor does Allemang's evidence (or any other evidence)  prove Defendants' alleged reasonable belief that: (1) ***any Plaintiff***[23] breached their non-compete by "prepar[ing] to compete" with Clear Street or divulging confidential information/trade secrets to a competitor, resulting in material harm to Clear Street; or (2) engaged in "misconduct" resulting in material harm to Clear Street, which Defendants admit would be necessary to justify marking Plaintiffs' vested-RSUs/stock options canceled/forfeited.[24]

***Defendants admit*** that: (1) Plaintiffs are leaving with all their own expertise/know-how that they brought to and used to benefit Clear Street (not vice versa) (*see, e.g.*, Tr. 300:8–301:19 (Volz testifying Will Frank could reasonably use his prior knowledge and skill at future employers)*,* and (2) Plaintiffs' future employer is not even a competitor (*see* Tr. 270:5-7).

---

[21] Plaintiffs' testimony and corroborating documentary evidence disproves ¶ 9 of Leonardo's declaration (ECF No. 73-1) that Plaintiffs allegedly used a recruiter to conceal their solicitation.  Allemang, Defendants' witness with actual knowledge (unlike Leonardo), did not corroborate Leonardo's assertion, but rather admitted that he was contacted by Hidden Road directly. Tr. 373:12-21.

[22] Defendants' counsel claimed that *Travers* negotiated all other employees' employment agreements with Hidden Road, but this was firmly denied by every Plaintiff, and even though counsel tried hard make Allemang agree with him, Allemang testified instead that Travers negotiated *his own* contract and told Allemang about it.  If Hidden Road modeled the others' contracts on it, that would be logical and industry standard, and Allemang admitted on cross that Travers did not negotiate Allemang's contract, he had his own conversations about it (even if he was unable to get the changes he wanted).  Tr. 414:21–415:1.

[23] Although Plaintiffs filed this action jointly, the Court must make a determination as to each Plaintiff independently from the others.  Each Plaintiff has his or her own evidence of having engaged in protected activity, has experienced different historical adverse retaliatory threats and adverse actions against them by Defendants prior to their resignations, and there are slight variations in Defendants' post-September 15, 2025 retaliatory threats and actions.  Most critically, the evidence Defendants offered, if any, to support their purported reasonable belief of breach or misconduct varies substantially with respect to each Plaintiff.

[24] Defendants' opposition brief quotes from Plaintiffs' RSU agreements and concedes that "misconduct," which requires "intentional misconduct … adversely affecting the business or affairs of the Corporation," is necessary for Defendants to cancel Plaintiffs' RSUs.  ECF No. 36 at 16.

Allemang's emails prove only that Plaintiffs asked their future employer about its own capabilities and plans, and discussed the most basic, generic, and publicly available industry data. App'x at 35. Oddly enough, it also proves that if anyone shared something that Defendants consider to be truly confidential information, it was Allemang, yet Defendants paid him millions of dollars to stay at Clear Street, so they certainly did not believe that he had violated any restrictive covenant or caused harm to Clear Street. *See* JE 42-45.

Regardless, and more importantly, Defendant Sicklick—Clear Street's Chief Legal Officer and author of the restrictive covenants—admitted he ***did not know if Plaintiffs' restrictive covenants are legally enforceable***, and that he intentionally revised them for use in the coercive September 16, 2025 amended employment agreements (a/k/a "counteroffers" that he also admitted writing), to place even more restrictions on the employees, regardless of whether they were enforceable or not. App'x. at 36.

As a matter of law, Plaintiffs' restrictive covenants are unenforceable on their face and as interpreted by Defendants. *See* ECF No. 50 at 6-8. Indeed, this Court analyzed the enforceability of restrictive covenants in a remarkably similar case, but where, unlike here, the employees resigned *en masse* to join an actual competitor. In *In re Document Technologies Litigation*, the Court denied the company's motion to enjoin its former employees from working for the new employer and ***held that the restrictive covenants were unenforceable***. 275 F. Supp. 3d 454, 466 (S.D.N.Y. 2017). More particularly, the Court held that: (1) employee non-solicitation provisions are unenforceable when applied against large groups of employees coordinating resignations *en masse* because any harm resulting from such actions is "***not a legally cognizable interest*** for the purposes of a restrictive covenant;" and (2) "preparation to compete" restrictive covenants are unenforceable because preparatory acts "cannot by law violate a non-compete" and acts cease to

be preparatory only when former employer's economic interests are detrimentally impacted through solicitation of clients." *Id.*, at 466-67 (emphasis added).[25] *See also Stork H&E Turbo Blading, Inc. v. Berry*, 32 Misc.3d 1208(A), 2011 WL 2611642, at *2-3 (Sup. Ct. June 30, 2011) (active and former employees are free to "prepare to compete during the term of a restrictive covenant . . . in order to begin competing upon expiration of the covenant" so long as employees did not impermissibly use trade secrets or confidential information to do so).

## III.    The Balancing of the Hardships Weighs Heavily in Favor of Plaintiffs.

The parties raised no new legal arguments during the hearings with respect to the balancing of hardships.  Plaintiffs therefore rest on their recitation of the relevant law in **ECF No. 7**: Pl. Mem. ISO Mot. for TRO/PI at 29; **ECF No. 50**: Pl. Reply Mem. ISO Mot. for TRO/PI at 10-11; and **ECF No. 83**: Pl. Supp. Br. Regarding FINRA Procedures (*passim*), except as supplemented below.

The evidence proves that the balance of the hardships weighs heavily in favor of issuing Plaintiffs' proposed preliminary injunction.  Defendants have a well-established history of retaliating against employees they perceive to be disloyal, especially those who oppose their illegal activities – including Plaintiffs.  (Section I).  As demonstrated in this action, Defendants believe they are "above the law." (Section II).  They knowingly and intentionally filed the false and defamatory U5s in response to Plaintiffs' notice of their original motion for a TRO before Plaintiffs could file the motion.[26]  *Id.*  Plaintiffs worked hard to study for and pass the exams that resulted in

---

[25] The Court in *Document Technologies* also specifically noted that at-will employees (like Plaintiffs here) are **free to coordinate** resignations from a company in order to move to a competitor, and companies like Clear Street "cannot use restrictive covenants to supply itself with all of the benefits of term agreements while simultaneously retaining the right to lay off its personnel whenever it so desires," as doing so is "not a proper purpose for such restraint on free market competition." *Id.* at 467 (suggesting employers hire employees under term employment agreements if they wish to prohibit resignations *en masse*).

[26] The Court should disregard the fact that Defendants' counsel "agreed" to Plaintiffs' renewed oral motion for entry of a TRO pending resolution of Plaintiffs' motion for a preliminary injunction after the Court already granted it at the close of the November 13, 2025 hearing.  Tr. 308:9-19.  On numerous prior occasions, Plaintiffs proposed Defendants stipulate to a TRO to give the parties time to try to settle, or in exchange for requested extensions/adjournments, *etc.*

their obtaining dozens of professional licenses among them. (Section I). Those licenses, and the data concerning Plaintiffs on FINRA's website (or in its records), are critical to Plaintiffs' professional reputations, careers, and livelihoods. *Id.* Defendants' false and defamatory U5s inflicted immediate harm and will continue to cause Plaintiffs irreparable harm. (Section I).

The litany of additional actions Defendants have expressly, or impliedly, threatened to take against Plaintiffs is extraordinary. (Section II.A). Absent a preliminary injunction, Plaintiffs are at imminent risk of, *inter alia,* Defendants:

(1) amending Plaintiffs U5s to add additional false and defamatory accusations of willful misconduct, being the subject of investigations, *etc*.;

(2) challenging Plaintiffs' and their families' right to receive the COBRA healthcare coverage for which Plaintiffs have already paid;

(3) seeking to prevent Plaintiffs from working for their new employer or prevent their new employer from employing them;

(4) making defamatory statements about Plaintiffs to their colleagues, clients, vendors, and other third parties;

(5) commencing frivolous lawsuits or arbitrations against them to retaliate against Plaintiffs for commencing this action and giving truthful testimony at the November hearings; and

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

and Defendants rejected the idea out of hand. Of course, we now know they refused a TRO because they intended to and did take additional adverse actions while this motion was pending. *See* Section II.B above.

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

By contrast, Defendants will suffer no cognizable hardship, including financial or operational burdens, if the preliminary injunction is granted. Requiring Defendants to refrain from taking further retaliatory adverse actions against Plaintiffs imposes no burden whatsoever.

With regard to the U5s, Plaintiffs submitted a brief regarding FINRA procedures per the Court's November 12, 2025 request. *See* ECF No. 83.[27] There are simple FINRA online forms where Defendants can correct U5s pursuant to FINRA Rule 812. Defendants admit Plaintiffs resigned on September 15, 2025, so they have a good-faith basis for saying so on Plaintiffs' U5s pending resolution of the parties' disputes. Making this truthful amendment imposes, at most, a minimal administrative inconvenience. Any concerns Defendants have are alleviated by entry of a court order. This Court can also issue an order to expunge Plaintiffs' U5s, which imposes no burden on Defendants. Finally, because U5s can be amended as needed, should this Court and/or one or more arbitrators later determine that the U5s as filed were accurate, they can easily be reinstated.

With respect to COBRA, Plaintiffs are paying for their and their family's COBRA coverage, so Defendants would bear no monetary burden whatsoever if they were prevented from trying to challenge their benefits. Indeed, Defendants would only incur a burden if they challenged them. Permitting Plaintiffs and their families to use the COBRA medical, dental, and vision benefits Plaintiffs paid for causes no harm to Defendants.

---

[27] The Court's email asked the parties to "be prepared to present, through counsel or a witness/affidavit, an informed explanation on the mechanics of making changes to Form U5s with FINRA." To Plaintiffs' knowledge, Defendants have not submitted their own briefing or testimony on this point. As Defendants did not contest Plaintiffs' submission on this point, they should be estopped from contesting the ease with which the U5s could be amended now.

25

Temporarily prohibiting Defendants from engaging in illegal speech—defamation per se—imposes no burden on Defendants.  The First Amendment provides no protection for defamatory speech.  *Counterman v. Colorado*, 600 U.S. 66, 76 (2023).

Similarly, temporarily enjoining Defendants from filing a retaliatory and frivolous lawsuit against Plaintiffs or their future employer that's patently illegal under multiple federal and state laws, without leave of court, imposes only a modest burden on Defendants (a multi-billion dollar conglomerate) compared to the harm such actions would cause Plaintiffs (currently unemployed individuals with families).  Defendants have no federal or state constitutional right to file a patently illegal lawsuit/arbitration.  *Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 743-44 (1983); *also Lau v. Meddaugh*, 229 F.3d 121, 123 (2d Cir. 2000); *Heath v. Warner Commc'ns, Inc.*, 891 F. Supp. 167, 171 (S.D.N.Y. 1995).  Defendants would merely need to file a motion showing that their lawsuit/arbitration is not retaliatory or frivolous, or that they would suffer irreparable harm if they cannot file it prior to resolution of this action.[28]  On this record, this seems highly unlikely.  Defendants admit that: (1) Plaintiffs are leaving with all their own expertise/know-how that they brought to and used to benefit Clear Street (not vice versa); and (2) Plaintiffs' future employer is not a competitor.  And the restrictive covenants underlying any such lawsuit are unenforceable.  (Section II.B).  Lastly, as a matter of law, the statute of limitations would be tolled during the pendency of the injunction.  *See* C.P.L.R. § 204(a) (mandating tolling during stay or court ordered prohibition); *Bd. of Regents of Univ. of State of N. Y. v. Tomanio*, 446 U.S. 478, 483 (1980) (federal courts are obligated to apply state law regarding tolling).

---

[28] This type of order is well known in the Second Circuit and is called a "leave-to-file" order typically issued with respect to *pro se* plaintiffs who overburden the court system.

IV.    **Public Policy Weighs in Favor of Granting the Preliminary Injunction.**

The parties raised no new legal arguments during the hearings with respect to public policy. Plaintiffs therefore rest on their recitations of the relevant law set forth in **ECF No. 7**: Pl. Mem. ISO Mot. for TRO/PI at 30, and **ECF No. 50**: Pl. Reply Mem. ISO Mot. for TRO/PI at 8 n.8.

The public has a strong interest in protecting individuals who report actual or suspected wrongdoing, and benefits when people with the courage to raise regulatory and legal concerns are safeguarded from retaliatory measures.  Whistleblower protections exist to ensure that regulators and the public learn about illegal activity that powerful companies would otherwise successfully hide.  The public also has an interest in learning when employees suspect that employers are defrauding the public (*e.g.*, inflated bond ratings defrauding investors). *See, e.g.*, Tr. 80:3-15.

The financial industry (*i.e.*, regulators, investors, employers) and the public in general rely on FINRA's records. There is also a clear public interest in ensuring the fairness, reliability, and integrity of the regulatory and judicial systems on which the public depends.  It is in the public's interest to protect the reliability of FINRA's filings, processes, and reporting system.

These principles are especially compelling here, where Defendants—after receiving good-faith notice of Plaintiffs' intent to seek emergency relief—used it as an opportunity to inflict harm by immediately filing the U5s.  Allowing such tactics discourages future whistleblowers from coming forward and giving notice.  Allowing employers to retaliate against employees by weaponizing regulatory filings would also erode public trust in employment protections and regulatory oversight.

More broadly, the public has a strong interest in ensuring that: (i) employers comply with the governing laws, rules, and regulations: (ii) parties to employment agreements honor their

contractual commitments; and (iii) employees retain their rights, including the right to be free from retaliation, and to quit an "at-will" job without being attacked for "disloyalty" or "defection."

In addition, the public has a vested interest in ensuring that individuals are able to maintain health coverage between jobs through COBRA. Allowing companies to threaten to or actually strip former employees of their COBRA coverage puts the life and health of the employees and their families, as well as the general public, at risk, especially during COVID/flu season and now with the rise of infectious diseases and new or resurgent outbreaks of influenza, measles, and other communicable diseases.[29] It is vital that healthcare remain accessible to as many members of the public as possible to prevent the spread of these diseases.

### V. The Court Should Waive or Require Only a Nominal Bond.

The parties raised no new legal arguments during the court hearings with respect to the posting of a bond. Plaintiffs therefore rest on their recitation of the relevant law in **ECF No. 50**: Pl. Reply Mem. ISO Mot. for TRO/PI at 11, and note that this Court has acknowledged the propriety of waiving the posting of a bond in similarly compelling circumstances. *See, e.g.*, *A&J Produce Corp. et al. v. JD Produce Maspeth LLC et al.*, No. 25-cv-1759-AT, ECF No. 41 (S.D.N.Y. Apr. 28, 2025); *O.M. v. N.Y. City Dep't of Ed. et al.*, No. 23-cv-04446-JAV-GWG, ECF No. 46 (S.D.N.Y. Oct. 3, 2023).

### CONCLUSION

For the reasons set forth herein, and in Plaintiffs prior briefing, Plaintiffs respectfully request that this Court enter Plaintiffs' [Proposed] Preliminary injunction submitted herewith.

---

[29] *See, e.g.*, Ctrs. for Disease Control & Prevention, *Measles Cases and Outbreaks*, *last visited Dec. 4, 2025*, https://www.cdc.gov/measles/data-research/index.html.

Dated: New York, New York

December 6, 2025

Respectfully Submitted,

By: /s/*Courtney R. Rockett*
    /s/*Alyssa M. Pronley*
Courtney R. Rockett
Alyssa M. Pronley
Patrick E. McDonough
Jarrett M. Field
**Sterlington PLLC**
228 Park Avenue South, No. 97956
New York, New York 10003
(212) 433-2831
courtney.rockett@sterlingtonlaw.com
alyssa.pronley@sterlingtonlaw.com
patrick.mcdonough@sterlingtonlaw.com
jarrett.field@sterlingtonlaw.com
*Attorneys for Plaintiffs Michael Batanjany,*
*Patrick Travers, Cory Solomon, and Jordan*
*Brodsky*

## <u>WORD COUNT CERTIFICATION</u>

I, Courtney R. Rockett, an attorney admitted to practice before this Court, hereby certify that the foregoing Plaintiffs' Post-Hearing Brief in Support of Motion for Preliminary Injunction complies with the word-count limitation set forth in Section III(D) of Judge Analisa Torres's Individual Practices in Civil Cases and in the Court's November 26, 2025 order [ECF No. 86].

I further certify that this document contains 9,584 words, excluding the caption, index, table of contents, table of authorities, signature block, and any certificates, but including footnotes and endnotes.  This word count was calculated using the word-count feature of Microsoft Word.

Dated: New York, New York
December 6, 2025

Respectfully Submitted,

By: /s/ *Alyssa M. Pronley*