UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MICHAEL BATANJANY, CORY SOLOMON,
PATRICK TRAVERS, and JORDAN BRODSKY,

                             Plaintiffs,

      v.                                          Docket No.: 25-cv-08420-AT

CLEAR STREET MANAGEMENT LLC,
CLEAR STREET DERIVATIVES LLC,
CLEAR HOLDINGS LLC,
CLEAR STREET LLC,
CLEAR STREET HOLDINGS LLC,
CLEAR STREET GROUP INC.,
URIEL EPHRAIM COHEN, and
KENNETH ARI SICKLICK,

                             Defendants.
-----------------------------------------------------------------X

### **DEFENDANTS' POST-HEARING BRIEF IN OPPOSITION**
### **TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

LEEDS BROWN LAW, P.C.
*Attorneys for Defendants*
One Old Country Road, Suite 347
Carle Place, New York 11514
516-873-9550
rostrove@leedsbrownlaw.com
acostello@leedsbrownlaw.com

Filed: December 15, 2025

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................................1

STATEMENT OF FACTS ............................................................................................................2

ARGUMENT

I.     THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST REQUIRES DENIAL
OF THE PRELIMINARY INJUNCTION ....................................................................................4

II.    PLAINTIFFS CANNOT ESTABLISH A CLEAR OR SUBSTANTIAL LIKELIHOOD OF
SUCCESS ...................................................................................................................................11

      A.     PROTECTED ACTIVITY ...................................................................................12

      B.     ADVERSE ACTION .........................................................................................19

      C.     CAUSAL CONNECTION ...................................................................................19

# TABLE OF AUTHORITIES

Page

CASE LAW

Abdu-Brisson v. Delta Air Lines, Inc.,
239 F.3d 456 (2d Cir. 2001) ........................................................................................20

Battice v. Phillip,
2006 U.S. Dist. LEXIS 53407 (E.D.N.Y. 2006) ........................................................22

Bright v. Coca Cola,
2014 U.S. Dist. LEXIS 155565 (E.D.N.Y. 2014) ......................................................21

Cunningham v. Con Edison,
2006 U.S. Dist. LEXIS 22482 (E.D.N.Y. 2006) ........................................................22

Delaney v. HC2, Inc,
761 F. Supp. 3d 641 (S.D.N.Y. 2025) ...................................................................12, 17

DiNome v. Cordis U.S. Corp.,
2024 U.S. Dist. LEXIS 149377 (S.D.N.Y. 2024) ......................................................13

Fleurentin v NY City Health & Hosps. Corp.,
2020 U.S. Dist. LEXIS 908 (E.D.N.Y. 2020) ............................................................30

Fraser v. Fiduciary Trust Co. Int'l,
417 F. Supp. 2d 310 (S.D.N.Y. 2006) ........................................................................14

Gubitosi v. Kapica,
154 F.3d 30 (2d Cir. 1998) .........................................................................................20

Hollander v Am. Cyanamid Co.,
895 F.2d 80 (2d Cir.1990) ..........................................................................................22

Kelly v. Howard I. Shapiro & Assocs.,
716 F.3d 10 (2d Cir. 2013) .........................................................................................13

Kirkland v. Cablevision Sys.,
760 F.3d 223 (2d Cir. 2014). 5)..................................................................................20

Rimini v. J.P. Morgan Chase,
2024 U.S. Dist. LEXIS 177572 (S.D.N.Y. 2024) ......................................................14

Romano v. A360 Media, LLC,
2023 U.S. Dist. LEXIS 10355 (S.D.N.Y. 2023) ...................................................................14, 18

Rosenberg v. MetLife,
8 N.Y.3d 359 (2007)......................................................................................................................5

Scaria v. Rubin,
1996 U.S. Dist. LEXIS 9659 (S.D.N.Y. 1996) ............................................................................20

Spiegel v. Estée Lauder Inc.,
2024 U.S. Dist. LEXIS 123188 (S.D.N.Y. 2024)..........................................................................13

Thacker v. HSBC,
2023 U.S. Dist. LEXIS 71055 (S.D.N.Y. 2023) ...........................................................................12

Webb-Weber v Community Action for Human Servs., Inc.,
23 N.Y.3d 448 (2014) .............................................................................................................12, 17

## PRELIMINARY STATEMENT

Plaintiffs admit that Clear Street's ("CS") business is highly regulated. Despite close scrutiny by FINRA and the SEC, Plaintiffs allege that CS somehow deceived regulators so completely that it was operating a "mafia-esque criminal enterprise."

Actual evidence shows something very different. In early 2025, Patrick Travers became deeply dissatisfied with his compensation after sustained and aggressive efforts to obtain greater compensation. As those efforts failed, Travers came to believe that senior management would not pay what he thought he deserved and that his position had become uncertain. Rather than simply seeking alternative employment, Travers spent months—while still employed by CS—devoting substantial work time to recruiting colleagues to leave with him. After being drawn into that effort, the other Plaintiffs knowingly participated in a coordinated plan to depart as a group, sharing information, aligning their moves, and breaching their contractual obligations. That plan culminated in a mass, pre-arranged resignation designed to replicate CS's Securities-Based-Swap Dealer ("SBSD") business elsewhere. When notice was given, Travers was evasive about who was leaving, and Plaintiffs have since recast their coordinated departure as whistleblowing retaliation. The record does not support that narrative.

As Carl Sandburg observed, "If the facts are against you, argue the law. If the law is against you, argue the facts. If the law and the facts are against you, pound the table and yell." Plaintiffs' repeated collateral accusations and sanctions motions do not change the evidence. When the Court evaluates the record under the governing law, it will be clear that Plaintiffs have not come close to meeting their burden for the extraordinary, mandatory relief they seek.

1

## STATEMENT OF FACTS

Given space constraints, this factual recitation is an overview, additional facts underpinning each argument are below.

CS's SBSD business is uniquely specialized, strategically important, and a significant driver of the firm's revenue. (Tr.259:2-261:12; Volz ¶21.) The SBSD relies on proprietary methods of funding, risk management, pricing, and capital utilization that were developed over time, tailored to CS's specific client base, and are unique. (Tr. 259:6-260:18; DiBacco ¶71-79.)

Patrick Travers served as CEO of the SBSD. (Tr.178:4-179:5.)  As the business became increasingly profitable, Travers believed that the SBSD team's 2024 discretionary bonuses should equal 25% of gross revenues. (Tr.367:18-369:11; Weg ¶5, 9; Dibacco ¶8-14.)  Senior management disagreed. (Id.)  Travers came to believe that senior management viewed him as pushing too aggressively for compensation, causing his long-term position at the firm to be uncertain.  (Id.) Travers began exploring alternative opportunities outside the firm.  (Id.)

Around this time, Hidden Road Partners ("HRP") was seeking to build an SBSD business. (Tr.269:11-12, 276:1-16, 282:21-283:19.)  Travers connected with HRP and viewed it as an opportunity to replicate the CS SBSD under compensation terms more favorable to him. (Tr.195:4-12, 369:14-18; Glazer ¶15-17; Weg ¶10.)  Travers began recruiting CS employees to leave with him. (Tr. 369:14-371:8, 374:1-378:9, 392:18-393:25; Glazer ¶5-23; Weg ¶10-19.)  Over the ensuing months, he brought at least eight other employees into discussions about joining HRP, including the Plaintiffs, Curtis Allemang, Will Frank, Adam Glazer, and Andrew Weg. (Id.) Travers orchestrated a coordinated recruitment effort, encouraging participants to join based on who else was "in" and aligning them around a collective transition.  (Id.)  As the team coalesced, discussions intensified, with hundreds of coordinated calls, messages, and meetings over months,

many occurring during work hours and at CS's offices. (Id.) Those communications related to the plan to replicate the CS business at HRP, including targeting CS clients. (Id.; Glazer ¶22.) Members of the group shared confidential information with HRP including during a Zoom and in emails. (Tr.378:10-388:16; Ex.42[1], 43, 43A; Glazer ¶24-31; Weg ¶33-35; DiBacco ¶81-104.)

Travers negotiated the employment contracts and compensation terms with HRP on behalf of the group. (Tr.138:14-18, 142:4-143:25, 395:4-396:23; Glazer ¶35-43.) It became clear that the group's financial upside depended on how quickly an SBSD business could become operational at HRP. (Tr. 385:16-389:12; Glazer ¶27-28; Weg ¶16-17.) The sooner that business could be launched, the sooner revenue targets could be met and bonuses could be earned. (Id.) That incentive further motivated the group to help HRP start its competing SBSD as rapidly as possible. (Id.)

On September 15, 2025, seven members of the SBSD team gave CS notice, as they had agreed upon in advance. (Tr.236:6-17, 267:3-24; Weg ¶49-50.)[2] The simultaneous departure of all seven employees posed an immediate and existential threat to a business that was a significant driver of CS's revenue, at a time when losing that many senior employees could have severely damaged CS's valuation during its Initial Public Offering ("IPO") exploration. (DiBacco ¶55.)

Senior management immediately began assessing how to address the situation and stabilize the business. (Tr.287:8-288:15, 327:15-329:22; DiBacco ¶53-60; Volz ¶55-56). Management understood that losing the entire group would severely impair, if not cripple, the SBSD operation.

---

[1] Numbered exhibits correspond to hearing exhibits and the additional exhibits annexed to the Ostrove Declaration.

[2] When Travers resigned, he initially lied to Volz, claiming only he and Allemang were leaving for HRP. (Tr.266:14-24.) He also lied to Cohen, claiming only four others were leaving. (Tr.320:23-321:19.) Further, we note that Plaintiffs' contention that mass defections like this are common and without legal consequence is meritless. See Gutmanstein ¶113-20.

(Id.)  The overriding objective was to stabilize the business by retaining talent to mitigate any damage and ensure CS could continue to service its clients. (Id.)  CS acted swiftly and decisively, making an immediate business decision to extend retention offers to select employees. (Id.)  Those employees were presented with a choice: commit to remain at the firm under revised agreements that increased their compensation and the length of their restrictive covenants or face termination and litigation.   (Tr.24:22-25:13, 88:7-90:15, 236:18-237:14, 294:20-295:6, 406:14-407:10; DiBacco ¶59; Volz ¶57-58, 67.)  That decision was driven by CS's good-faith belief that the departing group had engaged in coordinated disloyal conduct in violation of their contractual obligations and was undertaken to preserve operational continuity and stabilize the business. (Tr.267:13-271:14; 288:9-15, 290:1-24, 323:1-20, 359:11-360:23; DiBacco ¶53-60.)   It had nothing to do with whistleblowing. (DiBacco ¶61.)

Thereafter, CS negotiated with Travers on behalf of the departing group to reach an amicable resolution, just as Travers had negotiated employment agreements with HRP on behalf of the group. (Tr.460:13-462:14, 476:4-478:24.)  While CS generally files a U5 immediately upon separation of employment, it deferred filing pending negotiations. (Gutmanstein ¶56.)  When negotiations ultimately failed, the U5s were filed within the applicable reporting period, and Travers executed his "nuclear option," which was to use alleged regulatory violations to force a settlement. (Tr.442:7-443:25, 449:14-25; Weg ¶23–24; Glazer ¶52; Gutmanstein ¶56, 59-61; Ex.15-18.).

## **ARGUMENT**

## I.     THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST REQUIRES DENIAL OF THE PRELIMINARY INJUNCTION

While Defendants prove below that Plaintiffs cannot succeed on the merits, the Court need not address that element because the balance of the equities and public interest sharply weighs

against an injunction. Plaintiffs' motion for mandatory injunction seeks to have CS change their U5s but the U5s are currently accurate.

***FINRA Requires Accurate U5 Disclosures***

A FINRA member's U5 disclosure obligations depend on what a reasonable person in the firm's position would have concluded at the time of filing.  (Dkt 73-2, pp.1-2.)  Pursuant to FINRA's General Instructions, a member firm is under a continuing obligation to amend the U5 if additional relevant information becomes known after the filing. (Rev. Form U5 (05/2009), p.1.) "Accurate and forthright responses on the Form U-5 are critical" to FINRA's regulatory oversight and investor protection. Rosenberg v. MetLife, 8 N.Y.3d 359, 368 (2007). Thus, the issue is whether CS currently and reasonably believes the content of the U5s is accurate. (Ex.15-18.)[3]

The evidence confirms that CS's beliefs underlying the U5s are, in fact, accurate. Accordingly, CS reasonably believed—and continues to believe—that Plaintiffs breached their restrictive covenants.[4] These conclusions were reasonable when the U5s were filed and, more importantly, remain accurate today.

---

[3] As discussed in Defendants' supplemental brief, whether the restrictive covenants are enforceable is irrelevant to the whistleblower claim, and, regardless, they are enforceable.  (Dkt. 73-2, pp. 3-8.)  Additionally, CS's reasonable belief was bolstered by the fact that experienced employment counsel drafted the employment Agreements.  (Tr.434:18-21.)

[4] As set forth in Defendants' Supplemental Memorandum (Dkt.73-2,p.3), Plaintiffs' unenforceability argument fails because: (1) enforceability is irrelevant to the whistleblower claims and the accuracy of the U5s—the operative question is whether Defendants held a good-faith belief that contractual breaches occurred, not whether they will later be enforced; (2) Plaintiffs' unenforceability arguments lack merit, and (3) the argument was improperly raised for the first time in reply.  Further, Plaintiffs' arguments regarding Jordan v. Metro are meritless. (Dk. 36,pp.20-21.)

***Documentary Evidence Proves Plaintiffs Violated Their Restrictive Covenants***

The documentary evidence (Ex.42–43A) and Plaintiffs' admission about the workday Zoom with HRP from CS's office independently establish that the U5s are correctly marked. The documents and the Zoom evidence mutual solicitation, joint sharing of confidential information with HRP,[5] and coordinated preparation to build a competing SBSD at HRP. (DiBacco ¶ 80-103.) This evidence eviscerates Plaintiffs' testimony that their decisions were separate, independent, and free of encouragement or solicitation.[6] Exhibits 42–43A reflect team-wide planning, the use of CS tools and data to model revenue and pricing, the identification of which clients and systems would be replicated at HRP, all arranged by Travers. (DiBacco ¶80-103.) The exhibits reveal concrete steps to replicate CS's confidential and proprietary processes at HRP, and to give HRP a competitive advantage via planned follow-up conversations to advance that effort. (DiBacco ¶80-103; Weg ¶33-34.)

The LinkedIn evidence further bolsters CS's reasonable belief about the contract breaches and disproves Plaintiffs' "separate and independent" narrative. The documents establish that the Zoom with HRP occurred on July 17 (Ex.43-43A), and Glazer's supposed "cold" LinkedIn outreach (Ex.46) is dated July 24, <u>one week later</u>. This timing proves that the outreach was not a spontaneous, independent contact but a staged follow-up. Moreover, the LinkedIn messages sent to Glazer (Ex.46), Allemang (Ex.44), and Weg (Ex.53) share the same template language. The

---

[5] Solomon's testimony confirms the sensitivity of the discussed information Plaintiff's planned to use to undercut CS pricing: Solomon testified that competitors should not know CS's positions, net spreads, financing assumptions, or position size, explaining that such information "should not be known outside of our walls." (Solomon Tr. 120:4–121:18.)

[6] The 244-paragraph Complaint, 87-paragraph original declarations, and Solomon's direct examination all deceptively omitted **any** reference to the coordinated Zoom or the emails. Solomon acknowledged the Zoom and the internal emails only when confronted on cross examination, yet he continued to deny remembering the incriminating HRP emails. (Tr.139:11–140:22, 142:4-16.)

uniformity and timing of these messages demonstrate the "cold outreach" narrative was a ruse to conceal internal solicitation and the group's coordinated disloyalty. Moreover, Batanjany told Leonardo about this ruse. (Leonardo ¶9.) This disguised "cold outreach" confirms CS's belief that Plaintiffs intended their breach and deliberately tried to conceal it. The exhibits alone establish that CS has a current reasonable belief that the U5s are accurate.

### *Testimony Proves Plaintiffs Violated Their Restrictive Covenants*

The testimony of Glazer, Weg, and Allemang, which is credible, consistent, and corroborated by the Zoom and the exhibits, further supports CS's reasonable belief.

Glazer affirms that the departures were the product of a months-long plan orchestrated by Travers to replicate the CS's SBSD business at HRP. Glazer states:

- Travers personally solicited him, updated him on the status of other employees' decisions, and engaged in many conversations about jointly leaving CS as a team. (Glazer ¶5-8.)

- The plan was to help build a competing SBSD at HRP as quickly as possible so it would be operational before they started. (Glazer ¶14-16, 27-28.)

- The group held joint calls, met collectively with HRP, jointly exchanged ideas, reviewed revenue models, and planned to take market share from CS by undercutting CS pricing; they had Travers negotiate their contracts. (Glazer ¶11-13, 21-31, 35-43; DiBacco ¶81-104.)

- The "cold" LinkedIn outreach was a fiction. (Glazer ¶32-33.)

- The group agreed on a unified resignation date and strategy, with Travers directing them to continue working until instructed otherwise. (Glazer ¶44-46.)

- Travers reassured the group that they could get away with contractual breaches because he would "go nuclear" on CS if they pursued litigation. (Glazer ¶50-52.)

Weg corroborates these facts. He swears that:

- Travers personally solicited Weg to leave. (Weg ¶10-17.)

- In trying to persuade Weg to leave, Travers repeatedly reminded Weg that the SBSD at CS would collapse without the departing group and described which clients they would take, which contributed to Weg's belief that remaining at CS was not viable. (Weg ¶15-17, 23, 33–35.)

- Travers told him which employees already committed to going, updated him as additional members joined the plan, and held 20–40 follow-up conversations (often during work hours) about leaving as a coordinated group.  (Weg ¶11-14.)

- Travers described the SBSD they would replicate at HRP, explained that HRP needed help to get "up and running" quickly, and confirmed that the purpose of providing CS's internal information to HRP was to accelerate the launch of an operational competing SBSD. (Weg ¶16-17, 33-35.)

- Travers told Weg he would receive a LinkedIn message staged to look like a cold outreach so it would appear he had not been improperly solicited, and Weg received the message exactly as predicted. (Weg ¶20-21; Ex.53.) After receiving it, Weg had a brief follow-up conversation with HRP and was then asked to send his employment contract and await a job offer. (Weg ¶22; Ex.53.)

- Travers described ongoing discussions with HRP that matched the proprietary and confidential information reflected in Exhibits 42-43A and emphasized that no SBSD would ever share such information with a competitor. (Weg ¶¶33-35.)

- During the workday, Frank visited HRP's offices and later told Weg that he had explained to HRP what they "needed" technologically to build the SBSD; Weg emphasizes that Frank's knowledge of CS's technology and infrastructure was critical to enabling HRP to advance a competing SBSD platform. (Weg ¶18-19)

- Travers told Weg that, if necessary, he would "go nuclear" on CS, by invoking regulatory issues as leverage, and presented that threat as part of his effort to persuade Weg to join the coordinated departure. (Weg ¶23–24.)

Allemang similarly testified that he and Travers discussed which employees to take with them to build a competing SBSD that would do business with CS's current and prospective clients (Tr.376:8-78:4, 382:5-84:18, 392:18-93:25), they had hundreds of conversations to advance their effort (Tr.375:10-17), that the departing employees jointly discussed contract negotiations with HRP, which Travers led (Tr.395:15-96:23), that they planned their resignations together (Tr.398:17-19, 418:11-20.)

*CS's September 16 Knowledge Supported a Reasonable Belief of Restrictive Covenant Violations*

Momentarily putting aside that evidence confirms that the U5 is currently correct, the information available the morning of September 16 was sufficient to support CS's belief that Plaintiffs breached their restrictive covenants.   Seven members of senior leadership met that morning to finalize the plan to address the situation; and the information the team discussed and relied upon to conclude the contracts were breached included:

- Seven key SBSD-team members resigned at once.

- Their roles were exactly what a competitor would need to replicate a SBSD business, indicating inside targeting.

- All left for HRP, newly capitalized to build a SBSD, showing coordinated planning.

- Brodsky (middle office) and Frank (IT) leaving signaled non-public operational knowledge was shared.

- Each was earning record pay at CS; only pre-negotiated, coordinated guarantees explain a collective exit.

- Uriel Cohen said Travers initially concealed and then denied the number of resignations, which they viewed as dishonest.

- Cohen reported that weeks earlier, Travers spoke positively about his future at CS, which Cohen viewed as disingenuous in light of the coordinated resignations. On the day of resignation, Travers told Cohen that he was "not going to compete," a statement management found incredible given HRP's massive compensation offers and the composition of the departing team.

(DiBacco ¶53(a-g); see also Tr. 432:20-36:12, 438:15-39:20; Gutmanstein ¶8-9, 11).   This summary compresses a detailed record. Defendants respectfully urge the Court to review DiBacco's declaration, which describes in full the contemporaneous facts and discussions that informed management's decisions, and is consistent with the testimony of Cohen and Volz. (Tr. 270:8-71:1, 333:19-21.)

While this information was and remains sufficient to support CS's reasonable belief, after the September 16 morning meeting, later that afternoon, Allemang confirmed to Volz that the departures were coordinated (Tr.271:12-25, 402:10-13; Volz ¶ 69), that they were going to HRP to perform substantially the same functions they performed at CS (Volz ¶ 70), and that the reason they were leaving was about money, not regulatory concerns  (Volz ¶71–72), which was consistent with his testimony that Travers chose the group based on their skill sets (Tr.377:21-78:4) and money was the primary driver for leaving.  (Tr.397:9-98:3.)  Before the U5s were filed, Volz shared this information with Cohen, Gutmanstein, Sicklick and others.  (Tr.331:20-32:25, 440:17-441:1; Gutmanstein ¶11(g).)

Given the available information, CS reasonably believed at all relevant times, and certainly by October 10, that the Plaintiffs violated their contracts. Specifically, the contracts state that, *while employee is employed*[7]:

- … Employee shall not, directly or indirectly, participate in, engage in or prepare to engage in any Competitive Business Activity.[8] (Exs. 1-4, Attachment A §3.2)

- … Employee shall not…employ, solicit, induce, hire, offer to hire, or otherwise interfere with the employment or association of any current or former (within the prior twenty-four (24) months) director, member, officer, contractor, or employee of Company or its affiliates" (Exs. 1-4, Attachment A §4)

---

[7] While Plaintiffs claimed they will follow their agreements during the non-compete period, the breaches occurred while employed.

[8] The fact HRP was not yet operating a SBSD does not remove Plaintiffs' conduct from the scope of "Competitive Business Activity" which includes (i) "activity that is similar in nature to the services the Employee provided to the Company during the last 2 years preceding the termination," and (ii) "activity which utilizes Proprietary Information the Employee acquired during employment." Plaintiffs were hired by HRP to build a SBSD to perform the same functions they performed at CS, and doing so inevitably required the use of CS's confidential and proprietary knowledge. Thus, even if HRP's SBSD is not fully functional, Plaintiffs' activities satisfy the contractual definition.  At a minimum, CS reasonably believed same.

Given the foregoing, compelling CS to amend U5s despite ample evidence they are accurate would disserve the public interest, undermine FINRA's disclosure regime, and expose CS to regulatory risk and reputational harm. (Gutmanstein ¶128–33.) FINRA's system depends on member firms exercising reasonable judgment and forcing CS to substitute language it believes is inaccurate would distort the regulatory record and mislead regulators and those who rely on U5 disclosures.

Plaintiffs also cannot show equitable harm. The U5s have not impaired their employability; each Plaintiff has secured lucrative employment, and their testimony overstating reputational harm was incorrect because the public cannot view the termination narrative.[9] (Gutmanstein ¶2–3.)  If Plaintiffs contend that their current employment is now at risk due to CS's recently filed action, any injunctive relief would issue only upon a judicial finding that CS has a likelihood of success on the merits, necessarily confirming that CS reasonably concluded that contractual breaches occurred.

Accordingly, the balance of the equities and the public interest weigh against injunctive relief. CS should not be compelled to amend regulatory filings it reasonably believes are accurate to make them inaccurate.

## II.    PLAINTIFFS CANNOT ESTABLISH A CLEAR OR SUBSTANTIAL LIKELIHOOD OF SUCCESS

To establish a claim under Labor Law § 740, each Plaintiff must allege that he/she disclosed or threatened to disclose to a supervisor an activity, policy, or practice that the plaintiff reasonably

---

[9] This is verified by searching the Plaintiffs' names in the BrokerCheck website, which does not reveal that the Plaintiffs were terminated or the reason for the terminations. Any public exposure stems from Plaintiffs' choice to plead U5 content publicly instead of seeking confidential relief through FINRA or arbitration.

believed was illegal. <u>Thacker v. HSBC</u>, 2023 U.S.Dist.LEXIS 71055,\*14-15 (S.D.N.Y. 2023).  The

plaintiff must then identify a retaliatory, adverse action taken in response to that complaint. <u>Id.</u>

The plaintiffs must also prove a causal connection between the adverse action and protected

activity.  <u>Id.</u>  Plaintiffs cannot meet this standard.

## A.    <u>PROTECTED ACTIVITY</u>

Assuming arguendo that some of Plaintiffs' communications could qualify as protected

activity if they occurred, the October 3 and 4 letters and the October 9 call, are not protected

activities.

To be protected, a communication must identify or disclose the underlying "activity, policy

or practice" alleged to be unlawful.  The New York Court of Appeals explained:

> Subdivision (2)(a) [of Labor Law § 740] prohibits an employer from taking
> retaliatory personnel action against an employee because she either discloses or
> threatens to disclose the employer's "activity, policy or practice." The reasonable
> interpretation is that, in order to recover under a section 740 claim, plaintiff must
> show that she reported or threatened to report the employer's "activity, policy or
> practice," but need not claim that she cited any particular "law, rule or regulation"
> at that time. As one commentator has observed, "[m]erely the practice—not the
> legal basis for finding it to be a violation—appears to be what must be reported"

<u>Webb-Weber v Community Action for Human Servs., Inc.</u>, 23 N.Y.3d 448, 453 (2014)(citations

omitted).

A recent decision, relying on <u>Webb-Weber</u>, held that under Labor Law §740, to be

protected, a plaintiff "must identify the particular activities, policies or practices in which the

employer allegedly engaged." <u>Delaney v. HC2, Inc,</u>761 F.Supp. 3d 641, 676 (S.D.N.Y. 2025).

Although the plaintiff in <u>Delaney</u> described the underlying conduct (a failure to provide plan

documents), the court still found no protected activity because Plaintiff did "not explain what he

did to complain to the government," or why the alleged failure was "contrary to law, rule, or

regulation, or in any way improper." <u>Id</u>. Thus, even when the underlying practice is described, a

communication is not protected unless it also conveys what was reported and why it was believed to be unlawful.  See also, DiNome v. Cordis U.S. Corp., 2024 U.S.Dist.LEXIS 149377,*11-12 (S.D.N.Y. 2024)(following Webb-Webber and finding communication unprotected because it failed to identify specific unlawful practice).

Courts in analogous retaliation contexts likewise reject communications consisting only of legal labels rather than a description of the underlying conduct. In Speigel v. Estée Lauder Inc., the plaintiff's attorney told the employer that she intended to sue "due to the continued illegal harassment, hostile work environment which was allowed to exist at the store, as well as the illegal discrimination by her supervisors and the Human Resources Department." 2024 U.S.Dist.LEXIS 123188, *16 (S.D.N.Y. 2024), aff'd, 2025 U.S.App.LEXIS 10774 (2d Cir. 2025). The court held that this did not constitute protected activity because the complaint "states only, in conclusory terms," that counsel had notified the employer of "illegal harassment" and "illegal discrimination," and failed "to identify protected activity" beyond those generic characterizations. Id. The issue in Speigel was not that counsel failed to utter a magic word like "race," but that the communication omitted a description of the underlying conduct.

A protected communication must contain enough factual content to allow the employer to understand what conduct is being challenged as unlawful.  In Kelly v. Howard I. Shapiro & Assocs., the court held that complaints couched only in terms like "harassment" or "discrimination" were not protected activity because they lacked "factual circumstances that permit the inference" from which an employer can understand the acts which constitute a statutory violation. 716 F.3d 10, 15-17 (2d Cir. 2013). The focus is on whether "the substance of the complaint" would give the employer notice of the underlying conduct that it claimed was unlawful." Id. at 17.  Kelly failed not because the legal theory was unsound, but because the

13

communication contained no facts from which the employer could understand that she was alleging gender-based misconduct. What was missing was factual detail identifying the underlying conduct at issue.

In Rimini v. J.P. Morgan Chase, an employee claimed he engaged in protected activity by making "reports" concerning federal statutes implicated in JPMC's recent $200 million SEC and CFTC settlements and said an ALJ was "going to make a finding" that he had engaged in protected activity. 2024 U.S.Dist.LEXIS 177572,*22 (S.D.N.Y. 2024). Although these assertions referenced specific regulatory statutes and regulatory enforcement actions, they were insufficient because they provided no factual description of what underlying conduct had been reported, leaving the employer unable to discern the alleged underlying wrongful activity. The court emphasized that "vague assertions and innuendos" do not constitute protected activities. Id. This is consistent with other decisions rejecting communications that fail to articulate the underlying conduct. See Romano v. A360 Media, LLC, 2023 U.S.Dist. LEXIS 10355,*31-33(S.D.N.Y. 2023)(no protected activity where plaintiff's communications did not identify any facts suggesting that the complained-of conduct was unlawful, rendering her generalized threat of legal action insufficient); Fraser v. Fiduciary Trust Co. Int'l, 417 F.Supp. 2d 310, 322-24 (S.D.N.Y. 2006)(no protected activity where plaintiff failed to identify specific employer conduct he believed violated federal law).

Thus, to constitute protected activity, the communication must identify the underlying unlawful conduct. Labels, threats, or generalized references to "illegal" or "retaliatory" actions do not satisfy this standard unless accompanied by factual content that discloses the underlying "activity, policy, or practice" that the employee reported or threatened to report. Like these cases, Plaintiffs failed to satisfy this standard.

14

***The October 3 and 4 Letters***

As described in the Gutmanstein Declaration at ¶16-27 and in Sicklick's testimony (Tr.444:4-14, 450:16-23), the October 3 letter (Ex.9, unredacted) does not meet this standard. It provides no indication that it relates to whistleblowing activity. To the contrary, it expressly identifies the alleged "unlawful actions" as defamation, breach of contract, and coercive efforts to impose broader restrictive covenants, forfeiture, and baseless litigation. Nothing in the letter attributes CS's conduct to any report of employer wrongdoing; instead, it cites "personal animosity" and a desire to "punish" the employees. Its description of "cultural and compensatory dissatisfaction" concerns only conduct "since submitting their resignations," not any protected complaint. The passing reference to a "history of illegal conduct" is undefined, and the letter does not assert that Plaintiffs ever complained about, refused to participate in, or were mistreated because of the disclosure of an underlying "activity, policy, or practice." It describes Plaintiffs as "exemplary employees without prior complaints," underscoring its post-resignation focus.

Finally, the letter contains no reference to regulatory concerns, compliance failures, statutory or rule violations, or any internal report of misconduct. Even the phrase "retaliatory actions" appears solely in connection with post-resignation treatment, which Plaintiffs themselves have repeatedly characterized as retaliation <u>for their quitting</u>. (Brodsky-10/10/25,[10] ¶36; Travers-10/10/25, ¶51; Complaint ¶104.)

As described in the Gutmanstein Declaration ¶31-41 and in Sicklick's testimony (Tr.449:14-20), the October 4 letter (Ex.10, unredacted) also provides no indication that it relates to whistleblowing. Its opening paragraph asserts that CS altered Plaintiffs' RSU valuations immediately after receiving the October 3 letter, implying retaliation for the October 3 letter.

---

[10] Plaintiffs' declarations are cited as [Name]-[Date of execution].

The next paragraph states that it would be "difficult to imagine" a company taking "retaliatory action against employees who reported or threatened to report actual or suspected wrongdoing," but the only "wrongdoing" is the conduct described in the October 3 letter (defamation, coercion, breach of contract, bullying, and personal animosity following Plaintiffs' resignations). The letter does not identify any regulatory concern, factual description, or any internal report of an underlying "activity, policy, or practice" under Labor Law §740.

Its references to "retaliatory action" related solely to the alleged alteration of RSUs and the asserted "alteration or destruction of evidence," not to any act tied to a protected disclosure. The letter concludes with a threat of emergency judicial and regulatory action if the Carta entries are not corrected.  As Gutmanstein and Sicklick explain, nothing in the October 4 letter led them to understand it as conveying a whistleblowing complaint, and no reasonable reader could understand it that way.

As detailed in the Gutmanstein Declaration (¶16-27, 31-41) and in Sicklick's testimony (Tr.444:4-14, 449:11-50:23), CS understood these letters to concern contractual disputes, post-resignation treatment, and generalized accusations of "bullying," not the disclosure of any "activity, policy or practice" within the meaning of Section 740. That understanding was reinforced by Ostrove's contemporaneous October 8 email to Rockett, which Gutmanstein read at the time, stating:

> I still don't understand the contours of your claim or your theory which would entitle you to injunctive relief… your letters… do not articulate any claim outside of a breach of contract… [and] no facts contained in your letters or mentioned during our call support a cause of action for the alleged bullying.

(Ex.51[11]; Gutmanstein ¶46.)

---

[11] While part of this email relates to settlement, the relevant portions do not implicate FRE 408 and/or fall within the exception at subdivision b.  Regardless, the Court has indicated FRE does not apply.

In sum, nothing in the letters or counsels' exchange suggests that Plaintiffs had made or were making any report of whistleblowing activity. The letters did not identify any employer "activity, policy or practice" that Plaintiffs disclosed or threatened to disclose, nor do they convey what was reported and why Plaintiffs believed the underlying conduct was unlawful.

### The October 9 Call

Even accepting Rockett's colloquy in full, the October 9 call did not convey a protected activity. Rockett did not "identify the particular activities, policies or practices in which the employer allegedly engaged," nor did she explain what her clients "did to complain," or why Plaintiffs believed CS's underlying conduct "was contrary to law, rule, or regulation, or in any way improper." Delaney, 761 F.Supp.3d at 676 (citing Webb-Weber, 23 N.Y.3d at 453).

Rockett said that she told Ostrove they would be filing "an ERISA and whistleblower retaliation action," that the complaint would "outline an extensive history of mostly SEC, but also additional laws, rules, and regulations that have been violated," and that her clients had complained internally but corrective action was opposed. (Tr.163:8–64:1.) She also admitted that when Ostrove asked what conduct she was referring to, she declined to provide any specifics and told him to "ask his clients." (Tr.164:2-4.)

Nothing in this account identifies any "activity, policy or practice" within the meaning of Section 740. A bare assertion that "SEC laws, rules, and regulations" were violated provides no notice of what conduct is at issue. The SEC administers dozens of statutes and thousands of rules touching virtually every aspect of the firm's operations. Without any description of the particular practice allegedly reported, the communication cannot constitute protected activity.

Ms. Pronley's notes of the call confirm this. Rockett is recorded as saying the soon-to-be-filed papers would include "an extensive history of mostly SEC but also additional laws, rules,

[and] regulations that have been ongoing at the company," and that Plaintiffs "felt extraordinarily uncomfortable including things they were pressured to do that was illegal." (Ex.62-Court Ex.1, p. 2.) But the notes show no statement describing those practices. Instead, Rockett refused to elaborate, stating: "your clients know it… they know very well what the issues are and what laws they've been breaking." (Id.) Courts reject such "vague assertions and innuendos," which do not identify any employer activity or practice. <u>Romano</u>, 2023 U.S. Dist. LEXIS 10355, at *31-33. When Ostrove explained he could not meaningfully respond without knowing what conduct she was referring to, she reiterated that no details would be provided. (Ex.62-Court Ex.1, pp.4–5.)

The sequence of communications shows a deliberate tactic by Plaintiffs to avoid disclosing any factual detail about the alleged whistleblowing theory. The October 3 and 4 letters did not mention any regulatory concern or identify any employer practice alleged to be unlawful. During the October 6 call, as memorialized in the October 8 email (Ex.51), counsel again refused to elaborate and she did not reply to the October 8 email, even though the email expressly urged her to provide details. That pattern continued on October 9 when Rockett refused to provide any specifics. At every step, counsel intentionally and strategically withheld the factual content that may have rendered her communications protected.

Rockett's October 9 communication was made to Ostrove, not to Gutmanstein, Sicklick, or any other decisionmaker. Even assuming that the substance of that conversation was promptly relayed internally, it would not matter. Rockett did not identify any employer "activity, policy or practice," nor did she explain what Plaintiffs reported or why they believed the underlying conduct was unlawful. (Tr.443:18–44:14; Gutmanstein ¶49-54.) The communication therefore fails as a matter of law to constitute protected activity.

Accordingly, even if Plaintiffs were retaliated against for the October 3, October 4, or October 9 communications, Plaintiffs cannot demonstrate a clear or substantial likelihood of success because none of those communications constitute a protected activity.

**B.    ADVERSE ACTION**

Plaintiffs allege multiple adverse actions, but the only action before the Court is the filing of the U5s, which flowed from the termination. Although Plaintiffs' Proposed Order to Show Cause referenced other issues, they sought injunctive relief only as to the U5s and only advanced arguments on that issue. (Dkt.7, pp.5,7,24–25,29–30.)   Accordingly, during the pre-hearing conference, the Court limited the hearing to the U5s, while noting it could address COBRA.

While RSUs were discussed at the hearing, they do not support injunctive relief because they involve only economic loss. Plaintiffs contend that the RSU changes were a retaliatory response to the October 3 letter, but that letter was not a protected activity and thus cannot support a whistleblower claim.

As to COBRA, Plaintiffs did not lose COBRA eligibility; each Plaintiff received coverage (Tr.55:10-20, 113:16-18, Zivkovic ¶20.) Any administrative COBRA issues were the result of routine processing and were not directed by, or even known to, the decisionmakers involved in Plaintiffs' terminations. (Zivkovic ¶3-19.)

Plaintiffs' claims related to the RSUs, COBRA, and other alleged actions also fail. Assuming arguendo that these or other actions could be deemed adverse, they are irrelevant to the instant application, and Plaintiffs cannot show a causal connection to a protected activity.

**C.    CAUSAL CONNECTION**

Plaintiffs cannot establish the requisite causal connection between a protected activity and the terminations or marking of the U5s. Each Plaintiff independently bears the burden of

demonstrating a clear or substantial likelihood of success on every element of his/her claims. While Plaintiffs' strategy has been to litter the record with blunderbuss allegations of wrongdoing, absent a concrete, demonstrable link between a protected activity and adverse decisions, Plaintiffs' claims must fail.

***Legitimate Business Reasons Defeat Causation and the Absence of Pretext***

CS terminated Plaintiffs for legitimate, non-retaliatory business reasons, which defeats any inference of causation. Economic and business reasons constitute lawful justifications for employment actions, and the relevant inquiry is whether the employer honestly and in good faith believed it had a legitimate basis to act, not whether that belief was correct. See Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 469 (2d Cir. 2001).  An employer may make a mistaken, unwise, or even baseless decision without liability, so long as it was not motivated by retaliation. See Scaria v. Rubin, 1996 U.S.Dist.LEXIS 9659, at *24 (S.D.N.Y. 1996), aff'd, 117 F.3d 652 (2d Cir. 1997).

CS acted based on its reasonable belief that Plaintiffs breached restrictive covenants and engaged in coordinated disloyal conduct.  Even assuming that Plaintiffs engaged in prior protected activities, the coordinated resignations were an intervening event that led to the adverse actions. See Gubitosi v. Kapica, 154 F.3d 30, 33-34 (2d Cir. 1998) (proximity between protected activity and termination was insufficient to show retaliation where intervening event provided an independent, non-retaliatory basis for the adverse action).

To overcome CS's legitimate, non-retaliatory explanations, Plaintiffs must prove pretext. To prove pretext, a Plaintiff must establish that the unlawful retaliation would not have occurred in the absence of the protected activity.  Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014). Plaintiffs cannot meet that standard.

Plaintiffs' pleadings and testimony confirm that CS's actions were driven by Plaintiffs' coordinated resignations and perceived disloyalty, not by whistleblowing. Plaintiffs allege that they received no criticism during their employment (Complaint ¶58), Solomon alleges he was an exemplary employee (Tr.98-99), and Travers and Brodsky affirm that they received excellent performance reviews. (Travers-10/10/25 ¶9; Brodsky-10/10/25 ¶7.) Plaintiffs allege that the retaliation occurred only "in the three weeks [after] Plaintiffs resigned." (Complaint ¶4-5.) Thus, by Plaintiffs' account, no adverse action occurred during their employment, which was when many of the alleged protected activities occurred.

Plaintiffs plead that they were terminated "**solely because**" other employees simultaneously resigned to work for the same new employer (Complaint ¶104), and that Cohen's anger stemmed from his belief that Travers was soliciting employees to leave for HRP while still employed. (Complaint ¶117, 117(d).) Plaintiffs also affirm that Defendants acted on the belief that Plaintiffs orchestrated a group departure, violated their contracts, and that CS needed to "make an example" to deter additional exits. (Complaint ¶124.) These are not allegations of retaliation for whistleblowing, but of action taken in response to the resignations.

These admissions align with the testimony. Travers and Brodsky conceded that the resignations were the "**sole**" cause of CS's actions. (Tr.53:3-54:8, 228:12-29:19.) Plaintiffs' own words confirm Defendants' legitimate business reason motivated the decisions, not whistleblowing. See Bright v. Coca Cola, 2014 U.S. Dist. LEXIS 155565, *52 (E.D.N.Y. 2014) (dismissing retaliation claim where plaintiff admitted reason for adverse action was non-retaliatory).

***The Timing and Sequence of Events Undermines Any Inference of Causation***

To use temporal proximity to establish a causal connection, the gap between the protected activity and the adverse action must be short. See, e.g., Hollander v Am. Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir.1990) (three months too long); Battice v. Phillip, 2006 U.S. Dist. LEXIS 53407, at *8 (E.D.N.Y. 2006) (over four months too long); Cunningham v. Con Edison, 2006 U.S. Dist. LEXIS 22482, *19 (E.D.N.Y. 2006) ("passage of two months…seems to be the dividing line"). Most alleged protected activities long predated Plaintiffs' resignations, and any closer-in-time allegations fail for independent reasons.

Causation is further undermined by the issuance of massive bonuses paid after Plaintiffs engaged in numerous communications which they claim are protected.  Each plaintiff alleges multiple protected activities that predate their bonuses.  Solomon and Travers received millions in discretionary bonuses in February/March 2025 (Tr.65:20-22, 233:13-17), Brodsky and Batanjany also received substantial discretionary bonuses. (Tr.13:21–14:9; Zivkovic ¶22.)  Further, even after those massive bonuses were paid, CS negotiated with Plaintiffs to pay further bonuses (DiBacco ¶15), despite the alleged prior protected activities.

As late as September 16, CS offered Brodsky additional compensation to remain – that offer remained open even after Brodsky's alleged protected activity in the very meeting where she received the offer. (Brodsky-10/10/25 ¶21; Tr.263:15-64:12, 294:5-95:13.)  DiBacco begged Solomon to stay, even immediately following his alleged protected activity. (DiBacco ¶64-70.)

These actions occurred after Plaintiffs claim to have raised regulatory concerns.  This is fundamentally inconsistent with an inference that CS harbored retaliatory animus based on prior protected activities. A company intent on retaliating for whistleblowing does not reward the same

employees with bonuses, attempt to retain them, or offer enhanced compensation shortly after the supposed protected activity.

### *Comparator Evidence Defeats Any Inference of Retaliatory Causation*

Proof of causation may be established, or refuted, by comparing how an employer treated similarly situated employees who engaged in comparable conduct. Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010). Here, the treatment of similarly situated employees undermines causation. Travers testified that like him, DiBacco was labeled as a "disruptor," yet DiBacco was never terminated or retaliated against. (Tr.192:22-93:3, 221:3-15; DiBacco ¶4.) Weg also discussed regulatory matters and remain employed. (Weg ¶7.) Glazer and Allemang, who do not claim they engaged in protected activities, were given the same choice as Solomon and Brodsky: accept compensation to stay or leave and face litigation. (Glazer ¶48; Tr.405:3-08:15.) Finally, Gutmanstein directed that U5s be filed for everybody who refused the counteroffer, including Frank, who Gutmanstein knew was not a Plaintiff. (Gutmanstein ¶59-64; Illardi ¶8-9.)[12]

### *Plaintiff-Specific Causation Analysis*

Defendants now address causation as applied to each Plaintiff, beginning with credibility. To the extent there are factual disputes, they should be resolved in CS's favor. Plaintiffs' entire theory rests on false or misleading assertions, including their claimed lack of coordination and the manner in which they were contacted by HRP, which involved a deliberate ruse designed to hide their contractual breaches. Additionally, Plaintiffs contend that their departures were motivated by regulatory concerns, but credible witnesses persuasively explain that that Plaintiffs did not cite regulatory concerns as the reason they were leaving and instead focused on compensation

---

[12] A U5 was ultimately not filed for Frank as he is not a FINRA member. (Illardi ¶10.)

(Tr.3979:–98:2;[13] Weg ¶5–9; Glazer ¶19–20; DiBacco ¶15–28); if regulatory concerns were so important, the contemporaneous Zoom agenda and follow-up emails would have mentioned HRP's compliance framework; they did not. (Ex.43-43A; DiBacco ¶104.)  Instead, the follow-up emails were focused on compensation assessment.  (Tr.385:16-389:12; Ex.43.)

This case only exists because only after efforts to resolve this dispute failed, Travers decided to "go nuclear" by invoking alleged regulatory issues as leverage. (Weg ¶23–24; Glazer ¶52.)    Accordingly, Plaintiffs' testimony cannot be credited where it conflicts with contemporaneous documents and the testimony of multiple credible witnesses.  Each Plaintiff's individual claims are discussed below.

### **Brodsky**

#### *Client Data Sharing*

Brodsky testified that in April/May 2025, Volz directed her to send CS data to a White Bay employee.  (Tr.15:6-16:2.)[14]  Although Brodsky believed this might implicate regulatory concerns, she told Volz she would begin working on the request (Tr.16:9-10), but then contacted DiBacco, who advised her not to send the data.  (Tr.16:14-19, 41:2-7; DiBacco ¶29-38.)  Brodsky also

---

[13] Plaintiffs try to undermine Allemang's credibility.  Allemang testified that he had "a close personal, deep relationship" with Travers (Tr. 367:4-6), they had been colleagues and friends for 13 years (Tr. 366:116-18), he would stay at Travers' home regularly, and he "felt very conflicted" and "[did] not feel good about" testifying in a way that may harm Travers.  (Tr. 367:9.). Allemang was not happy with CS and described CS's counteroffer as "blood money." (Tr. 410:22-23.)  The Court saw how Allemang tried to help Travers despite having to admit facts that devastate Travers' credibility.  See, e.g., Tr. 370:1-371:20 (avoiding outright confirmation that Travers explicitly organized the move); Tr. 394:7-395:23 (denying Travers negotiated contracts, then admitting he knew what contract would look like based on conversations with Travers); Tr. 398:6-20 (claiming he did not know if resignation date was jointly selected, then admitting it was decided among the team).

[14] This was proper due to the existence of a work sharing agreement.  (Tr.346:17-20; Gutmanstein ¶79-86.)

contacted Weg to ask whether the employee was an associated person, and Weg advised her that he was not.  (Tr.39:21-40:23.)

Brodsky claimed that DiBacco later told her that Cohen had asked why Brodsky was being "difficult." (Tr.16:19-22). DiBacco denies that Cohen said this or that he relayed it to Brodsky, and states that his conversation with Cohen was uneventful and he would not have expected Cohen to recall the conversation; he said that Cohen expressed no animus towards DiBacco or Brodsky. (DiBacco ¶34-35.)[15]  Cohen denied he said this to DiBacco and testified that he did not remember this situation.  (Tr.350:5-51:9).

Brodsky acknowledged that she was never forced to share the information, nobody ever told her they were upset about her refusal, and that DiBacco and Weg agreed with her.  (Tr.16:24, 41:12-25, 43:24-44:24.)   Brodsky received no criticism or adverse treatment following this incident (Tr.46:17-22, 52:4-11), which occurred approximately four months before the resignations.  Brodsky acknowledges that this incident was unconnected to her termination as she has "no doubt" that the "sole" reason she was fired was to "punish [her] for leaving" (Brodsky-10/10/25, ¶36) and there is no evidence to the contrary.

Further, there is no evidence that Volz knew of Brodsky's refusal, nor is there evidence that any of the other decision makers who unanimously agreed upon this business decision (DiBacco ¶53-61; Tr.270:21-71:22, 277:8-78:20) harbored any animus towards Brodsky due to this alleged activity.  Likewise, there is no evidence that Gutmanstein or Sicklick (who were involved in the

---

[15] Solomon testified that DiBacco was a "wonderful individual" who has his "utmost respect" (Tr.84:23-24, 92:9), Travers described DiBacco as a "pretty senior, well-established executive." (Tr.182:7-8). DiBacco's credibility has not been challenged by any Plaintiff, and his name has appeared on every iteration of Plaintiffs' witness list.

RSU and U5 determinations) were aware of her refusal. There is no evidence that any employment decision was related to this situation, and all the evidence indicates otherwise.

### *Post-Resignation Complaint*

Brodsky alleges that on September 16, during a discussion with Volz about the counteroffer, she raised the data-sharing issue. (Tr.21:4-5, 24:20–26:22.) Volz did not react with anger, stated that he wanted Brodsky to remain at CS (Tr.50:1-13), and testified that he was not even aware of her prior concerns at the time. (Tr.263:17-22.) He offered to take responsibility for the issue if it arose again so that it would "go away," but Brodsky nonetheless refused to sign the new agreement (Tr.26:14-16, 50:20–51:9, 264:1-12) and was terminated. (Tr.26:23–27:17.)

The decision to present Brodsky with the choice of signing the counteroffer or being terminated was made before this discussion. There is no evidence that Volz relayed this conversation to Gutmanstein or Sicklick (who were later involved with the RSUs and U5s) or anyone else. There is no evidence of animus stemming from this. To the contrary, immediately following the protected activity, Volz urged her to stay and offered to address her concerns. Brodsky cannot prove causation.

### **Batanjany**

### *Regulation SHO Violations*

Batanjany alleges that in late Spring or early Summer 2025, he complained to Solomon and another member of his team, Blando, about Regulation SHO violations,[16] and that Solomon conveyed his concerns to DiBacco. (Battanjany-2 ¶7-14.) Solomon's affidavit states only that he spoke to DiBacco about the Regulation SHO violations, it does not state that Solomon advised

---

[16] Solomon's belief that a Regulation SHO violation occurred was based on a misunderstanding of how Regulation SHO operates. (Gutmanstein ¶89-98.)

DiBacco that the complaint emanated from Batanjany (Solomon ¶13), nor does it state that DiBacco was unhappy about Batanjany expressing that opinion, nor is there any evidence that DiBacco ever relayed that concern to any of the other decision makers at CS. There is no evidence that this comment led to any animus. Batanjany separately alleges that during this period he complained to an executive assistant, Jennifer Leonardo, about unspecified illegal conduct.[17] (Batanjany-12/6/25 ¶44.) This has nothing to do with CS's business decision to terminate Batanjany (DiBacco ¶57-61) and Batanjany admitted as much, verifying that "he was terminated for cause *solely* because a number of other Clear Street employees had also resigned with the intention of joining [HRP]." (Complaint ¶104, verified by Batanjany.)

**Solomon**

***1940 Act Violations/Kurek Whistleblower Retaliation***

Solomon testified that during a meeting in late 2024, Josh Kurek raised concerns to Ed Tilly, Volz, and others about whether CS was an approved custodian for 1940 Act funds,[18] and Kurek was terminated a week later. (Tr.71:5-72:12.) Solomon was not present for this meeting, admitted he did not know what was being discussed, and acknowledged that regulatory topics were routinely discussed at such meetings. (Tr.126:4-27:14.) According to Solomon, Kurek's supervisor, told Solomon that Kurek had been fired, but did not state the reason; Solomon never discussed the matter with Kurek[19] and does not know who made the decision to terminate Kurek.

---

[17] Even if that was a protected activity, which it was not, there's no evidence Leonardo conveyed the information to anyone.

[18] A good faith question existed as to whether a violation occurred; but CS erred on the side of caution by offboarding the affected companies. (Gutmanstein ¶104-05.)

[19] Plaintiffs' brief contends that Solomon discussed this with many members of management (Pl. Br., p.6), but there is no evidence that Solomon spoke with any decisionmaker, nor is the discussion a protected activity.

(Tr.72:13-20, 125:17-27:14.)  This testimony amounts to speculation and workplace rumor, not evidence. Regardless, Klein was not involved in any of the employment decisions, there is no evidence that Klein reacted negatively, or that Klein told anybody about this.  This is not a protected activity, it is time attenuated, and not connected to any employment decision affecting Solomon.

### Client Data Sharing

Solomon testified that in late 2024, he participated in a call with Alpine Securities ("Alpine"), a hedge fund owned by Cohen, regarding a potential transaction.  (Tr.68:2-69:23.) Solomon believed Alpine had information that may be proprietary to CS. (Tr.69:13-18.)  Solomon speculated that somebody from CS provided Alpine with this information.  (Tr.70:3-6.)  Solomon told DiBacco, who was similarly concerned and rejected the transaction in favor of the novation. (Tr.7017-23, 124:6-14; DiBacco ¶44-48.)   Solomon claimed he mentioned the issue with unspecified members of the derivative team but did not describe what was said.  (Tr.125:3-5.) Solomon never raised his concerns with any other supervisor.  (Tr.125:6-7.)  There is no evidence that DiBacco conveyed Solomon's concerns to anyone else, or that any decisionmaker was aware of them.  DiBacco was not angered by the statement and later urged Solomon to stay.  (Tr.98:5-13; DiBacco ¶64-70.)  This incident occurred more than nine months before the challenged actions, prompted no adverse response, and evidences no retaliatory animus.  It does not support causation.

### Collateral/Capitalization/Novation

Solomon testified that in late 2024, he learned that CS was failing to require CSD to post collateral required by regulatory agencies.  (Tr.73:15-75:25.)[20]  Solomon discussed these concerns

---

[20] At the time, Travers was CEO of CSD (Tr.428:3-10), and the existing collateral framework was based on the advice of outside counsel.  (Tr.428:17-429:8.)  Travers never raised the issue until it was spotted by Solomon.  (Tr.429:19-23.)

with DiBacco, Travers, Klein, Volz, Pento, Tilly, and Gutmanstein, which he characterized as a "very, very large situation that the firm had to address." (Tr.76:13-20.) Although there was no clear answer on whether a violation occurred, to err on the side of caution, CS undertook a novation, which was decided upon by DiBacco after careful consideration. (Tr.352:21-353:7, 426:3-427:6; DiBacco ¶27, 39-43.) Solomon and Travers both agreed the novation was the best solution (Dibacco ¶4; Tr. 425:11-20), and their only complaints were that the novation was time-consuming and might affect compensation. (DiBacco ¶27; Gutmanstein ¶108-09.) Given their agreement with the decision, Plaintiffs cannot plausibly contend the novation was retaliatory. While Plaintiffs argue that the novation was an adverse action because it "punished Travers and Solomon" by transferring assets (Pl.Br., p.8; Travers Aff. ¶11-13), there is no evidence this had any financial impact on Plaintiffs. Moreover, it is preposterous to suggest that the firm undertook a costly novation to retaliate against employees to whom it later paid massive bonuses. DiBacco carefully explains why he decided to novate, and it had nothing to do with retaliation. (DiBacco ¶39-43).

***Bond Rating***

Solomon testified that in early 2025, during a bond rating, CS failed to disclose long-term financial commitments. (Tr.77:3-19.)[21] Solomon discussed his concerns about this with DiBacco and Klein. (Tr.78:9-15.) Despite this discussion, Solomon later received a large discretionary

---

[21] This was contradicted by Volz, who testified, "I was in the meeting, and I know for a fact that the term commitments that Mr. Solomon referenced are disclosed in our financial statements …" (Tr.264:23-265:6; see also Gutmanstein ¶67-75.) Moreover, the bond rating agency learned of the allegations asserted in this lawsuit, discussed them with CS, and did not change the rating. (Gutmanstein ¶76.)

bonus. (Tr.129:19-130:5.) There is no evidence that either Klein or DiBacco relayed this concern to any decisionmaker, reacted negatively to it, or harbored any animus arising from the discussion.

Solomon alleges he suffered adverse action when Cohen directed another trader (Cohen's friend) to take over some of Solomon's trading. (Tr.80:20-81:7, 137:6-8.)[22] That change never occurred (Tr.137:16-18), and while begging Solomon to stay, DiBacco assured him his role was secure. (DiBacco ¶ 66.) Accordingly, even assuming this could qualify as an adverse action, it was never implemented, was not tied to any protected activity, it bears no causal connection to Solomon's termination, and nepotism is not unlawful. Fleurentin v NY City Health & Hosps. Corp., 2020 U.S. Dist. LEXIS 908, *17 (E.D.N.Y. 2020).

### Post-Resignation Complaint

On September 16, 2025, DiBacco presented Solomon with a counteroffer to remain at CS that significantly increased his compensation. (Tr.88:7-90:15.) DiBacco advised Solomon that if he did not sign, CS would take legal action. (Tr.92:14-93:1.) Solomon claims that he asked DiBacco about CS's compliance issues. (Tr.90:19-91:5.) DiBacco explains that, in the context of a broader conversation, Solomon made an offhand remark that "there's always some kind of shit going on," referenced the novation, and asked generally what would happen if another issue arose. (DiBacco ¶64–68.) DiBacco reassured him that any issues would be addressed properly as they had been in the past, continued urging Solomon to stay, and did not view the comment as significant. (DiBacco ¶69–70.) DiBacco never relayed the remark to anyone. (Id.)

Solomon declined to sign and was then terminated by DiBacco, although Solomon testified that he did not believe DiBacco was responsible for making the termination decision (Tr.94:22-

---

[22] Solomon seemingly admitted Cohen didn't have any retaliatory animus, stating, "I don't know if [Cohen] even knows who I am." (Tr.98:15.)

95:4.)  This was not a protected activity, but even if it was, causation fails because the decision to terminate Solomon was made before the conversation.  Moreover, DiBacco continued efforts to retain Solomon after the remark and never shared it with anyone, foreclosing any inference that it influenced employment decisions.

### Travers

When Cohen initially thought it was just Travers who resigned, Cohen tried to encourage him to stay. (Tr.316:14-320:4.)  Only after Cohen learned the full extent of Travers disloyalty did he change his mind and abandon the pursuit to keep him (Tr.320:23-322:2, 329:10-17.)  At the September 16 meeting, all participants agreed Travers was the ringleader, he would be too expensive to retain given that HRP offered him numbers ranging from $10-16M, he had been disingenuous, and the SBSD could function without him.[23]  (DiBacco ¶53e-g, 58-59.)

Travers admits that CS's actions were "solely to retaliate against [him] for voluntarily resigning from CS and in an effort to punish [him], and [his] family, for leaving CS." (Travers-10/10/25 ¶51.)  Thus, Travers admitted that his termination was not caused by any alleged protected activities.  Moreover, Travers did not engage in protected activities after November 2024 because he affirmed that by this date, he was too afraid to make any further reports of misconduct. (Travers-10/10/25 ¶16.)  Thus, his last complaint is temporally attenuated.

### *1940 Act Violations/Kurek Whistleblower Retaliation*

Travers says that in November 2024, he participated in meetings with others concerning a regulatory concern raised by Kurek, recommended it be addressed, and management agreed with

---

[23]   While Travers told the Court that HRP's compensation would be "two times" (Tr. 240:20-241:5.) his ▮▮▮▮ compensation (Zikovic ¶ 22), he later said implied that he was only getting ▮▮▮▮▮ which he claimed showed that he was leaving CS due to compliance issues, not money. (Tr. 473:23-474:10.)

his recommendation. (Travers-10/10/25 ¶11; <u>see also</u> Gutmanstein ¶100-07.) Although Travers claimed that Kurek's report caused Kurek's termination (Tr.183:23-186:25), he admitted he did not know who made that decision. (Tr.216:21–217:1.) Travers does not allege that he complained about Kurek's termination; rather, he asserts only that the custodian issue was discussed and addressed. (Travers-10/10/25 ¶11; Tr.214:17–215:13.)

While Travers claimed Weg was "replaced from his CCO activities" for discussing the issue, he admitted that Weg remained CCO (Tr.215:20-216:4) and further admitted that everybody in management agreed the issue was legitimate, took corrective action, and nobody else was terminated. (Tr.214:19-216:20.) Any claim that Travers was terminated ten months later because of this discussion is speculative, attenuated, and unsupported by the record, particularly given the absence of any adverse response or animus.

***Margin Call Issues***

Travers testified that in 2024, Pento proposed solving a regulatory issue regarding capital requirements by using Alpine. (Tr.189:19-23.) Travers expressed discomfort, and Travers claims that Pento told him if he did not like it he could resign. (Tr.189:11-190:2.) DiBacco agreed that the Alpine transaction shouldn't happen and he pushed against the idea, eventually deciding that the better approach was to novate, resulting in no retaliation to DiBacco. (Tr.219:8-16; DiBacco ¶44-48.) Travers cannot establish that this complaint affected employment decisions nine months later as it is far too attenuated. Further, DiBacco advanced the same complaint and was not terminated. Even if Pento made this statement and it is deemed to reflect animus, Pento did not work at CS at the time of Travers termination (Tr.219:17-20), he was not at the executive meeting in which the decisions were made (DiBacco ¶52-61), and there's no evidence that Pento was involved in the decisions. Indeed, Travers testified:

Q. And you'd agree with me that Chris Pento, the person you were complaining about saying that he made a retaliatory comment to you, he had nothing to do with the decision to terminate you or how your U5 was marked, correct?

A. That's correct, yes.

(Tr.219:12-16.) While Travers attempted to backtrack, later speculating that Pento may have had influence, there is <u>no evidence</u> of Pento's involvement.

### *Collateral/Capitalization/Novation*

As discussed above regarding Solomon, no inference of retaliatory causation can follow from the novation which Travers approved and was not undertaken to retaliate against anyone. (DiBacco ¶27, 39-43.)

### *Data Sharing – Alpine/White Bay*

Travers testified that in February 2025, he was asked by Elli Ausubel (White Bay Partner and COO of Alpine) to provide CS's client data. (Tr.190:15-21; Travers-10/10/25 ¶14.) Travers told Cohen he was uncomfortable sharing the information; Cohen understood his concerns and proposed sending the information to his own email address, which Travers agreed was a good solution. (Tr.191:5-20.)[24] Thereafter, Travers had multiple conversations with compliance and Weg about the issue without any negative pushback. (Tr.192:3-22.) While Travers claimed that in February/March 2025 he learned Cohen was considering replacing him and DiBacco for being "disruptors" (Tr.192:21-193:7), DiBacco was never terminated (Tr.221:13-15), and Travers was not terminated until seven months later due his solicitation of employees and the coordinated resignations; Travers admitted Cohen's anger stemmed from his belief that Travers was soliciting

---

[24] This was right before Cohen approved the payment of a massive discretionary bonuses to Travers.

employees to leave CS for a new employer (Tr.232:5-10), and because Cohen felt rejected and took offense that Travers would consider leaving. (Tr.235:11-22.)

### RSU Buyback

Travers claims that in late summer or early fall 2025, CS management was discussing a plan to buy back RSUs at a discount before an anticipated IPO. (Travers 12/6/25 ¶16-19.) Travers claims, without providing any detail, that he "expressed [his] concerns about this illegal conduct to senior management." (Travers-12/6/25 ¶19.) This allegation is far too vague to establish causation, as it does not identify who Travers spoke to, how his comments were received, or indicate whether any of the decision-makers were involved. Moreover, given the bombshell nature of these allegations, it is incredible that they would not have been raised earlier. Further, this unsupported allegation of wrongful conduct is meritless - the discussions about purchasing the RSUs pre-dated the planned IPO, and, once CS determined to pursue the IPO, the purchase was halted. (Gutmanstein ¶111-13.)

### Post-Resignation Complaint

Cohen attempted to get Travers to stay in their first brief conversation following Travers' resignation (Tr. 201:19-25, 316:14-320:18), but in a follow-up conversation Cohen angrily complained that bringing seven people to HRP was a slap in the face (Tr.201:9-18, 228:6-11) and Travers was subsequently terminated for cause. (Tr.203:25-204:9.) Thereafter, Travers spoke with Tilly about a settlement. (Travers-10/10/25 ¶26-28.) During this conversation, Travers claims he engaged in a protected activity when he told Tilly about misconduct that should have been reported to regulatory authorities.[25] (Travers-10/10/25 ¶30.) While this is not even a protected activity,

---

[25] This is not protected because it does describe an "activity, policy or practice," "explain what he did to complain", or why the alleged failure was "contrary to law, rule, or regulation, or in any way improper."

Travers also cannot establish this communication caused his termination or U5 filing, given that Travers had been terminated days before it occurred, and there is no evidence that Tilly told anybody about the discussion or that Tilly was involved in the later U5 filing.   Regardless, for the reasons detailed above, this non-protected activity did not cause any employment actions.

Dated:  Carle Place, New York
           December 15, 2025

Respectfully submitted,

LEEDS BROWN LAW, P.C.

By: _____/s_____
        RICK OSTROVE
        ANDREW COSTELLO

## **WORD COUNT CERTIFICATION**

I, Rick Ostrove, an attorney admitted to practice before this Court, hereby certifies that the foregoing Defendants' Post-Hearing Brief in Opposition to Plaintiffs' Motion for a Preliminary Injunction complies with the word-count limitation set forth in Section III(D) of Judge Analisa Torres's Individual Practices in Civil Cases and in the Court's November 26, 2025 order [ECF No. 86]. I further certify that this document contains 9,999 words, excluding the caption, index, table of contents, table of authorities, signature block, and any certificates, but including footnotes and endnotes. This word count was calculated using the word-count feature of Microsoft Word.

Dated: Carle Place, New York
      December 15, 2025

                                   Respectfully submitted,

                                   LEEDS BROWN LAW, P.C.

                                   By: _____/s_____
                                        RICK OSTROVE