UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL BATANJANY, CORY SOLOMON,
PATRICK TRAVERS, and JORDAN
BRODSKY,

                    Plaintiffs,

-against-

CLEAR STREET MANAGEMENT LLC,
CLEAR STREET DERIVATIVES LLC, CLEAR
HOLDINGS LLC, CLEAR STREET LLC,
CLEAR STREET HOLDINGS LLC, CLEAR
STREET GROUP INC., URIEL EPHRAIM
COHEN, and KENNETH ARI SICKLICK,

                    Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:    6/5/2026

25 Civ. 8420 (AT)

**OPINION
AND
<u>ORDER</u>**

ANALISA TORRES, District Judge:

This action arises from an employment dispute between four licensed broker-dealers and their former employer, Clear Street, a financial technology and investment firm.[1] *See generally* Compl., ECF No. 1. Plaintiffs Michael Batanjany, Cory Solomon, Patrick Travers, and Jordan Brodsky allege that Clear Street and its senior executives (1) retaliated against Plaintiffs for making complaints about perceived legal or regulatory violations and (2) engaged in other misconduct. *See id.* ¶¶ 159–244. The parties have agreed to arbitrate all claims for monetary damages. *See* ECF No. 126. Plaintiffs seek a preliminary injunction pending arbitration directing Defendants not to take any further adverse action, and to amend certain regulatory filings—Form U-5s—that state that Plaintiffs were discharged "for cause" because they breached their

---

[1] Plaintiffs and Defendants both refer to "Clear Street" in general terms without distinguishing between the various corporate entities named in this action (e.g., Clear Street Management LLC, Clear Street Derivatives LLC, Clear Holdings LLC, Clear Street LLC, Clear Street Holdings LLC, Clear Street Group Inc.). *See generally* Mem. I, ECF No. 7; Mem. II, ECF No. 93 (post-hearing brief); Opp. I, ECF No. 36; Opp. III, ECF No. 103-26 (post-hearing brief). Accordingly, the Court refers to the corporate defendants collectively as "Clear Street."

"restrictive covenants."  *See* Mem. I, ECF No. 7; Mem. II, ECF No. 93; Opp. I, ECF No. 36; Opp. II, ECF No. 73; Opp. III, ECF No. 103-26; Reply I, ECF No. 75; Reply II, ECF No. 120.  Having heard testimony at a two-day preliminary injunction hearing and considered the many affidavits and declarations filed by the parties, the Court GRANTS Plaintiffs' motion for a preliminary injunction.[2]

## BACKGROUND

I.    Factual Background[3]

A.  Hearings

The Court held a full-day hearing on this matter on November 13, 2025, and a half-day hearing on November 20, 2025.  Three Plaintiffs in this action testified: Jordan Brodsky, Cory Solomon, and Patrick Travers.  *See* 11/13 Hr'g Tr; 11/20 Hr'g Tr.  Defendants called: Andrew Volz, Chief Commercial Officer at Clear Street, 11/13 Hr'g Tr. at 257:3–6; Uriel Cohen, Executive Chairman, founder, and co-CEO of Clear Street, 11/20 Hr'g Tr. at 313:16–7; Curtis Allemang, a Clear Street employee, *id.* at 404:4–14; and Kenneth Sicklick, Clear Street's in-house counsel, *id.* at 424:6–8.  Cohen and Allemang testified via videoconference.  With respect to the facts

---

[2] The Court held a hearing on this matter on November 13 and November 20, 2025.  A temporary restraining order was entered on consent, enjoining Defendants from taking further adverse action against Plaintiffs but not ordering Defendants to take action with respect to amending the Form U-5s.  *See* 11/13 Hr'g Tr. at 308:9–19, ECF No. 93-6; 11/20 Hr'g Tr. at 491:5–7, ECF No. 93-7.  The parties then filed extensive post-hearing briefing.  *See, e.g.*, Mem. II; Opp. III; Reply II; *see also* Pl. Supp. Mem., ECF No. 127; Opp. Supp. Mem, ECF No. 139.

[3] The Court denies Plaintiffs' motion to strike the declarations of John DiBacco, James Ilardi, Scott Gutmanstein, and Tania Zivkovic.  *See* Pl. Ltr. Mot. to Strike, ECF No. 107; *see also* ECF Nos. 110–12 (parties' letters regarding motion to strike).  Plaintiffs are correct that the Court's order was entered in response to Defendants' concern that time constraints prevented them from calling their own identified witnesses.  *See* ECF No. 111.  But because the Court's December 10 order did not explicitly limit each party to submitting declarations of witnesses listed in the parties' respective witness lists, *see* ECF No. 102, the Court shall not strike the declarations.  In assessing the weight of the evidence, the Court considers that the witnesses who submitted declarations were not subject to cross-examination.

relevant to Defendants' filing of the Form U-5s and for the purpose of deciding this motion, the Court credits the testimony of each witness.[4]

B. Factual Findings

The Court makes only those factual findings necessary or helpful to resolve Plaintiffs' motion for a preliminary injunction. The parties devoted much of their hearing testimony and briefing to the issues of Plaintiffs' protected activities leading up to their resignation/termination and Defendants' subsequent decision to fire Plaintiffs. Because the Court finds that Plaintiffs are likely to succeed on the merits of their claim that Defendants filed Form U-5s with the Financial Industry Regulatory Authority ("FINRA") in retaliation for Plaintiffs' protected activity, the Court focuses on the events leading up to Defendants' filing of the U-5s on October 10, 2025.

In making its findings, the Court is mindful that the Federal Rules of Evidence "do not apply to a hearing on a motion for a preliminary injunction," although the Court may consider the admissibility of evidence under the Rules when assigning what weight to give the evidence. *Go New York Tours Inc. v. Aurora Tourism Servs. Inc.*, No. 22 Civ. 10633, 2023 WL 6162305, at *6 (S.D.N.Y. Sep. 21, 2023) (citation omitted). Specifically, "affidavits may be considered in connection with a motion for a preliminary injunction." *Id.* (citation omitted); *see also Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.").

Plaintiffs are four broker-dealers registered with FINRA who formerly worked for Clear Street's derivatives team. *See* Mem. I at 6; Batanjany Decl. II ¶ 21, ECF No. 93-5; 11/13 Hr'g Tr.

---

[4] The Court finds each Plaintiff's testimony credible as to their subjective belief that legal or regulatory violations occurred. The Court does not determine whether Clear Street did, or did not, commit certain violations as a matter of law.

at 59:24–60:3; Volz Decl. ¶¶ 12–18, ECF No. 37-1.  Plaintiffs became uncomfortable with certain business practices at Clear Street and eventually left the firm to work for another company, Hidden Road Partners ("Hidden Road").  *See generally* 11/13 Hr'g Tr; Batanjany Decl. II.  On September 15, 2025, Plaintiffs each notified Clear Street of their voluntary resignations.  *See, e.g.*, Brodsky Decl. ¶¶ 6, 16, ECF No. 7-2; Solomon Decl. ¶ 11, ECF No. 48; Travers Decl. ¶ 21, ECF No. 7-3; Batanjany Decl. II ¶ 29.  The next day, Defendants purported to fire Plaintiffs "for cause," claiming that Plaintiffs had breached the non-compete and non-solicitation clauses of their employment agreements.  *See* Brodsky Decl. ¶ 25; Solomon Decl. ¶¶ 14–19; Travers Decl. ¶ 24; Batanjany Decl. II ¶ 30.

Following their resignation/terminations, Defendants cancelled (and then reinstated, and then cancelled again) Plaintiffs' restricted stock units ("RSUs") and filed Form U-5s with FINRA stating that each Plaintiff was discharged for cause for breaching their restrictive covenants.  *See* Batanjany Decl. II ¶¶ 32–33; Gutmanstein Decl. II ¶¶ 61–62, ECF No. 103-21.

A. The Form U-5

Form U-5 is the "Uniform Termination Notice of Securities Industry Registration." *Loew v. Kolb*, No. 03 Civ. 5064, 2003 WL 22077454, at \*1 n.1 (S.D.N.Y. Sep. 8, 2003).  FINRA regulations "require that any time a [certain] licensed individual is terminated, a Form U-5 be completed outlining the reasons for termination."  *Id.*  Because Plaintiffs are registered broker-dealers, Clear Street was required to file U-5s with FINRA within 30 days of firing Plaintiffs, or by October 15, 2025.  *See* ECF No. 85 (citing FINRA Regulatory Notice 10-39 (Sep. 8, 2010)).  Form U-5s become a part of a broker-dealer's permanent professional record.  *See* 11/13 Hr'g Tr. at 208:25–209:18; *id.* at 34:15–35:24 (Brodsky's testimony that a U-5 "drives your

4

reputation"); Compl. ¶ 7; *see also* FINRA Regulatory Notice 10-39 (describing varying uses of U-5s by regulatory agencies, firms, and investors).

Section 3 of Form U-5 indicates whether the employee was terminated from employment and, if applicable, the reason for termination.  Although the reason for termination is not available to the broader public, *see* Opp. III at 11; Gutmanstein Decl. ¶¶ 2–3, "Section 3 termination narratives are accessible by the SEC, FINRA, and any FINRA member, including future employers, clients, investors, and banks."  Reply II at 3 & n.6 (citing FINRA's "Classic CRD" feature allowing all FINRA members to review full Form U-5s).[5]

B.  Events Leading to September 16, 2025

1.  Jordan Brodsky

Jordan Brodsky is an operations professional who worked for Clear Street Management and Clear Street Derivatives.  *See* 11/13 Hr'g Tr. at 13:1–14; Volz Decl. ¶ 17.  At the hearing, she testified that she was "unhappy" at the firm, in large part because she "noticed that Clear Street was . . . asking colleagues to perform activities that [she] believed violated client privacy laws."  11/13 Hr'g Tr. at 15:5–8.  For example, in April or May 2025, Andrew ("Andy") Volz, Clear Street's Chief Commercial Officer, asked her to send client data to White Bay, the family business of Uriel Cohen, who is Clear Street's co-CEO and the Chairman of its Board of Directors.  *See id.* at 15:21–16:5, 181:16–18.  Brodsky expressed her discomfort with this request to her supervisors, *id.* at 16:17–22, 17:15–23, and worried that she would be asked to do this again, *id.* at 18:15–21.

---

[5] Defendants describe the limited public nature of Section 3 of the Form U-5 for the first time in their post-hearing opposition brief.  *See* Reply II at 2–3.

Although her supervisors did not ultimately require her to share the data, *see id.* at 41:20–25, after this incident, she started seeking new employment, *id.* at 18:22–19:1.

In early July 2025, Noel Kimmel, the President of Hidden Road, reached out to Brodsky, and in mid-August, Hidden Road offered her a job. *Id.* at 19:3–14; 46:23–47:16. On September 15, during her weekly one-on-one with her manager, Brodsky announced her resignation from Clear Street, and then notified Clear Street's Chief People Officer, Tania Zivkovic, and others. *Id.* at 19:20–20:25.

The next day, Brodsky met with Andy Volz. *Id.* at 21:4–5. Volz presented her with a counteroffer and stated, "if you leave this room without signing the offer, you will be terminated for cause, [and] we are going to pursue legal action against Pat Travers and anyone who doesn't sign." *Id.* at 24:22–25:3. Brodsky told Volz that her departure had, at least in part, "to do with the incident where he asked [her] to send client information to White Bay." *Id.* at 25:21–25. Volz offered to send an email saying that he instructed Brodsky to send the data and that the "issue would go away." *Id.* at 26:1–9. After Brodsky refused Clear Street's counteroffer, she was told to leave, and later that day, Zivkovic sent Brodsky an email stating she had been terminated for cause. *Id.* at 26:14–16; 27:1–28:3. Brodsky testified that she did not "coordinate" with Patrick Travers or any of the other Plaintiffs who were leaving to Hidden Road. *Id.* at 48:7–16.

### 2. Michael Batanjany

Michael Batanjany served as the "Head of Securities Lending Demand" and helped execute transactions for Clear Street Derivatives. *See* Volz Decl. ¶ 18. Batanjany avers that he witnessed violations of "Regulation SHO at the securities lending desk," *see* Batanjany Decl. II ¶¶ 7–13, and that Clear Street personnel made misleading statements about the number of securities available for short-selling, *id.* ¶ 16. He states that he spoke about these concerns with people such as Cory

Solomon, *id.* ¶ 14, but in general, Batanjany "tried to keep [his] head down and only discuss misconduct [he] witnessed with people [he] trusted not to retaliate," *id.* ¶ 17. In late July 2025, a representative of Hidden Road contacted him on LinkedIn, and on September 9, he accepted a job offer with the company. *Id.* ¶¶ 23–24. On September 15, Batanjany notified Zivkovic of his resignation by email, and the next day, Zivkovic told him he was fired for cause. *Id.* ¶¶ 29–30.

### 3. Cory Solomon

Cory Solomon worked as the "Managing Director of Derivatives" for Clear Street Management, Clear Street Derivatives, and Clear Street LLC. *See* 11/13 Hr'g Tr. at 62:16–63:23. He was "instrumental in developing and executing Clear Street's derivatives strategies." Volz Decl. ¶ 16.

Solomon testified that the "culture" at Clear Street "wasn't a good fit for [him]." 11/13 Hr'g Tr. at 67:8–16. He described various incidents that made him uncomfortable. First, there were "numerous instances" when he was asked to share client data with third parties. *Id.* at 67:23–68:11. Second, on one occasion, another employee raised concerns about whether "Clear Street was an approved custodian for [1940] Act Funds," and "[w]ithin a week," that employee was no longer at the firm. *Id.* at 71:3–9. Solomon learned from Tom Klein, Clear Street's Treasurer, that the individual was fired, which made Solomon feel uneasy. *Id.* at 72:13–18. Third, in late 2024, Solomon expressed concerns to his superiors, including Klein and John DiBacco, about Clear Street's failure to meet certain regulatory requirements with respect to margins and a novation. *Id.* at 73:13–76:25; 130:11–131:13. Fourth, in early 2025, Solomon discussed with his superiors Clear Street's failure to make certain disclosures to a ratings agency. *Id.* at 77:3–80:15. In the summer

of 2025, after he had voiced these concerns, Solomon was "made aware" that another employee would be taking over Solomon's highest-rated return portfolio. *Id.* at 80:16–81:8.

Like Brodsky and Batanjany, Solomon notified Clear Street of his resignation on September 15, 2025. *See id.* at 84:9–20. On September 16, he spoke to DiBacco, his supervisor. *Id.* at 87:11–23. DiBacco presented Solomon with a counteroffer and gave him five minutes to sign it, stating that if he did not, he would be terminated for cause and sued; Solomon was not permitted to have legal counsel review the document. *See id.* at 88:7–19. During this conversation, Solomon asked DiBacco whether Clear Street would address his concerns about their day-to-day operations. DiBacco told him that it would not because the purpose of the counteroffer was for Clear Street to "isolate [Patrick] Travers to be on his own [at Hidden Road]." *Id.* at 88:20–89:8. After Solomon declined to sign the counteroffer, he was sent home, and he later received a letter from Zivkovic stating he was terminated for cause. *See id.* at 94:5–17.

### 4.  Patrick Travers

Patrick Travers served as the CEO of Clear Street Derivatives. *See* 11/13 Hr'g Tr. at 178:4–179:6. While there, Travers witnessed "issues" that he "didn't agree with," *id.* at 183:2–13, including the incident Solomon described where an employee who raised alarm about 1940 Act violations was fired, *see id.* at 185:2–187:6. Travers further states that after he expressed concerns about this matter and the issue regarding the novation of securities, he was "relieved of [his] responsibilities of being the principal to Clear Street LLC." *Id.* at 187:24–188:7. Travers was also asked on multiple occasions to provide client information to individuals at White Bay, and he made his discomfort with this request known to Cohen. *Id.* at 190:12–191:2. Later, in about February or March of 2025, Cohen spoke to Travers, leaving Travers with the understanding that Travers

was viewed as a "disrupter" because of his "pushing back and not . . . rolling over." *Id.* at 192:19–193:14.

Soon thereafter, Travers connected with Noel Kimmel, the president of Hidden Road, *id.* at 195:11–21, and eventually, in about September 2025, Hidden Road offered Travers a job, which he accepted, *id.* at 198:4–11. His colleagues, including DiBacco, Andrew Weg, and Adam Glazer (who was also set to depart Clear Street for Hidden Road but reneged, accepting Clear Street's counteroffer), aver that Travers' dissatisfaction with Clear Street stemmed from compensation grievances and the feeling that "senior management didn't value him properly," rather than from his concerns about regulatory matters. *See* Weg Decl. ¶ 5, ECF No. 103-23; Glazer Decl. ¶¶ 17–20, ECF No. 103-20; DiBacco Decl. ¶¶ 6–7, 15–21, 28, ECF No. 103-25.

On September 15, Travers informed Clear Street that he was resigning. 11/13 Hr'g Tr. at 198:14–200:9. He spoke about his decision to leave with Edward ("Ed") Tilly, Zivkovic, Volz, Cohen, and DiBacco. *See id.* Travers and Cohen discussed "financials," then agreed to a meeting a week later to discuss a "possible solution." *Id.* at 201:8–202:2. The next day, in an afternoon call with Cohen, Travers offered to continue to work at Clear Street beyond the duration of his non-compete agreement to minimize any harm to the company, and Cohen reaffirmed their plan for a meeting. *Id.* at 202:6–22. Three hours later, Sicklick, Clear Street's in-house counsel, called Travers and fired him. *Id.* at 206:19–22.

### 5. Other Employees

In all, on September 15, seven employees, including all four Plaintiffs, gave notice of their intent to leave Clear Street for the same firm, Hidden Road. Volz Decl. ¶ 6. Six (all except Batanjany) were members of the derivatives team. *Id.* ¶¶ 14–19. Two employees, Adam Glazer and Curtis Allemang, also submitted resignation notices on September 15, 2025, but ultimately

9

accepted Clear Street's counteroffers after being told that they would be fired for cause and sued. *See* 11/13 Hr'g Tr. at 204:12–18; Glazer Decl. ¶¶ 48–49.  During Allemang's conversation with Volz, Volz "threatened to bleed [him] and [his] family dry in litigation if [he] didn't sign the amended employment agreement." 11/13 Hr'g Tr. at 408:6–10.  Allemang signed the counteroffer, which he states "felt" like "blood money." *Id.* at 401:19–23.

There is evidence that during their tenure at Clear Street, and while being recruited by Hidden Road, Travers, Allemang, and Glazer participated in a Zoom call with Hidden Road to discuss the firm's capabilities and whether working at Hidden Road would be a good opportunity for them. *See* 11/13 Hr'g Tr. at 396:24–398:3; Glazer Decl. ¶¶ 24–27.  Hidden Road was seeking to build a swaps-based derivatives business. *See* 11/13 Hr'g Tr. at 222:4–9; 269:11–12, 276:1–16, 282:21–283:19.  After the meeting, Allemang emailed Hidden Road his financial assessment of the revenue the company could generate if it launched a swaps-based derivatives business. *See* Glazer Decl. ¶ 30.  The parties disagree about what information was provided to Hidden Road and whether the information was confidential.  Clear Street, however, only obtained evidence of this meeting after October 10, the date it filed the Form U-5s claiming that Plaintiffs were discharged for cause. *See* 11/20 Hr'g Tr. at 411:18–413:19.

### C.  Events After September 16, 2025

Plaintiffs allege that following their resignations/terminations and the filing of this lawsuit, Defendants took or attempted to take several retaliatory actions.

#### 1.  COBRA Coverage

On September 18, 2025, when Batanjany first received his Continuation of Health Coverage ("COBRA") election notice from Clear Street, the qualifying event was listed as "End of employment (Voluntary)." Batanjany Decl. II ¶ 39.  However, in October 2025, Batanjany saw

10

that the qualifying event had been changed to "End of employment (Involuntary)."  *Id.* ¶ 40.

Defendants claim that this change occurred on September 23, 2025, before the lawsuit was filed.

*See* Zivkovic Decl. ¶ 13, ECF No. 103-24.  Regardless, there is no evidence that any Plaintiff has

been unable to access COBRA coverage.  *See id.* ¶¶ 19–20.

> 2.  RSUs

Plaintiffs' September 16 termination notice informed them that their RSUs would be

forfeited.  *See, e.g.*, Batanjany Decl. II ¶ 32.  On about September 17, the RSUs were marked in

Clear Street's internal systems as forfeited/canceled for "misconduct."  *See e.g.*, *id.* ¶ 33.  On

September 22, the RSUs appeared reinstated.  *Id.* ¶ 33.

By letter dated October 3, Plaintiffs' counsel accused Defendants[6] of taking unlawful

actions against Plaintiffs in response to their resignation/termination and demanded that Clear

Street cease taking adverse action.  *See generally* Oct. 3 Ltr., ECF No. 103-1.  The next day, on

October 4, Clear Street's internal systems reflected that Plaintiffs' interests in RSUs had again

been "deleted."  *See* Oct 4 Ltr. at 1, ECF No. 103-2.

In response, by letter dated October 4, Plaintiffs' counsel told Defendants that it was

"difficult to imagine that a company mere days away from filing an S-1 . . . would knowingly and

intentionally take retaliatory action against employees who reported or threatened to report actual

---

[6] It is not clear exactly to whom the October 3 and 4 letters were transmitted.  *See, e.g.*, Compl. ¶ 136 (stating that the letter was sent to "Clear Street").  The letters are addressed to various executives at Clear Street, including Cohen, Sicklick, and Gutmanstein.  *See* Oct 3 Ltr; Oct. 4 Ltr.

or suspected wrongdoing by Clear Street." *Id.* at 2. The letter stated that if Plaintiffs' RSUs were not restored, Plaintiffs would seek emergency judicial and regulatory relief. *Id.* at 3.

### 3. Form U-5s

On October 9, the parties' attorneys spoke by phone. *See* Oct. 9 Call Notes, ECF No. 103-19; *see also* ECF No. 103-12 (emails between counsel); 11/13 Hr'g Tr. at 267:8–17 (discussing the notes). Contemporaneous notes from that call reflect that one of Plaintiffs' lawyers stated that Plaintiffs would be bringing an "ERISA [(Employee Retirement Income Security Act)]" and "[w]histleblower retaliation action" and that Defendants' counsel should "[t]alk to [his clients] about all of their illegal behavior that the plaintiffs raised concerns about [and] reported internally." Oct. 9 Call Notes. According to the notes, Plaintiffs' attorney informed defense counsel that the complaint would "outline[] an extensive history of mostly sec[urities violations] but also additional laws, rules[, and] regulations that have been ongoing at the company that [Plaintiffs] have complained about . . . and THAT is why they left the company." *Id.* at 2; *see also id.* ("NOT an employer dispute, it was retaliatory – and your clients know it – hopefully they will [tell] you, they know very well what the issues are and what laws they've been breaking.").

The next morning, on October 10, and before Plaintiffs filed their complaint, Defendants filed Form U-5s with FINRA stating that Plaintiffs were discharged for "Breach of Contract – Restrictive Covenants." *See, e.g.*, Form U-5s, ECF Nos. 103-3 (Batanjany), 103-4 (Solomon), 103-5 (Brodsky), 103-6 (Travers); *see also, e.g.*, 11/13 Hr'g Tr. at 35:15–17.

## ANALYSIS

### I.    Legal Standard

The parties agree that the merits of their claims, and potential counterclaims, are subject to arbitration. *See* ECF No. 126. The Court nonetheless "has jurisdiction to issue a preliminary

injunction to preserve the status quo pending arbitration." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 894–95 (2d Cir. 2015). "The standard for such an injunction is the same as for preliminary injunctions generally." *Id.* at 895.

> To obtain a preliminary injunction, a party must ordinarily establish:

> (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest.

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks and citation omitted).

Defendants argue that a heightened standard applies because "Plaintiffs seek to change the status quo" by altering the Form U-5s. Opp. I at 8. The heightened standard requires that Plaintiffs: "(1) make a 'strong showing' of irreparable harm, and (2) demonstrate a 'clear or substantial likelihood of success on the merits.'" *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020). Plaintiffs insist, however, that their motion seeks to restore the parties' positions to the "status quo ante," that is, the last uncontested status between the parties, and should therefore be evaluated under the ordinary standard. *See* Mem. II at 5–6; *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). The Court need not resolve whether the ordinary or heightened standard applies to Plaintiffs' claims because Plaintiffs would be entitled to relief even under the heightened standard.

II.    Analysis

A. Irreparable Harm

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). "Essential to

a showing of irreparable harm is the unavailability or at least inadequacy of a money damages award." *Shady v. Tyson*, 5 F. Supp. 2d 102, 106 (E.D.N.Y. 1998). "[A]bsent 'extraordinary circumstances,' irreparable harm is not established by loss of income or position, or the inability to find other employment." *Id.* at 109 (citation omitted); *see also Sampson v. Murray*, 415 U.S. 61, 91–92 & n.68 (1974).

Plaintiffs have made a sufficient showing that, notwithstanding their recent employment at Hidden Road, the Form U-5s, if not amended, would cause harm during the pendency of arbitration proceedings. A "derogatory or false Form U-5 statement[] can effectively 'blackball' a broker from the industry." *Acciardo v. Millennium Sec. Corp.*, 83 F. Supp. 2d 413, 419 (S.D.N.Y. 2000); *see also Jordan v. Metro. Life Ins. Co.*, 280 F. Supp. 2d 104, 108–09 & n.6 (S.D.N.Y. 2003). Even if Plaintiffs are presently employed, the false U-5s are likely to result in reputational and economic harm, as all FINRA members, including investors, potential clients, and future prospective employers, can view the forms. Notably, the core work of some of the Plaintiffs, such as Solomon and Travers, is client-facing. *See, e.g.*, Weg Decl. ¶¶ 13–14. In addition, recruiters at prospective employers can view the Form U-5s, which would impede Plaintiffs' ability to learn about future opportunities. Moreover, at least some Plaintiffs may wish to seek employment at places other than Hidden Road during the pendency of arbitration proceedings because Defendants have initiated litigation seeking to prohibit Plaintiffs' work at Hidden Road. *See* ECF No. 105. Taken together, Plaintiffs have made a sufficient showing of the likelihood of harm pending arbitration.

These harms are irreparable. First, to the extent certain Plaintiffs have shown a risk of harm to their client base, this harm is irreparable, as "there is no adequate remedy at law for loss of a client base, a loss which cannot be remedied by money damages." *Jordan*, 280 F. Supp. 2d at 109 n.11; *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999). Second, under New

York state law, employers enjoy absolute immunity from defamation lawsuits for statements made on a Form U-5. *See Rosenberg v. MetLife, Inc.*, 8 N.Y.3d 359, 368 (2007). Plaintiffs, therefore, would be barred from recovering monetary damages arising from Defendants' statements on the U-5s. *See id.*; *Stega v. New York Downtown Hosp.*, 31 N.Y.3d 661, 671–72 (2018) (noting that an "absolute privilege applies to statements made by an employer about a terminated employee on a U-5 Form"); *Barclays Cap. Inc. v. Shen*, 20 Misc. 3d 319, 326 (N.Y. Sup. Ct. 2008) (explaining that *Rosenberg* "unequivocally rules out monetary damages, of any kind, for a claimed defamation in a required U-5 filing"); *see also Krolick v. Natixis Sec. N. Am. Inc.*, No. 109979/2012, 2011 WL 8619153, at *3 (N.Y. Sup. Ct. Nov. 23, 2011) (suggesting that the *Rosenberg* privilege applies to retaliation claims); *Loughlin v. Goord*, 558 F. Supp. 3d 126, 150–51 (S.D.N.Y. 2021) (same). Therefore, any harm stemming from the Form U-5s cannot be compensated by damages and is irreparable. Plaintiffs have, therefore, made a strong showing of irreparable harm during the pendency of arbitration proceedings.

### B. Clear or Substantial Likelihood of Success

Although Plaintiffs make several claims in their complaint, in their motion for injunctive relief, they focus on their cause of action for retaliation under New York Labor Law §§ 740(2) and (8). *See generally* Mot., ECF No. 7; Mem. II. Accordingly, the Court also concentrates on the whistleblower retaliation claim. *See Exec. Trim Constr., Inc. v. Richardson*, No. 25 Civ. 369, 2025 WL 1448350, at *5 n.6 (N.D.N.Y. May 20, 2025) (declining to address a claim where "Plaintiff's moving papers do not address the likelihood of success on the merits of [that] claim").

Labor Law § 740 prohibits an employer from "tak[ing] any retaliatory action against an employee . . . because such employee . . . discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes

is in violation of law, rule or regulation." N.Y. Lab. Law § 740(2)(A). The statute defines "retaliatory action" as "an adverse action taken by an employer or his or her agent to discharge, threaten, penalize, or in any other manner discriminate against any employee or former employee exercising his or her rights under this section, including . . . actions or threats to take such actions that would adversely impact a former employee's current or future employment." *Id.* § 740(1)(e). Therefore, to state a claim under § 740, a plaintiff must plead: "(1) activity protected by the statute; (2) retaliatory action; and (3) 'some causal connection' between the protected activity and the adverse action." *Callahan v. HSBC Sec. (USA) Inc.*, 723 F. Supp. 3d 315, 326 (S.D.N.Y. 2024) (citation omitted).

For the purposes of Plaintiffs' motion, Defendants do not dispute that Plaintiffs are former employees covered by § 740, that filing a false Form U-5 constitutes adverse action, and that Plaintiffs engaged in at least some protected activity—namely, the reporting of suspected regulatory violations to their supervisors or other Clear Street executives—leading up to their resignation/termination from Clear Street. *See generally* Def. Ltr. at 2, ECF No. 46; Opp. III. Defendants argue, however, that Plaintiffs' October 3 and 4 letters and the October 9 call do not constitute protected activity, and that, therefore, actions taken in response to that activity, such as filing a Form U-5, do not violate § 740. Def. Ltr. at 2; Opp. III at 12.

Specifically, Defendants contend that the letters and call are not protected activity because they do not "identify the particular activities, policies or practices in which the employer allegedly engaged." Opp. III at 12–13 (quoting *Delaney v. HC2, Inc.*, 761 F. Supp. 3d 641, 676 (S.D.N.Y. 2025)). This argument fails. Defendants are correct that the October 4 letter refers to "actual or suspected wrongdoing," without specifying the wrongdoing. Opp. III at 15–16; *see* Oct. 4 Ltr. Likewise, with respect to the October 9 call, Defendants may be right that Plaintiffs' counsel did

16

not "identify the particular activities, policies or practices in which the employer allegedly engaged." Opp. III at 17 (quoting *Delaney*, 761 F. Supp. 3d at 676). But the cases Defendants cite that require particularity pertain to pleading standards in a civil complaint, not the legal definition of protected activity. *See Webb-Weber v. Cmty. Action for Human Servs., Inc.*, 23 N.Y.3d 448, 453 (2014); *Delaney*, 761 F. Supp. 3d at 676; *Rimini v. J.P. Morgan Chase & Co.*, No. 22 Civ. 7768, 2024 WL 4354875, at *7 (S.D.N.Y. Sep. 30, 2024).

The October 4 letter and October 9 call "threaten[ed] to disclose . . . to a public body an activity, policy or practice of the employer that [Plaintiffs] reasonably believe[d was] in violation of law, rule or regulation." N.Y. Lab. Law § 740(2)(a). For example, the October 4 letter states that it is "difficult to imagine that a company mere days away from filing an S-1. . . would knowingly and intentionally take retaliatory action against employees who reported or threatened to report suspected wrongdoing by Clear Street." *Id.* at 2. It then states that if Plaintiffs' RSUs are not restored, Plaintiffs will "have no choice" but to seek judicial relief. *Id.* at 2. On the October 9 call, Plaintiffs' counsel explicitly informed Defendants' attorney that Plaintiffs would be filing an "ERISA and whistleblower retaliation action," that the complaint would "outline an extensive history of mostly [Securities and Exchange Act], but also additional laws, rules, and regulations that have been violated," and that Plaintiffs had complained to Defendants internally. *See* Oct. 9 Call Notes; Opp. III at 17. Even though the October 4 letter and the October 9 call do not spell out Clear Street's allegedly unlawful policies or practices, they nonetheless informed Defendants that Plaintiffs sought to file a lawsuit alleging whistleblower retaliation with respect to purported securities law and regulatory violations about which Plaintiffs had previously complained and which were known to Defendants. *See* Reply II at 4–5. The Court concludes, therefore, that at least the October 4 letter and the October 9 call—in which Plaintiffs threatened to file a public

lawsuit disclosing policies and practices they reasonably believed were in violation of the law and about which they previously complained—constitute protected activity.

Next, Plaintiffs have made a strong showing that Defendants filed the Form U-5s because of this protected activity. There is close temporal proximity—less than 24 hours—between the October 9 call and the October 10 filing of the U-5s. *See Delaney*, 761 F. Supp. 3d at 676 n.26 (explaining that causation may be inferred by temporal proximity under New York's whistleblower statute). James Ilardi, a compliance officer at Clear Street, states that after September 16, he "repeatedly reminded" Gutmanstein about the deadline to file the Form U-5s, but Gutmanstein did not instruct him to file the U-5s until October 10—right after the October 9 call and five days before the deadline to file the forms with FINRA. *See* Ilardi Decl. ¶¶ 7–8, ECF No. 104-22. Indeed, Sicklick, Clear Street's in-house counsel, acknowledged that the U-5s were filed in response to the October 9 call. *See* 11/20 Hr'g Tr. at 442:8–443:25, 444:15–21.

Gutmanstein's declaration supports a finding that Clear Street was concerned with Plaintiffs' publication of their allegations, rather than the fact that negotiations had been unsuccessful. *See, e.g.*, Gutmanstein Decl. ¶ 132 (stating that "Plaintiffs' allegations have already been the subject of media attention due to the Plaintiffs' strategic decision to file this complaint publicly in court instead of confidentially in arbitration," and that an "order directing further amendments [to the U-5s] . . . could generate additional coverage and create confusion in the market."); Opp. I at 6 (complaining of Plaintiffs' decision to "publiciz[e] sensational allegations that belong in confidential arbitration"); *see also* Volz Decl. ¶ 77 (characterizing settlement negotiations as "ongoing" on October 10). This finding is further supported by the timing of the Form U-5 submissions—in the morning, before the lawsuit was initiated. *See* Compl. ¶ 8.

Plaintiffs, therefore, have demonstrated a "clear or substantial likelihood of success," *Yang*, 960 F.3d at 128 (citation omitted), on their claim that the Form U-5s were filed in retaliation for Plaintiffs' threatened whistleblower lawsuit.

### C. Public Interest

Because the parties' arguments regarding the public interest involve only the Form U-5s, the Court focuses on the U-5s.

Plaintiffs argue that the equities and public interest factors weigh in their favor. They contend that Defendants, instead of using the Form U-5 as a tool to ensure the "fairness, reliability, and integrity of the regulatory and judicial systems," used the forms as an "opportunity to inflict harm" in response to Plaintiffs' intent to seek an injunction. Mem. II at 28. Plaintiffs maintain that allowing such tactics—namely, "weaponizing regulatory filings"—"discourages future whistleblowers from coming forward and giving notice [of their claims]" and "erode[s] public trust in employment protections and regulatory oversights." *Id.* Defendants argue that the public interest is harmed by ordering them to amend otherwise accurate U-5s. *See* Opp. III. at 11 ("[F]orcing [Clear Street] to substitute language it believes is inaccurate would distort the regulatory record and mislead regulators and those who rely on U[-]5 disclosures.").

The Court is persuaded by Plaintiffs' arguments. Defendants are correct in their assertion that "[a]ccurate and forthright responses on the Form U-5 are critical" to carrying out the purpose of FINRA. *Rosenberg*, 8 N.Y.3d at 368. However, the Court finds that Defendants' actions were contrary to the public interest for that precise reason: regardless of whether the U-5s were ultimately accurate—an issue not before the Court—Defendants have not shown they were motivated by accuracy, and the equities, therefore, do not weigh in their favor.

19

Plaintiffs were at-will employees whose employment agreements included (1) a non-compete provision stating they "shall not, directly or indirectly, participate in, engage in or prepare to engage in any [c]ompetitive [b]usiness [a]ctivity" during a specified period (three months for Travers and Brodsky and nine months for Batanjany and Solomon); and (2) a non-solicitation provision stating they shall not "employ, solicit, induce, hire, offer to hire, or otherwise interfere with the employment . . . of any current or former . . . employee of [Clear Street]" while employed at the firm and for 24 months thereafter.  Volz Decl. ¶¶ 23, 28, 30; *see also* Batanjany Decl. II at 14–18 (Ex. A, employment agreement).

Defendants' claims in the U-5s that each Plaintiff breached his or her restrictive covenants were not based on a reasoned, good-faith belief.  When Defendants filed the forms, they did not have evidence of any particular conversations between Plaintiffs and Hidden Road,[7] had not investigated whether each Plaintiff individually engaged in conduct constituting a breach,[8] and had not researched whether the restrictive covenants were enforceable as applied to each Plaintiff.[9] Rather, as the Court already determined, Defendants rushed to file the Form U-5s in response to Plaintiffs' threat to initiate a whistleblower action.

Moreover, it is unreasonable to conclude, as Clear Street did, that Plaintiffs breached their non-compete and non-solicitation covenants merely because they coordinated their departure to

---

[7] Defendants did not have evidence of the phone calls or meetings Plaintiffs had with Hidden Road at the time Defendants filed the Form U-5s, nor did they know what information was shared with Hidden Road or by whom. *See, e.g.*, 11/20 Hr'g Tr. at 362:23–363:10; *id.* at 411:18–413:19.

[8] Even if Defendants reasonably believed at least one person was involved in solicitation in light of the coordinated departure, there is no reasonable basis to believe that *all* Plaintiffs were involved.  *See, e.g.*, 11/13 Hr'g Tr. at 267:24 (Volz: "Yes. I believed it was orchestrated by Pat.").

[9] For example, Clear Street's in-house counsel stated that he does not know the case law on whether language prohibiting an employee from preparing to compete is enforceable against individuals interviewing with other firms. *See* 11/20 Hr'g Tr. at 434:14–21.  He also admitted to not researching whether noncompete provisions in Clear Street's counteroffer were enforceable before including them in the amended employment agreement.  *See id.* at 456:10–457:1 ("[T]here are things in here that I thought may be enforceable, may not be enforceable, but I was willing to live with that. . . . If somebody signed it and wanted to challenge enforceab[ility] later, I understood that that was a risk.").

20

the same firm. *See, e.g.*, Gutmanstein Decl. ¶ 11 (stating that he believed Plaintiffs breached their agreement because there was a "coordinated" departure to the same firm); Volz Decl. ¶ 5 ("They breached all these agreements as evidenced by the circumstances surrounding their coordinated resignations."); 11/20 Hr'g Tr. 323:1–6 (Cohen's testimony that it was "clear to him the second he heard multiple people leaving" from Travers' division that "they violated multiple areas of the agreements"); Opp. I at 1 (claiming that Clear Street's actions were justified because "Plaintiffs had engaged in coordinated disloyalty that materially harmed Clear Street's business").[10]

Under New York law, enforcement of restrictive covenants is "strict" and may only be justified by the following employer interests:  "(1) protection of trade secrets, (2) protection of confidential customer information, (3) protection of an employer's client base, and (4) protection against irreparable harm where an employee's services are unique or extraordinary." *Permanens Capital L.P v. Bruce*, No. 21 Civ. 10525, 2022 WL 3442270, at *5 (S.D.N.Y. July 22, 2022) (citations omitted), *report and recommendation adopted*, 2022 WL 4298731 (S.D.N.Y. Sep. 19, 2022); *see BDO Seidman v. Hirschberg*, 93 N.Y.2d 382, 388–89 (1999).

There is no evidence that Clear Street knew, at least before October 10, that any Plaintiff, let alone all of them, engaged in conduct that impaired these interests.[11]  Without more, it would be unreasonable to enforce the restrictive covenants against Plaintiffs.  Indeed, "harm to a company's operations arising [even] from the coordinated en masse resignation of several employees . . . . is not a legally cognizable interest for the purposes of a restrictive covenant." *In re Document Techs. Litig.*, 275 F. Supp. 3d 454, 466 (S.D.N.Y. 2017) (cleaned up).  And with

---

[10] The Court expresses no opinion as to whether each Plaintiff did or did not breach their employment agreement because that issue is not before the Court.  The Court only determines whether, based on what Clear Street knew when it filed the Form U-5s, its conclusion that Plaintiffs breached their contracts was reasonable.

[11] Even now, there is no evidence that Batanjany or Brodsky encouraged anyone to leave Clear Street or performed any work for Hidden Road.  *See, e.g.*, 11/20 Hr'g Tr. at 396:12–23 (Allemang's testimony describing having conversations with Solomon and Travers about the Hidden Road opportunity but not with Batanjany or Brodsky).

respect to non-solicitation agreements in particular, courts have held that such a covenant is "unenforceable insofar as it purports to prohibit at-will employees, who have yet to accept an offer of new employment, from 'inducing' or even 'encouraging' their coworkers to leave their present employer." *Id.* "The legitimate interest of the employer must [be to] protect against *unfair* competition, not simply to avoid competition in the general sense." *Kelly v. Evolution Mkts., Inc.*, 626 F. Supp. 2d 364, 374 n.9 (S.D.N.Y. 2009) (emphasis in original); *see also* Sealing Order at 12–13, ECF No. 165 ("Providing high-level conceptual information and hypothetical scenarios to an entity that does not already have that information or capability will of course provide an advantage to that entity. But there is nothing unfair about it."). Therefore, to the extent Defendants believed (and thus stated on Plaintiffs' Form U-5s) that each Plaintiff breached their covenants merely because of their coordinated departure and future employment at a potential competitor, this belief was unreasonable.

Notably, the fact that Defendants admit that they would not have filed the same Form U-5s had they settled their dispute with Travers pre-litigation, *see* Opp. III at 4, suggests that "Defendants do not actually believe the contents of Plaintiffs' U[-]5s is dictated by FINRA rules" or accuracy. Reply II at 11; *see* 11/20 Hr'g Tr. at 459:16–25 (Sicklick: "When the plaintiffs made the decision to move to litigation, in my mind, they were telling us to file the U[-]5s.").

In sum, because the Court finds that Defendants were not motivated by the accuracy of the Form U-5, Defendants' conduct in filing the forms was not in the public interest, and the final two factors weigh in Plaintiffs' favor.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction pending arbitration is GRANTED. Defendants are ORDERED to amend the Form U-5s filed with FINRA to reflect that Plaintiffs

voluntarily resigned from their positions.  Defendants are also ordered not to take further adverse

action against Plaintiffs, including the interference with COBRA benefits, during the pendency of

arbitration.  As a condition of this Order, Plaintiffs shall post a bond, pursuant to Fed. R. Civ. P.

65(c), in the amount of $5,000.00, no later than June 12, 2026.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 7.

SO ORDERED.

Dated: June 5, 2026
      New York, New York

ANALISA TORRES
United States District Judge